BLANK ROME LLP
Attorneys for Plaintiff
MANSEL OIL LIMITED
LeRoy Lambert (LL 3519)
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-0208
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MANSEL OIL LIMITED,

                Plaintiff,

    -against-

SWIFT AVIATION GROUP, INC.,

                Defendant.

08 Civ. 1086 (GBD)

## MEMORANDUM OF LAW IN REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT AND FOR MARITIME ATTACHMENT AND IN OPPOSITION TO MOTION TO STAY THE ACTION PENDING LONDON ARBITRATION

Of Counsel:

    LeRoy Lambert (LL-3519)

BLANK ROME LLP
ATTORNEYS FOR PLAINTIFF MANSEL OIL LIMITED
THE CHRYSLER BUILDING
405 LEXINGTON AVENUE
NEW YORK, NEW YORK 10174-0208
(212) 885-5000

129053.00601/6634311v.1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION AND SUMMARY OF MANSEL'S POSITION............................................1

FACTS ................................................................................................................4

LEGAL ARGUMENT ..........................................................................................13

POINT I ............................................................................................................13

STAYING THE ACTION DOES NOT "STAY" THE  ATTACHMENT ORDER
UNDER THE ORIGINAL  COMPLAINT AND STAYING THE ACTION UNDER
THE AMENDED COMPLAINT WOULD NOT "STAY" THE  PROPOSED
AMENDED ATTACHMENT ORDER ...........................................................13

POINT II ...........................................................................................................19

GRANTING LEAVE TO FILE THE AMENDED COMPLAINT WOULD NOT BE
"FUTILE".............................................................................................19

POINT III...........................................................................................................19

RESPONDING TO THE "RELATION-BACK" ISSUE ................................................19

Page

## TABLE OF AUTHORITIES

### FEDERAL CASES

*American Protein Corp. v. AB Volvo*, 844 F.2d 56 (2d Cir.), *cert. denied*, 488
U.S. 852 (1988)..................................................................................................24

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006).2, 17, 28

*Dolco Investments, Ltd. v. Moonriver Development, Ltd.*, 486 F. Supp. 2d 261
(S.D.N.Y. 2007).............................................................................................21, 22

*FESCO Ocean Management Ltd. v. High Seas Shipping Ltd.*, 2007 U.S. Dist.
LEXIS 19970 (S.D.N.Y. 2007)..........................................................................24

*First American Bulk Carrier Corp. v. Van Ommeren Shipping (USA) LLC*, 2008
U.S. Dist. LEXIS 21816 (S.D.N.Y. March 19, 2008) ....................................16

*HBC Hamburg Bulk Carriers GmbH & Co. KG v. Proteinas y Oleicos S.A. de
C.V.*, 2005 U.S. Dist. LEXIS 8009 (S.D.N.Y. May 4, 2005) ........................14

*Hawknet Ltd v. Overseas Shipping Agencies*, 2008 U.S. Dist. LEXIS 35542
(S.D.N.Y. April 29, 2008)..............................................................................6, 25

*Health-Chemical Corp. v. Baker*, 915 F.2d 805 (2d Cir. 1990) .........................19

*Hidrocarburos y Derivados, C.A. v. Lemos*, 453 F. Supp. 160 (S.D.N.Y. 160)................17

*Holborn Oil Trading, Ltd. v. Interpetrol Bermuda, Ltd.*, 774 F. Supp. 840
(S.D.N.Y. 1991)..................................................................................................23

*Intergrated Containers Serv., Inc. v. Starlines Container Shipping Ltd.*, 471 F.
Supp. 119 (S.D.N.Y. 1976)................................................................................29

*Kirno Hill Corp. v. Holt*, 618 F.2d 982 (2d Cir. 1980)......................................22

*Leonelli v. Pennwalt*, 887 F.2d 1195 (2d Cir. 1989)..........................................19

*Limonium Maritime S.A. v. Mizushima Marinera, S.A.*, 961 F. Supp. 600
(S.D.N.Y. 1997)..................................................................................................16

*MAG Portfolio Consultant, GmbH v. Merlin Biomed Group, LLC*, 268 F.3d 58
(2d Cir. 2001)......................................................................................................23

ii

Page

*OGI Oceangate Transport Co. Ltd. v. RP Logistics Pvt. Ltd.*, 2007 U.S. Dist.
LEXIS 46841 (S.D.N.Y. 2007)..................................................................................21

*Parkroad Corp. v. China Worldwide Shipping Co. Ltd.*, 2005 U.S. Dist. LEXIS
11122 (S.D.N.Y. June 6, 2005)..............................................................................14

*Phoenix Bulk Carriers Ltd v. Unicarbon Ltd.*, No. 07 Civ. 10404 (RMB)
(S.D.N.Y. February 13, 2008)..................................................................................6

*SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*, 2007 U.S. Dist. LEXIS 18562
(S.D.N.Y. 2007) ........................................................................................21, 24

*Seatrek Trans. Pte Ltd v. Regalindo Resources Pte. Ltd.*, 2008 U.S. Dist. LEXIS
30578 (S.D.N.Y. 2008) ..........................................................................................29

*Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684
(1950)..................................................................................................15, 17, 28

*T&O Shipping, Ltd. v. Source Link Co., Ltd.*, 2006 U.S. Dist. LEXIS 88153
(S.D.N.Y. 2006) ...........................................................................................6, 25

*Tide Line, Inc. v. Eastrade Commodities, Inc.*, 2006 U.S. Dist. LEXIS 60770
(August 25, 2006) .................................................................................................6

*Tide Line, Inc. v. Eastrade Commodities, Inc.* , 2006 U.S. Dist. LEXIS 95870
(August 15, 2006) ...........................................................6, 20, 22, 23, 25, 27

*Transportes Navieros y Terrestes, S.A. DE D.V. v. Fairmount Heavy Transport
N.V.*, 2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. 2007)....................................21

*Wajilam Exports (Singapore) Pte. Ltd v. ATL Shipping Limited*, 475 F. Supp. 2d
275 (S.D.N.Y. 2006) ................................................................21, 22, 23, 24

*Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002)......................................29

*William Wrigley, Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989) ............................24

*Wm. Passalacqua Builders v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d
Cir. 1991)................................................................................................23

*World Reach Shipping Ltd. v. Industrial Carriers Inc..*, 2006 U.S. Dist. LEXIS
83224 (S.D.N.Y. Nov. 9, 2006) .........................................................13, 15, 24

129053.00601/6634311v.1

## INTRODUCTION AND SUMMARY OF MANSEL'S POSITION

Plaintiff Mansel Oil Limited ("Mansel") respectfully submits this Memorandum of Law (i) by way of reply in further support of its motion for leave to file an amended complaint and for an amended attachment order ("the Motion") (Docket #22) and (ii) in opposition to the cross-motion of Defendant Swift Aviation Group, Inc. ("Swift Aviation Group") to stay the action pending an arbitration of the merits of the dispute in London[1] ("the Cross-Motion") (Docket #26).

Mansel contends there is a balance of freight and demurrage due under two maritime charter parties in the principal amounts of $533,046.33 and $73,239.59, respectively, plus interest and costs. Liability for Mansel's claims will be determined in the London Arbitration.

The purpose of this action in New York is to obtain security for Mansel's claims pending the outcome of the London Arbitration, not to adjudicate the merits of those claims.[2] Swift Aviation Group's opposition to the Motion and its Cross-Motion needlessly complicate and confuse this relatively simple situation.

---

[1]    The status of the arbitration ("London Arbitration") is described in the accompanying declaration of Ingolf Kaiser dated May 19, 2008 ("Kaiser Dec."), the solicitor in London handling the disputes for Mansel.

[2]    The Court issued an Attachment Order on February 5, 2008 ("Attachment Order") (Docket #4) against property in this District of Swift Aviation Group. Mansel now seeks leave to file an amended complaint which names four subsidiaries of Swift Aviation Group as additional defendants: (1) Swift Aviation Management, Inc. ("Swift Aviation Management"), (2) Swift Aviation Services, Inc. ("Swift Aviation Services"), (3) Swift Aviation Sales ("Swift Aviation Sales"), and (4) Swift Air, LLC. ("Swift Air"). The proposed Amended Complaint is annexed as Exhibit A to the Affidavit of LeRoy Lambert dated April 4, 2008 ("Lambert Aff.") (Docket #23) in support of the motion. Swift Aviation Group and the four subsidiaries will be referred to collectively as the "Swift Defendants" and the four subsidiaries will be referred to collectively as the "Swift Subsidiaries." Mansel further asks the Court to issue an Amended Order of Attachment authorizing the attachment of property in this District of any of the Swift Subsidiaries. The proposed Amended Attachment Order is annexed to the Lambert Affidavit as Exhibit B.

In addition to the Kaiser Declaration and this Memorandum of Law, Mansel also submits a Declaration dated May 20, 2008, of Simon Lane ("Lane Dec."), a broker at Petrian Shipbrokers LLP (Petrian") and a Supplemental Affidavit of LeRoy Lambert dated May 21, 2008 ("Lambert Supp. Aff.") and Exhibits E to I thereto.

Mansel has every right to seek to secure its claims in the London Arbitration under the centuries-old and simple procedures provided by Supplemental Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure.[3] Swift Aviation Group cannot be "found" in this District, and neither can any of the Swift Subsidiaries. The Amended Complaint (Lambert Aff., Ex. A) states a maritime claim against the Swift Defendants. Mansel has met the initial requirements set forth by the Second Circuit in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006) ("*Aqua Stoli*") for the *ex parte* issuance of the Amended Attachment Order (Lambert Aff., Ex. B).

Normally, Mansel would have filed a complaint naming Swift Aviation Group and the Swift Subsidiaries, and an attachment order under Rule B would have issued *ex parte*. Mansel would have then served the attachment order on banks in New York. If and when an electronic funds transfer ("EFT") in the name of one of the defendants was cleared at one of the banks in New York, the bank would restrain it, notify Mansel, and Mansel would in turn have notified the Swift Defendants. *Aqua Stoli*, at 437-38.

At that point, the Swift Defendants, or any one of them, would have been entitled to a prompt post-attachment hearing under Rule E(4)(f) at which they could raise the defenses allowed by the Second Circuit in *Aqua Stoli*, including that the Amended Complaint "fails to state a *prima facie* admiralty claim" against the Swift Defendants. *Aqua Stoli* at 445-46.

Here, however, Mansel proceeded against property in the name of Swift Aviation Group alone in the first instance, and Mansel's Amended Complaint and application for Amended Attachment Order thus comes before the Court at this time in a contested situation, not in the usual *ex parte* situation.

---

[3] Specific Supplemental Rules will be referred to by letter ("Rule [letter]") and the numbered rules [of the Federal Rules of Civil Procedure by number ("Rule [number]").

Practically, however, the standards for <u>issuance</u> of the Amended Attachment Order remain those set forth in *Aqua Stoli*. Mansel has met the initial standards for *ex parte* issuance of the Amended Attachment Order. At present, none of the Swift Subsidiaries have appeared or answered the Amended Complaint; indeed, it has not been filed. Moreover, Swift Aviation Group concedes that neither it nor any of the Swift Subsidiaries are subject to this Court's jurisdiction and hence that they cannot be "found" in this District. Furthermore, since the Amended Attachment Order has not been issued, no property belonging to any of the Swift Subsidiaries has been attached so as to trigger Rule E(4)(f) hearing to vacate the attachment.

To the extent the Court nevertheless wishes in advance of any attachment under the Amended Attachment Order to vet whether the Amended Complaint meets the *Aqua Stoli* "prima facie admiralty claim" test, whether at a Rule E(4)(f) hearing or Rule 12(b)(6) motion, the Amended Complaint easily passes muster under the applicable jurisprudence in this Circuit in the context of Rule B proceedings. Allowing the Amended Complaint to be filed would not be "futile," and the motion for leave to file an Amended Complaint should be granted under the "freely given" standards applicable under Rule 15(a).

As to the Cross-Motion, Mansel does not object to a stay of the action insofar as Counts I and II are concerned or insofar as Count III is concerned, <u>provided</u>, however, that Mansel is allowed to continue its efforts to obtain security under the Amended Attachment Order. Mansel objects to any stay which precludes it from continuing its attempts to secure its claims.

# FACTS

Swift Aviation Group's Memorandum of Law[4] and accompanying Affidavit of Jeff A. Shumway dated April 21, 2008,[5] do not accurately characterize the procedural status in the wake of events surrounding motion by Swift Air to vacate an attachment of $118,136 under the original Complaint and Attachment Order.[6]   Accordingly, Mansel first sets forth its understanding of the present procedural status.

A.    Swift Air's Motion to Vacate and Present Procedural Status

The original Attachment Order resulted in the restraint of two EFT's. The first EFT was restrained on February 15, 2008. The beneficiary of that EFT was described as: "Beneficiary Customer:/General Ledger Acct. Swift Aviation Group." Lambert Supp. Aff., Ex. E.

On March 27, 2008, some thirty-seven days after Mansel notified Swift Aviation Group of the restraint of the first EFT, Swift Air intervened and contended the EFT was its property, not property of Swift Aviation Group. In the absence of any alter ego allegations in the original Complaint, Swift Air contended that the attachment should be vacated. Swift Air Memorandum of Law in Support of Motion to Vacate (Docket #10) ("Swift Air Mem.") at 5-6; Swift Air Reply Memorandum of Law in Support of Motion to Vacate (Docket #16) ("Swift Air Reply Mem.") at 4-6. Mansel countered that Swift Air had proved its property interest in the $118,136 and the definition of "property interest" in Rule B cases was in any event broad enough to include Swift

---

[4]   Docket #27 ("Swift Mem.")

[5]   Docket #28 ("Shumway Apr. 21 Aff."). Mr Shumway also submitted an affidavit in connection in support of Swift Air's motion to vacate, Docket #18 ("Shumway Apr. 1 Aff."). In addition, reference will be made below to affidavits of J. Kevin Burdette dated March 24, 2008 (Docket #11) ("Burdette Aff.") and April 1, 2008 (Docket #17) ("Burdette Supp. Aff.").

[6]   See Docket ##9-11, 14-18, 20-21 and 25.

Aviation Group's interest in the $118,136. Mansel Memorandum of Law in Opposition (Docket #14) ("Mansel Motion to Vacate Mem.") at 6-11.

At the Rule E(4)(f) hearing on April 3, the Court directed Swift Air to provide additional information about the obligation underlying the debt represented by the EFT and the account(s) to which the funds represented by the EFT were destined. Swift Air provided to the Court and to the undersigned some, but not all, the information requested at about 4:00 p.m. on Friday, April 4. Lambert Supp. Aff. Ex. F. The Court granted Swift Air's motion to vacate an hour and a half after Mansel received the information. Lambert Supp. Aff., Ex. G; Shumway Apr. 21 Aff., Ex. 12. Since, in Mansel's view, Swift Air provided some of the information the Court directed Swift Air to provide, but not all, Mansel, by letter the evening of April 4, pointed out the deficiencies in Swift Air's response and requested that the Court reconsider its decision. Lambert Supp. Aff., G.

Earlier on that same day, Friday, April 4, Mansel had asked the Court to hear the Motion by way of Order to Show Cause and an expedited briefing schedule in the hope that the Court would issue the Amended Attachment Order prior to ruling on Swift Air's motion to vacate. The Court declined to hear the Motion on an expedited basis, however. Shumway April 21 Aff., Ex. 14 (Docket #21). On Monday, April 7, Mansel filed the Motion pursuant to the normal motion scheduling rules (Docket #22). The parties have since agreed to several extensions.

Yet another relevant event occurred on April 4, namely, on the morning of April 4, 2008, JP Morgan Chase informed Mansel that it had restrained an EFT in the amount of $49,300 which named Swift Aviation Group as its beneficiary. Lambert Supp Aff., Ex. H.

On April 9, 2008, after further exchanges among counsel, Mansel made a tactical decision to stipulate to the release of the $118,136 and $49,300 without further motion or appeals

practice regarding the Swift Air motion to vacate.  Swift Air had contended that in the absence of

an alter ego allegation, this Court must follow the decision of Judge Karas in *T&O Shipping Ltd.*

*v. Source Link Co. Ltd.*, 2006 U.S. Dist. Lexis S.D.N.Y Dec. 6, 2007), which allowed a

complaint to be amended to include alter ego allegations but <u>refused</u> to allow the amended

complaint and attachment to relate back to and attach funds which had been attached solely

under the original complaint which did not include (as here) any alter ego allegations against

other persons.[7]  The Stipulation (Docket #25; Shumway April 21 Aff., Ex. 13) ("Stipulation")

signed by Mansel and Swift Air as well as by Swift Aviation Group specifically stated that the

release of the EFT's was without prejudice to any arguments any party had or may have had that

the EFT's should have been or should not have been restrained.

Swift Aviation Group contends (e.g., Swift Mem. At 2, 15) that the Court's Order

granting Swift Air's Motion to Vacate the Attachment of $118,136 somehow precludes Mansel

from alleging Swift Air and Swift Aviation Group are alter egos of each other.   These

contentions are incorrect.  In deciding that the $118,136 was property of Swift Air under the

original Attachment Order, despite Swift Air's instruction to Elite Jet to send the money to Swift

Aviation Group, the Court did not decide, and was not asked to decide, whether the corporate

identities of Swift Aviation Group and Swift Air should be disregarded during the Swift Air

Motion to Vacate proceedings.[8]

---

[7]  Mansel contended reliance on Judge Karas' decision in *T&O Shipping* was premature in that the Court
had not yet ruled that Swift Aviation Group had no "property interest" in the $118,136. Mansel Memorandum in
Opposition to Motion to Vacate (Docket #14) at 10. For the propriety of the Amended Attachment Order relating
back to the funds originally attached, contrary to *T&O Shipping,* Mansel relied on *Tide Line, Inc. v. Easttrade
Commodities, Inc.* , 2006 U.S. Dist LEXIS 95870 (August 15, 2006); *Tide Line, Inc. v. Eastrade Commodities, Inc.,*
2006 U.S Dist LEXIS 60770 (August 25, 2006). *Phoenix Bulk Carriers Ltd v. Unicarbon Ltd.*, No. 07 Civ. 10404
(RMB) (S.D.N.Y. February 13, 2008).  On April 29, 2008, Judge Buchwald issued a decision in *Hawknet Ltd v.
Overseas Shipping Agencies*, 2008 U.S. Dist LEXIS 35542 (S.D.N.Y. April 29, 2008) in which she allowed an
amended order to relate back.

[8]  THE COURT: But you don't say that gives you a basis to seize the money of different corporations

The Stipulation simply reflects that on April 9 Mansel decided to make a fresh start to obtain security under the Amended Complaint and Amended Attachment Order and to drop the request that the $118,136 attached on February 15, 2008, or the $49,300 attached on April 4, 2008, under the original Attachment Order, remain attached as if those amounts had been attached under the Amended Attachment Order.

The Motion's third request for relief includes a request that the Court order the $118,136 attached on February 15 and the $49,300 attached on April 4 remain subject to attachment under the Amended Attachment Order even though the EFT's were attached at a time when the Amended Attachment Order was not before the Court or the Swift Defendants. The Stipulation renders moot this part of the requested relief. The third request for relief also asks that any funds attached under the original Attachment Order during the pendency of the Motion (i.e., from April 7 to the date the Amended Attachment Order is issued be held subject to the Amended Attachment Order. This portion of the request for relief survives the Stipulation, but, as a practical matter, there have been no further attachments under the original Attachment Order.

B.    Factual Background

No additional amounts since the $49,300 on April 4 in the name of Swift Aviation Group have been restrained by virtue of the original Attachment Order, and Mansel's claims remain unsecured. Apparently, Jerry Moyes and his brother Ron made a financially disastrous foray into

---

simply because he is part of each one of those separately-held corporations.

MR. LAMBERT: To the extent the corporate separateness is observed, that's correct.

THE COURT: And you haven't made any application at this point that somehow they're a shell company or they are somehow set up in order to be an alter ego.

MR. LAMBERT: There is no alter ego cause of action or agent for undisclosed principal cause of action in this complaint, present complaint, your Honor.

Transcript of Hearing on April 3, 2008, at 22-23, lines 24 to 9 ("Transcript") annexed as Ex. 11 to Shumway Apr. 21 Affidavit.

-7-

the world of buying and selling jet fuel and diesel. See Lane Declaration. They chose to contract first in the name of the Moyes trucking company, Swift Transportation Co., Inc. ("Swift Transportation") (see Amended Complaint, ¶¶7-8), then requested that the name of the charterer be switched to Swift Aviation Group. They have now beaten a retreat to the safe harbor of Swift Aviation Group's status as a holding company to hide behind the Swift Subsidiaries. As a "holding company," Swift Aviation Group would not usually conduct day to day business in its own name, and it is apparently now "attachment proof" insofar as EFT's moving in its name are concerned. An arbitration award in London is likely a year away, at least. Mansel is entitled to issuance of the Amended Attachment Order under the bright line rule of *Aqua Stoli*.

It is perhaps helpful to step back and look at the larger factual context.

Swift Transportation needs diesel to run its trucks.

Swift Aviation Group and the Swift Subsidiaries, particularly (as described by Mr. Shumway in his April 21 Affidavit) Swift Air, Swift Aviation Management, and Swift Aviation Services, need jet fuel to operate their fleets of planes and to supply fuel to others at the FBO facility at the Phoenix Airport.

Laymon Harrison of Oasis Trading Group LLC ("Oasis") in Atlanta acted as broker/facilitator for Swift. Copies of two pages from Oasis website are annexed as Ex. I to the Supplemental Lambert Affidavit. Oasis identifies "Swift Transportation" and "Swift" and "Swift Group" as a reason for Oasis' formation and Mr. Harrison as its President. Oasis states that its "business strategy includes enhancing and improving the manner in which [petroleum] product is shipped, exchanged, and distributed to required locations of SWIFT and SPEEDWAY." (emphasis added.). Lambert Supp. Aff., Ex. I. Mr. Lane, the broker for Mansel, dealt with Mr. Harrison. Lane Dec. ¶2-4.

-8-

Swift Transportation and/or Swift Aviation Group had a contract with Kuwait Petroleum Corporation ("KPC"). Lane Dec. ¶2. Amended Complaint, ¶72.

Originally, someone at or on behalf of Swift Transportation agreed through the brokerage chain to terms of the Overseas Limar Charter for the carriage of jet fuel, and someone at or on behalf of Swift Transportation negotiated the Torm Sofia Charter for the carriage of diesel (gas oil).

Someone—logically, someone who acts at times for Swift Transportation and at times for Swift Aviation Group or a Swift Subsidiary—asked Mansel through the broker chain to agree to change the name of the charterer from Swift Transportation to Swift Aviation Group.

Mansel's broker, Mr. Lane, has identified Jerry Moyes and his brother Ron Moyes as the persons behind Swift. Lane Dec. ¶3.

Jerry Moyes is the founder of Swift Transportation and the President and Director of Swift Aviation Group, Swift Aviation Management, and Swift Aviation Services. Amended Complaint, ¶¶8, 21-50.

The value of the cargoes was in the tens of millions of dollars. The cost to transport the cargoes was in the millions (just for the two charters at issue here). There were other charters as well. Lane Dec. ¶5; Amended Complaint, ¶¶75-77.

Swift Aviation Group used its credit, which necessarily would have included assets of the Swift Subsidiaries to finance the amounts of the purchases through BNP Paribas. Lane Dec., ¶4; Amended Complaint, ¶¶72-78.

Contrary to the statements of Mr. Burdette and Mr. Shumway that the Swift Defendants "operate independently," the proceedings and evidence adduced to date amply show that the Swift Defendants operate as one company, under the same logo, from the same offices,

controlled by the same officers and persons, and are owned by Swift Aviation <u>Group</u>. "Group" itself implies that several companies are included. Based on his position as CFO of Swift Aviation Group (the only factual predicate he gives) Mr. Shumway displays in his April 21 Affidavit and detailed knowledge of the businesses of the Swift Subsidiaries. This intimate knowledge is further evidence of Swift Aviation Group's domination of the Swift Subsidiaries.

1.      It took Swift Aviation Group and Swift Air thirty-seven days and three law firms to realize and make the argument that the $118,136 attached on February 15, 2008, was in connection for services nominally provided by Swift Air and that Swift Air was separate from Swift Aviation Group.

2.      Even after it purportedly realized this, its representatives contended that Mansel and the Bank of America had "wrongfully attached" the $118,136 when the beneficiary was clearly stated to be "Swift Aviation Group" and its own representatives gave the instruction (as the Court and Mansel learned on April 4) (that is, it was not a "mistake" by the customer).

3.      Kevin Burdette is the Vice-President of Swift Air and also of Swift Aviation Group. Mr. Burdette first swore that "Plaintiff in this case erroneously attached an electronic funds transfer ("EFT") belonging to Swift Air," as if Plaintiff and the Bank had acted improperly. Burdette Aff., ¶2. Swift Air's attorneys in Texas sent threatening letters to counsel for Mansel and the Bank, making the same allegation.[9]

4.      Mansel (as well as the Bank of America) promptly produced to counsel for Swift Aviation Group and for Swift Air the text of the EFT which unequivocally states that the beneficiary was "Swift Aviation Group." Lambert Motion to Vacate Aff. ¶14 and Ex. 16.

---

[9]    Affidavit of LeRoy Lambert dated March 28, 2008, in Opposition to Motion to Vacate (Docket #15) ("Lambert March 28 Aff."), ¶¶10-11, Exs. 11, 12, 12A.

5.      In the Burdette Supplemental Affidavit of April 1, 2008, Mr. Burdette conceded that the transcript of the EFT "indicates that the beneficiary of the wire transfer is 'Swift Aviation Group." He contended, however, that the "designation of 'Swift Aviation Group' is in fact, a reference to the federally registered service mark referred to in paragraph 20 [of his March 20 affidavit] and utilized occasionally by Swift Air, LLC" (Burdette Supp. Aff. ¶4). He then stated that this "designation of 'Swift Aviation Group' as the beneficiary of the wire transfer was never intended to be a reference to the incorporated entity Swift Aviation Group, Inc." and that its use was "an error in drafting" (Burdette Supp. Aff. ¶5). Although Mr. Burdette apologized for the "confusion," he provided no explanation about how such an error in drafting could even occur to someone at an "independently operated" company, or, indeed, whose error it was.

6.      In response to the Court's direction at the hearing on April 3 to provide the invoice, Swift Air produced a document attached to the Lambert Supp. Affidavit as Ex. F. This document shows that a representative of the Swift Defendants specifically instructed Elite Jet to wire the $118,136 the National City Bank account "To Further Credit: Swift Aviation Group."

7.      This "mistake" and confusion about the two companies was not a one-off occurrence. The April 4 attachment of $49,300, which Swift Air contended was for services it provided also named "Swift Aviation Group" as the beneficiary.

8.      The confusion of the management of the Swift Defendants is illustrated by confusion about the address of the companies. Mr. Burdette stated in his March 20 Affidavit that Swift Air's "principal place of business address [is] located at 2710 E. Old Tower Road, Phoenix, Arizona, 85034." Burdette Aff. ¶9.

9.      Mr. Shumway submitted, however, in his Affidavit dated April 1, 2008, in support of "Swift Air's Motion to Vacate." In ¶7, he stated, "Swift Aviation Group is a holding

-11-

company that has an interest in different Subsidiaries, including Swift Air." According to Mr. Shumway, Swift Aviation Group's "principal place of business" is at "2710 E. Old Tower Road" in Phoenix. Shumway April 1 Dec.¶6; Shumway April 21 Dec. ¶26). This is the same address as Mr. Burdette stated under oath was the "principal place of business" of Swift Air (Burdette Aff. ¶9).

10.    Mr. Burdette, as Vice-President of the "separate and independently operated" Swift Air, should know the address of Swift Air's "principal place of business." However, Mr. Shumway, as Chief Financial Officer of Swift Aviation Group, the parent of Swift Air, apparently knows better. Mr. Shumway swears that Swift Air "is headquartered at 2406 S. 24th Street" in Phoenix, although he admits that Swift Air "maintains additional offices" at 2710 E. Old Tower Road. Shumway April 21 Aff. ¶33.

11.    Mr. Shumway does not describe the business of Swift Aviation Group in either of his Affidavits, other than to say it is a "holding company." Shumway April 1 Aff. ¶7; see also Shumway April 21 Aff., ¶24 (Swift Aviation Group is the "parent corporation" of the Swift Subsidiaries).

12.    Confusion about who is who is also found in Ex. B to the Burdette Affidavit. In signing a Swift Air resolution to open a bank account, an agreement nominally in the name of Swift Air, he signs it as "Executive VP Swift Aviation Group." Lambert March 28 Aff., ¶20 and Ex. 21.

13.    With respect to Swift Air and Swift Aviation Services, Mr. Shumway coyly states that each has its own employees "other than a few top management employees" which are shared. Shumway April 21 Dec. ¶¶35, 52. In fact, as alleged in the Amended Complaint at ¶¶21-45, the "few top management employees" are the same persons.

-12-

## **LEGAL ARGUMENT**

Strictly, this Memorandum should first reply to the arguments in Points II-IV of Swift Aviation Group's Memorandum,[10] opposing Mansel's motion. However, Swift Aviation Group leads with its argument to stay the action (Point I). For ease of presentation, Mansel will respond in the order of Swift Aviation Group's Memorandum.

### POINT I

**STAYING THE ACTION DOES NOT "STAY" THE ATTACHMENT ORDER UNDER THE ORIGINAL COMPLAINT AND STAYING THE ACTION UNDER THE AMENDED COMPLAINT WOULD NOT "STAY" THE PROPOSED AMENDED ATTACHMENT ORDER**

Swift Aviation Group contends in Point I of its Memorandum that the Court should stay this action, whether it be the original complaint or the Amended Complaint. The parties agree that such a stay is proper insofar as the merits of the disputes under the Charters are concerned. If, however, Swift Aviation Group contends that such a stay precludes Mansel from continuing to seek to obtain security under the original or the Amended Complaint, Swift Aviation Group is not correct. In *World Reach Shipping Ltd. v. Industrial Carriers Inc.*, 2006 U.S. Dist. LEXIS 83224 at *14 (S.D.N.Y. Nov. 9, 2006), Judge Buchwald considered whether a stay pending arbitration of the merits in London should "freeze" plaintiff's attempts to obtain security in New York through Rule B. Judge Buchwald stated and held:

> In a final effort to prevent [plaintiff] from attaching more of [defendant's] property, [defendant] moves the Court to stay these proceedings until the London arbitration is resolved. This application is simply another variation on defendant's general theme that plaintiff's security should be limited not by the damages claimed but artificially. Having already found that plaintiff's Proposed Amended Complaint is sustainable and having discussed

---
[10]  Docket #27 ("Swift Mem").

-13-

the purpose of Rule B, this argument merits no further discussion prior to rejection.

A.  As to Swift Aviation Group, Staying the Action on the Merits Does Not Preclude Mansel From Continuing to Seek to Obtain Security for its Claims

Mansel and Swift Aviation Group agree that the merits of their disputes under the Charter Parties are referable to arbitration in London; indeed, they are arbitrating the merits of those disputes in London. Complaint, ¶¶6, 11; Answer, 6, Answer, ¶¶6, 11, 19; Kaiser Dec., ¶¶9-17.

But such a stay would only affect the proceedings in New York on the merits of the charter party claims, not Mansel's efforts to obtain security. In fact, Swift Aviation Group seems to concede that a stay of the merits would not stay or preclude Mansel from continuing to serve the existing Attachment Order to try to vindicate its independent right to security. "If the Court does not stay the entire proceeding (save for the existing Order of Attachment against Swift Aviation Group's assets) . . . ." Swift Mem. at 4. Accordingly, if the Court grants the stay of the disputes on the freight and demurrage disputes, Mansel may continue to try and secure its claims by continuing to serve the Attachment Order on banks in New York pending the outcome of the London arbitration.

Since the purpose of Rule B is twofold, to compel an appearance by the defendant and to obtain security, a stay of the action on the merits does not affect, or preclude, Mansel's right to invoke Rule B to obtain security for those claims. In *Parkroad Corp. v. China Worldwide Shipping Co. Ltd.*, 2005 U.S. Dist. LEXIS 11122, *5 (S.D.N.Y. June 6, 2005), this Court held that a general appearance does not preclude ongoing attempts to obtain security. Similarly, in *HBC Hamburg Bulk Carriers GmbH & Co. KG v. Proteinas y Oleicos S.A. de C.V.,* 2005 U.S. Dist. LEXIS 8009, *5 (S.D.N.Y. May 4, 2005), Judge Buchwald held: "Without security, the filing of an appearance by a foreign defendant provides little assurance that any favorable

-14-

judgment would be satisfied." *See also World Reach Shipping Ltd.*, *supra*,. 2006 U.S. Dist. LEXIS 83224 at *14.

As the Supreme Court held in *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 698 (1950) (citations omitted): "The importance of the right to proceed by attachment to afford security has been emphasized . . . ["Plaintiffs"] right to maintain the attachment will depend on their ability to prove fraud in the transfer of the [vessel] upon a hearing. They are entitled to have that hearing."

Equally, then, if the Court grants Mansel leave to file the Amended Complaint and issues the Amended Attachment Order, the action on the Amended Complaint naming Swift Aviation Group and the Swift Subsidiaries as defendants could be stayed as well, provided, however, that such a stay does not preclude Mansel from continuing its efforts to secure its claims under the Amended Attachment Order against property in the name of Swift Aviation Group and any of the Swift Subsidiaries.

B.      While "Primary Liability" Is Being Determined in London, Mansel Remains Entitled to Seek Security for Its Claims From Alter Egos of Swift Aviation Group

Swift Aviation Group contends in Point IB that Mansel's alter ego claims in Count III of the Amended Complaint are premature and should be stayed. As to the effect of a stay, as above, Mansel is entitled to seek security pursuant to Rule B pending the outcome of the London Arbitration under the alter ego allegations of Count III by alleging a prima facie admiralty claim against the Swift Subsidiaries and showing that none of the Swift Subsidiaries can be found in this District. Mansel is exercising its rights under Rule B to seek to obtain security for its claims in London; it does not need to prove the merits of its alter ego causes of action at this point any more than it needs to prove the merits of its claims under the Charters to be entitled to attach property in the name of the Swift Subsidiaries. Alleging them sufficiently at this point is all it

-15-

need do under *Aqua Stoli* to be entitled to seek to attach EFT's in New York in the name of any Swift Subsidiary.

In reality, Swift Aviation Group's arguments are premature. The alter ego and veil piercing allegations contained in Count III of the Amended Complaint cannot be stayed because the Court has not yet granted the motion for leave to file an amended complaint. By asking the Court to stay Count III, Swift Aviation Group seemingly concedes that Mansel is entitled to file the Amended Complaint.

Even *Limonium Maritime S.A. v. Mizushima Marinera, S.A.*, 961 F.Supp. 600 (S.D.N.Y. 1997), upon which Defendant heavily relies, suggests that the motion for leave to amend should be granted. The court in that case did not even analyze the application for a stay until *after* the plaintiff had amended its complaint to add the alleged alter ego defendants. *Id.* at 604. Accordingly, the proper time to assess whether Mansel's alter ego/veil piercing allegations should be stayed is *after* the Amended Complaint has been filed and after the Swift Subsidiaries appear or property in their name is attached.

In *Limonium,* the court exercised its discretion to stay any proceedings on the alter ego allegations pending the outcome of an arbitration, but this decision was in the context of a motion by the plaintiff to compel the thirty-one alleged alter egos to participate in the arbitration. Here, Mansel makes no such motion. *Limonium* does not discuss a plaintiff's continuing rights to seek security while the merits are decided elsewhere. In a pre-*Winter Storm* case, this is not surprising; the issue arose once EFT's were deemed attachable property. Other cases reveal good reasons why this outcome should be the exception, not the rule.

In *First American Bulk Carrier Corp. v. Van Ommeren Shipping (USA) LLC*, 2008 U.S. Dist. LEXIS 21816 (S.D.N.Y. March 19, 2008), Judge Stanton permitted the plaintiff to amend

its complaint to add a potential alter ego/successor-in-interest as a defendant so the court could determine the issue of alter ego prior to the arbitration. *Id.* at \*3 ("Therefore, [plaintiff] has leave to amend its complaint to add SVO as a defendant so that the Court may determine, prior to arbitration, whether SVO is the successor-in-interest to Van Ommeren and a "Charterer" under the charter agreement, bound by the arbitrator's decision.")  Similarly, Judge Haight, in *Hidrocarburos y Derivados, C.A. v. Lemos*, 453 F.Supp. 160, 174 (S.D.N.Y. 160), held that "the statute [FAA] quite clearly mandates resolutions of such questions [of veil piercing] prior to the arbitration hearing and award."

Of course, as the Second Circuit in *Aqua Stoli* also pointed out (as did this Court at the April 3 hearing), "Should it wish, [any Swift Defendant] has the option of relieving itself of this particular attachment by posting other security." *Aqua Stoli,* at 444.  Once security is posted, EFT's to or from the Swift Defendants are not subject to attachment and the merits of the alter ego allegations could be determined once the London Arbitration is completed.  However, unless and until security is voluntarily posted or Mansel obtains security through attachment, Mansel is entitled to attempt to vindicate its independent right to security.  As the Supreme Court stated in *Swift & Co. Packers*, *supra*, the plaintiff was entitled to prove the transfer of the vessel from the defendant to a third-party was fraudulent in order to obtain security pending the outcome of the merits of the claims between plaintiff and defendant.  So, here, if the Swift Defendants will not post security, Mansel is entitled to allege its alter ego allegations to obtain security and meet the *Aqua Stoli* standards.

C.    There Are No "Concurrent Proceedings" Which Threaten "Judicial Economy" or Which Risk Concurrent Proceedings or Potential Contradicting Decisions

Whether Swift Aviation Group owes Mansel anything under the Charters will be decided in the London Arbitration.  Mansel does not ask this Court to make any decisions about the

-17-

merits of those disputes. Swift Aviation Group does not appear to contend Counts I and II fail to state a prima facie admiralty claim entitling Mansel to attach property in the name of Swift Aviation Group in this District pursuant to Rule B. There is thus no risk of conflicting decisions on Counts I and II.

Equally, whether the Swift Defendants are alter egos of each other will <u>not</u> be decided in the London Arbitration. The only tribunal to have that issue before it (once the Amended Complaint is filed) is this Court. So, there is no risk that this Court will issue a decision on this issue which conflicts with a decision of the arbitrators in London.

Swift Aviation Group's argument in Point IC appears to rest on the misconception that in order to determine liability on the alter ego allegations of Count III of the Amended Complaint, this Court would necessarily have to determine liability on Counts I and II. But such an argument misconceives the procedural posture. To obtain <u>security</u> pending the outcome of the London Arbitration for its Count I and II claims from the Swift Defendants under the Count III alter ego claims, Mansel must (as it has done in the Amended Complaint) plead a prima facie admiralty alter ego claim and show that the Swift Defendants cannot be found in this District. If it does these two things <u>and</u> if it actually attaches property in the name of any of the Swift Defendants in this District, any such amounts will be held <u>pending the outcome of the London Arbitration</u>.

If Mansel then succeeds in the London Arbitration and if Swift Aviation Group does not pay the award(s), then <u>and only then</u> will this Court <u>need</u> to decide whether the Swift Defendants are in law and in fact alter egos of one another. At no point is there a risk of a conflicting decision by this Court and the arbitrators in London. Neither is called upon to decide an issue which the other is called upon to decide.

-18-

As discussed in Point IB, when to hold a <u>trial</u> on the alter ego issue is committed to the discretion of this Court. That is, deciding whether the Amended Complaint satisfies the standards established in *Aqua Stoli* is <u>not</u> a final determination that Mansel is entitled to the funds if it succeeds in the London Arbitration. That final determination can indeed be "stayed" pending the outcome of the London arbitration. All that Mansel need do now is meet the standards established in *Aqua Stoli* for a prima facie admiralty alter ego claim in order maintain its right to seek security under Rule B and maintain it, if in fact it attaches anything.

**POINT II**

**GRANTING LEAVE TO FILE THE AMENDED COMPLAINT WOULD NOT BE "FUTILE"**

A.      Rule 15(a) is Liberally Construed

Rule 15(a) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." The decisions interpreting Rule 15(a) generally and especially in the context of Rule B actions for security have uniformly given leave "freely." Almost invariably, the Rule B cases involving leave to amend issues concern amendments to add alter allegations against persons other than the originally named defendant(s). The exceptions are limited and construed narrowly and include the objection that Swift Aviation Group makes here, that allowing the amended complaint would be "futile" because the amended complaint would not withstand a motion to dismiss the complaint. Swift Aviation Group cites (Swift Mem. at 13) *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) and *Leonelli v. Pennwalt*, 887 F.2d 1195, 1199 (2d Cir. 1989). In the former, the Court denied the notion for leave to amend in the context of a full record created on a summary judgment motion after discovery. In the latter, the Court concluded the cause of action sought to be added would be time-barred. Neither case is similar to the facts here.

-19-

As described below, Count III of the Amended Complaint states a "prima facie admiralty claim" against the Swift Defendants and would survive a Rule E(4)(f) hearing to vacate an attachment of the property of any of the Swift Subsidiaries or a motion under Rule 12(b)(6).[11]

B.   The Amended Complaint Adequately Alleges Alter Ego and Would Survive a Rule E(4)(f) Motion to Vacate and/or a 12(b)(6) Motion to Dismiss

As stated above, the issues here are before the Court in an unusual procedural posture. If the Amended Complaint had been presented as the original complaint with the Amended Attachment Order, Swift Air's Motion to Vacate would have been contested under the Amended Attachment Order, not the original Attachment Order. In the Stipulation, however, Mansel accepted the procedural fact that the Swift Air Motion to Vacate was decided on the basis of the original Complaint and Attachment Order.

While the Second Circuit has not addressed the specific question of what a plaintiff must show to make out a "prima facie" admiralty claim, numerous decisions since *Aqua Stoli* have held that a plaintiff need only make a prima facie showing to sustain an attachment under Rule B. *In Tide Line, Inc. v. Eastrade Commodities, Inc.*, 2006 U.S. Dist. LEXIS 95870, *15 (S.D.N.Y. 2006), Chief Judge Wood carefully reviewed the case law and the relevant policy considerations (citations omitted) in the context of a Rule B alter ego claim:

> Although *Aqua Stoli* does not explicitly address this "probable cause" or "reasonable grounds" standard, the decision's emphasis that "Rule B specifies the sum total of what must be shown for a valid maritime attachment," – including a "valid prima facie admiralty claim against the defendant" – implies that the "probable

---

[11]   Since Swift Aviation Group contends the Swift Subsidiaries operate independently from Swift Aviation Group and from each other, it is arguable that Swift Aviation Group does not, on its own theory and papers in opposition, have standing to object at this stage to the inclusion of the Swift Subsidiaries and that such arguments should be asserted, if at all, by the Swift Subsidiaries, but none have intervened to oppose the motion for leave to amend. This illustrates again that the appropriate procedure is for the Court to grant the leave to amend and await a proper motion to vacate and/or dismiss.

cause" or "reasonable grounds" standard is improper insofar as it purports to go beyond this limited inquiry.

For a plaintiff to show that "it has a valid prima facie admiralty claim against the defendant, in the context of maritime attachment, it appears that a plaintiff need not prove anything beyond its Verified Complaint, pursuant to Supplemental Rules B and E.

In *SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*, 2007 U.S. Dist. LEXIS 18562, *10 (S.D.N.Y. 2007), Judge Karas noted that the analysis in *Tide Line* "is consistent with the limited inquiry contemplated by *Aqua Stoli* and comports with a basic definition of the term "*prima facie.*" He held that the court "will look only to Plaintiff's pleadings, and not to any evidence submitted by the parties, to determine whether Plaintiff has made a legally sufficient claim for piercing the corporate veil.").

In *Dolco Investments, Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261, 271 (S.D.N.Y. 2007), Judge Sweet stated: "The Court agrees with the weight of authority in this district, and will apply the prima facie standard, as it more closely comports with the Second Circuit's rejection of the 'broader Rule E(4) (f) inquiry' that the reasonable grounds test would necessarily include." *See also Transportes Navieros y Terrestes, S.A. DE D.V. v. Fairmount Heavy Transport N.V.*, 2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. 2007) (Judge Preska) (same); *OGI Oceangate Transp. Co. Ltd. v. RP Logistics Pvt. Ltd.*, 2007 U.S. Dist. LEXIS 46841 (S.D.N.Y. 2007) (Judge Sweet) (same).

Mansel has to date had no opportunity to obtain discovery from Swift on the alter ego issues in this matter. This fact alone underscores the soundness of applying the prima facie pleading standard at this stage of the proceedings. As explained by Judge Lynch:

Discovery has not yet been had, and it would defeat the purpose of attachment—preserving defendants' assets in case plaintiff is able to prevail at trial or on summary judgment—to require at this stage that plaintiffs asserting a valid prima facie maritime claim prove that the facts in the complaint are true.

*Wajilam Exports (Singapore) Pte. Ltd v. ATL Shipping Limited*, 475 F. Supp. 2d 275, 279
(S.D.N.Y. 2006). Indeed, practically all of the cases cited by Swift were decisions on or after a
trial, discovery, or a full motion record.

C.    Mansel Has Met its Alter Ego Pleading Burden in the Present Case

It is well established in this Circuit that under the federal maritime law, a corporate veil
may be pierced where it is shown that the corporation was used by another person or entity to
"perpetuate a fraud" or where it was "so dominated and its corporate form so dominated such
that it primarily transacted the other entity's or individual's business." *See, e.g., Tide Line, Inc.
v. Eastrade Commodities, Inc.*, 2006 U.S. Dist. LEXIS 95870, *33 (S.D.N.Y. 2006) (quoting
*Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980)). *See also Dolco Investments, Ltd. v.
Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261, 271 (S.D.N.Y. 2007) ("Thus there are two distinct
theories under which a maritime plaintiff may pierce the corporate veil: fraud and alter ego.");
*World Reach Shipping Ltd. v. Indus. Carriers Inc.*, 2006 U.S. Dist. LEXIS 83224, *10 (S.D.N.Y.
2006) ("Federal common law allows piercing of the corporate veil where (1) a corporation uses
its alter ego status to perpetrate a fraud or (2) where it so dominates and disregards its alter ego's
corporate form that the alter ego was actually carrying on the controlling corporation's business
instead of its own."); *Wajilam Exports (Singapore) Pte. Ltd v. ATL Shipping Limited*, 475 F.
Supp. 2d 275, 282 (S.D.N.Y. 2006) (holding same).

The Swift Defendants cannot contend here that they have been unable to commence an
investigation of the facts and to frame a responsive pleading. *See, e.g., Wajilm Exports*, 475 F.
Supp. 2d at 282 ("[T]the relevant allegations concern Via Sistina's own corporate relationships
and practices, so there is no apparent reason why it should have difficulty investigating
plaintiff's claims without more specifics than are provided in the Complaint."). It is not, in
other words, necessary to plead every single fact that may ultimately support a finding that one

-22-

129053.00601/6634311v.1

defendant is the alter ego of the other; rather, "plaintiff need only allege sufficient facts to support an inference that [one defendant] has so dominated and disregarded the [other defendant's] form that [the other defendant] primarily transacted [the defendant's] business rather than its own." *Id.* at 283 (emphasis added).

The Second Circuit has identified a number of factors that are relevant in evaluating alter ego claims:    (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of business discretion displayed by allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guaranty of the corporation's debts by the dominating entity; and (10) intermingling of property between the entities. *See MAG Portfolio Consultant, GmbH v. Merlin Biomed Group, LLC*, 268 F.3d 58, 63 (2d Cir. 2001); *Holborn Oil Trading, Ltd. v. Interpetrol Bermuda, Ltd.*, 774 F. Supp. 840, 844 (S.D.N.Y. 1991) (applying these factors in the admiralty context); *Tide Line*, 2006 U.S. Dist. LEXIS 95870, *35 (applying these factors in Rule B context); *Wajilam*, 475 F. Supp. 2d 275, 284 (same).

Swift Aviation Group attempts to isolate and pick apart various of the factors alleged above to somehow prove, at this preliminary stage, that Court III is "futile." This attempt necessarily fails because in any alter ego case, no one factor controls, and it is not necessary that all be alleged or proved; each case is decided on its own facts. As the Second Cirucut stated in *Wm. Passalacqua Builders v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir. 1991),

> Applying these -- or any other pertinent factors -- to the infinite variety of situations that might warrant disregarding the corporate form is not an easy task because disregarding corporate separateness is a remedy that "differs with the circumstances of each case." . . . The jury must decide

> whether -- considering the totality of the evidence, - the policy behind the
> presumption of corporate independence and limited shareholder liability -
> - encouragement of business development -- is outweighed by the policy
> justifying disregarding the corporate form -- the need to protect those
> who deal with the corporation.

*Id.* at 139 (internal citations omitted) (quoting *American Protein Corp. v. AB Volvo*, 844 F.2d 56,

60 (2d Cir.), *cert. denied*, 488 U.S. 852 (1988) and citing *William Wrigley, Jr. Co. v. Waters*, 890

F.2d 594, 601 (2d Cir. 1989)).

In keeping with the long-acknowledged fact that maritime actors are "peripatetic," the

courts of this district have not been quick to vacate Rule B attachments based on alter ego

allegations in a complaint, and such attachments have been upheld on numerous occasions.

*Wajilam, supra*, 475 F.Supp. 2d at 275 (upholding attachment where complaint alleged that

defendants routinely diverted funds in disregard of the companies' corporate separateness);

*FESCO Ocean Management Ltd. v. High Seas Shipping Ltd.*, 2007 U.S. Dist. LEXIS 19970

(S.D.N.Y. 2007) (Judge Buchwald) (upholding attachment where plaintiff alleged payments by

one party on behalf of another without contractual obligation to do so); *World Reach*, 2006 U.S.

Dist. LEXIS 83224 (holding amended complaint stated prima facie case against alleged alter ego

where it alleged that it was acting as a paying agent in satisfying or arranging for third parties to

satisfy the debts of the controlled entity, made hire payments on behalf of the controlling

company and was "intimately involved in the specific details of the [Charter Agreement]."); *SPL*

*Shipping Ltd v. Gujarat Chiminex Ltd.*, 2007 U.S. Dist. LEXIS 18562 (S.D.N.Y. 2007)

("Plaintiff has essentially made three allegations against Nirma:  first that Nirma has in this case,

and other cases, made payments on behalf of Gujarat to third parties; second, that there existed

such unity of ownership and interest ... that no separation exists between Nirma and Gujarat,

such that the corporate form has been disregarded; and third, that Nirma has dominated and used

-24-

Gujarat for their own purposes such that there is no meaningful difference between the three entities and there has been an intermingling of funds between the several entities. Both factors are found among the list of factors a court may consider when alter ego status has been pled, and are sufficient to state a valid admiralty claim.") (internal quotation marks omitted); *Tide Line,* supra, 2006 U.S. Dist. LEXIS 95870, \*44-46 (allowing attachment to stand on amended complaint alleging that defendant was a shell corporation, was a chartering arm through which the other defendant conducted its business, was wholly dominated, had no identifiable assets employees or assets, had payments made on its behalf, and had corporate and business functions performed for it by its controlling company); *T&O Shipping, Ltd. v. Source Link Co., Ltd.,* 2006 U.S. Dist. LEXIS 88153 (S.D.N.Y. 2006) (denying motion to dismiss amended complaint where defendants were admittedly commonly owned and allegedly ignored corporate distinctness in contractual dealings with plaintiff and other parties).

Judge Buchwald recently handed down a decision in *Hawknet Ltd v. Overseas Shipping Agencies,* 2008 U.S. Dist LEXIS 35542 (S.D.N.Y. April 29, 2008), in which she addressed many of the issues presented here. She reviewed the proposed (second) amended complaint, the additional materials provided by the parties, and concluded that the allegations in the proposed amended complaint were not wholly conclusory and allowed the amendment as well as the attachment to remain in place.

Since one of the alleged alter egos contended that the attached funds belonged to it and not the contractual party, Judge Buchwald directed the parties to proceed with discovery on the alter ego allegations and complete it within 60 days. As discussed in Point I above, Mansel submits that whether to wait for the outcome of the London Arbitration or to allow discovery in

the meantime and proceed to a final determination on the alter ego allegations is a matter for the Court's discretion.

In the present case, the allegations contained in the Amended Complaint more than adequately satisfy this Circuit's alter ego pleading requirements as to each of the defendants. The allegations are far from "conclusory" or "general," but are supported by specific and detailed factual allegations. As is more fully detailed at paragraphs 20-87 of the Amended Complaint, Mansel's allegations include specific details about common ownership, directorship and officers, (see ¶¶21-50); common office space, contact details and employees (see ¶¶51-56, 85); common beneficial ownership (see ¶¶46-50); inadequate capitalization (see ¶¶73-79); payment of others' debts (see ¶¶73-79); guaranteeing others' obligations without adequate consideration for doing so (see ¶¶73, 76); absence of independent business discretion, (see ¶¶21-50, 86); domination and control (see ¶¶52-72, 86-87); transactions among the defendants not on arms' length terms (see ¶¶73-79); and commingling of funds (see ¶¶81-83).

Swift Aviation Group contends the use of the common service mark "Swift Aviation Group" carriers no weight. Swift Mem at 17. It repeats the contention that "Swift Aviation Group" is not meant to refer to Swift Aviation Group, Inc. Swift Mem at 17. The Court stated its skepticism at this contention at the hearing on April 3: "I'm not going to play semantics...We don't talk about Microsoft, Inc. as opposed to Microsoft." Shumway Apr. 21 Aff. Ex. 11, Transcript of April 3 Hearing, at 32, Lines 19-25.

Mansel submits that the federal service mark is especially relevant and material in the circumstances of this case because it is evidence that Swift Aviation Group, the owner of the mark and the company that registered it, dominates the Swift Subsidiaries. See ¶¶57-59 of the Amended Complaint. In particular, the person who applied for the mark on behalf of Swift

Aviation Group declared under oath that the Swift Service Mark was for "business management services, namely management of private air terminals for others, aircraft management for others, namely managing and arranging passenger aircraft operations" and also for "aircraft repair and maintenance; fueling services for aircraft," and the United States Patent and Trademark Office issued the Swift Service Mark for those purposes. The United States Code, 15 U.S.C. §1127, provides:   "The term 'service mark' means any word, name, symbol, or device, or any combination thereof— (1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter, to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown."

The above describes the activities of the Swift Subsidiaries as alleged in the Amended Complaint and, indeed, as described by Mr. Shumway in ¶¶31-61 of his April 21 Affidavit.

Based on the allegations alone of the Amended Complaint, Mansel has met any burden it may have under Rule E(4)(f) or Rule 12(b)(6).   Moreover, as Chief Judge Wood stated in *Tide Line*, 2006 U.S. Dist LEXIS 95870 at *18-25 and at *43-49, a plaintiff is not necessarily limited to the complaint, and a court may take into account additional information provided at the E(4)(f) hearing in determining whether a plaintiff has stated a prima facie admiralty claim under *Aqua Stoli*. See in this regard the Lane and Kaiser Declarations and the Factual Background section of this Memorandum.

Doubtless, maritime courts are more receptive to alter ego claims for sound, historical, experience-based reasons: maritime actors do not so much incorporate to limit liability as to avoid it. In *Swift & Co. Packers v. Compania Columbian del Caribe, S.A.*, 339 U.S. 684 (1950),

the Supreme Court held it had authority to decide whether a transfer of a vessel to avoid attachment was fraudulent. In *Aqua Stoli*, the Second Circuit explained:

> Maritime attachments arose because it is frequently, but not always more difficult to find property of parties to maritime disputes than of parties to a traditional civil action. Maritime parties are peripatetic and their assets are often transitory ... Thus, the traditional policy underlying maritime attachments has been to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy a judgment.

*Aqui Stoli*, 460 F.3d at 443.

D.   Plaintiff Asserts Quasi in Rem, Not Personal Jurisdiction

Defendants suggest (Swift Mem. at 21) that the Amended Complaint is deficient because it does not allege that this Court has "personal jurisdiction" over defendants, but this contention reveals a basic misunderstanding of Rule B. The jurisdiction of this Court is premised upon *quasi in rem* jurisdiction over the property of the Swift Defendants which has been, or will be, attached within this district. Indeed, it is one of the key requirements of Rule B that the defendant *not* be "found" within the district for jurisdictional purposes. The Swift Defendants concede they cannot be found here and hence their property, here is subject to attachment under Rule B. *See Intergrated Containers Serv., Inc. v. Starlines Container Shipping Ltd.,* 471 F. Supp. 119, 122 (S.D.N.Y. 1976). The constitutionality of attaching electronic funds transfers ("EFTs") passing through New York pursuant to Supplemental Admiralty Rule B was upheld in *Winter Storm Shipping, Ltd. v. TPI,* 310 F.3d 263, 276 (2d Cir. 2002) (" ... we hold that when an individual or company transfers funds by means of an EFT, those funds may be subjected to maritime attachment in the hands of an intermediary bank without violating constitutional due process, whether or not the initiator of the transfer knew which intermediary bank would be used to effect it.").

E.    Defendants' Forum Non Conveniens Argument Is Similarly Flawed

Defendants' contention that this action should be dismissed on *forum non conveniens* grounds again reflects a fundamental misunderstanding of one of the two purposes of Rule B, namely, to allow a party to obtain security in one jurisdiction in respect of its claims on the merits against a party in another jurisdiction.   Indeed, the Swift Defendants' position was expressly rejected in Seatrek Trans. Pte Ltd v. Regalindo Resources Pte. Ltd., 2008 U.S. Dist. LEXIS 30578, *7 (S.D.N.Y. 2008) (rejecting motion to dismiss Rule B action on *forum non conveniens* grounds, as follows: "Plaintiff responds, and the Court agrees, that there is clear authority supporting the practice of obtaining a merits adjudication in one forum and initiating a maritime attachment proceeding in another forum to secure any potential award.   Indeed, it would appear that this is a fundamental purpose of Supplemental Rule B and the institution of maritime attachment generally.") (citations omitted).

## POINT III

## RESPONDING TO THE "RELATION-BACK" ISSUE

With respect to the relation back issues (Swift Mem. at Points III and IV), see discussion above at page 7.

## CONCLUSION

The Court should grant Plaintiff Leave to File an Amended Complaint in the form annexed as Exhibit A to the Lambert Affidavit; issue an Amended Order of Attachment against property in this District of any of the Defendants in the form annexed as Exhibit C to the Lambert Affidavit; and deem any funds which may be attached between April 7 and the Court's ruling on this motion under the Court's prior Order of February 5, 2008, as being attached pursuant to the Amended Order.


Dated:   New York, New York
         May 21, 2008

                              Respectfully submitted,
                              BLANK ROME LLP

                              By: _____
                                 LeRoy Lambert (LL-3519)
                                 Attorneys for Plaintiff
                                 405 Lexington Avenue
                                 New York, New York 10174
                                 (212) 885-5000

129053.00601/6634311v.1