UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MANSEL OIL LIMITED,

      Plaintiff,

      v.

SWIFT AVIATION GROUP, INC.,

      Defendant.

---

**ECF case**

08 Civ. 1086 (GBD)

**DECLARATION OF ANTHONY ROBERT
SWINNERTON IN SUPPORT OF
DEFENDANT'S CROSS-MOTION TO STAY
ALL CLAIMS PENDING ARBITRATION**

ANTHONY ROBERT SWINNERTON, a solicitor duly admitted to practice law in the jurisdiction of England and Wales, hereby declares under penalty of perjury, as follows:

1.    I am a partner of the law firm Swinnerton Moore, LLP ("Swinnerton Moore"), which represents Defendant Swift Aviation Group, Inc. ("Swift Aviation Group") in the London Maritime Arbitrators Association arbitration (the "London Arbitration) brought against it by Plaintiff Mansel Oil Ltd. ("Mansel Oil"). I have twenty-five years experience with commercial and maritime arbitrations, including international arbitrations. I submit this declaration based on personal knowledge or, where so indicated, upon information and belief in support of Swift Aviation Group's Cross-Motion to Stay All Claims Pending Arbitration.



2.      I have reviewed (i) Plaintiff's memorandum of law and the accompanying

Affidavit of LeRoy Lambert in support of Plaintiff's Motion for Leave to File an Amended

Complaint; to Issue Amended Order of Attachment; and to Attach the Funds Presently Attached

Pursuant to the Amended Order of Plaintiff Mansel Oil Limited, dated April 7, 2008; (ii)

Defendant's memorandum of law and the accompanying Declaration of Jeff A. Shumway, Chief

Financial Officer of Swift Aviation Group, and the Declaration of John L. Gardiner, counsel to

Defendant, (1) in support of Defendant's Cross-Motion to Stay Claims in Favor of Arbitration

and (2) in Opposition to Plaintiff's Motion to Amend, dated April 21, 2008; and (iii) Plaintiff's

Memorandum of Law in Reply in Support of Plaintiff's Motion to Amend ("Plaintiff's

Opposition"), dated May 21, 2008, as well as the Declaration of Ingolf Kaiser dated May 21,

2008, submitted in support of Plaintiff's Motion to Amend ("Kaiser Decl.").

3.      I have a different opinion regarding a number of points stated by Plaintiff and by

Mr. Kaiser, partner at Stephenson Harwood, the law firm responsible for representing Plaintiff in

the London Arbitration, and I set out my views below.

4.      Firstly, the record shows that Plaintiff Mansel Oil has been rather dilatory in its

pursuit of the London Arbitration.  Mansel Oil first wrote to Swift Aviation Group on January

16, 2008, claiming $533,046.33 due to it under the Torm Sofia Charter for freight and demurrage

charges, and $73,239.59 due under the Overseas Limar Charter for demurrage charges.  The total

debt purportedly due under the two charter party agreements is $606,285.92. (Shumway Decl., ¶

7 and Exh. 3.)

5.      While Mansel Oil filed a complaint in New York on February 1, 2008, alleging a

total debt purportedly due under the two charter party agreements of $1,078,291.67, Mansel Oil

did not formally commence arbitration in London and appoint its arbitrator until March 26, 2008.

2



(Compl. ¶ 15, Shumway Decl. Exh. 4.) Swift Aviation Group appointed its arbitrator on April 16, 2008. (Exh. 1.) At that time, with Swift Aviation Group having promptly appointed its arbitrator, it was reasonable to believe that the arbitration would proceed apace, and that a determination by Final Award of the merits of Plaintiff's claim could be achieved within a reasonably short time-frame.

6.      However, from April 16, 2008, the date Swift Aviation Group appointed its arbitrator, until June 4, 2008, I had not received any communications from Plaintiff's counsel, a period of one and a half months, when counsel served Defendant with its Claim Submissions in relation to both Charterparty Agreements (Exhs. 2 and 3).

7.      In my experience, this is not in keeping with how maritime arbitrations usually proceed, unless a claimant wishes to delay the proceedings.

8.      I note that the Plaintiff's claims have been reduced in the Claim Submissions from $1,078,291.67 to $559,974.24. Plaintiff is now claiming $476,407.05 under the Torm Sofia Charter and $83,567.19 under the Overseas Limar Charter.

9.      Normally, a claimant serves a notice of arbitration shortly after sending a demand for payment (*e.g.*, two weeks). The claimant subsequently serves so-called "Claim Submissions" relatively shortly after commencing arbitration, after which the respondent serves a "Defense" and "Counterclaim," where applicable. As of May 19, 2008, Plaintiff's counsel Mr. Kaiser simply stated that "Mansel will prepare and serve Points of Claim on Swinnerton Moore in the near future." (Kaiser Decl. ¶11.) As noted above, Plaintiff served Defendant with its Claim Submissions on June 4, 2008. Mr. Kaiser, who swore to his declaration shortly before Plaintiff's counsel served its Claim Submissions, does not proffer any reasons as to why it took five and a

half months for Plaintiff to prepare and serve its Claim Submissions from the time it made its initial demand for payment on January 16, 2008.

10. I also feel compelled to comment on Plaintiff's assertion that "[a]n arbitration award in London is likely a year away, at least," implying Plaintiff could not bring the arbitration to completion for another twelve months and that this matter is otherwise beyond its control. (Plaintiff's Opposition at 8.) In my view, if the arbitration claim is actively pursued, an arbitration award likely could be rendered within six months from now, perhaps in November/December, 2008. If Plaintiff asserts there is no real defense to its claims, then the tribunal has authority to issue an award after the exchange of submissions and pleadings, without an oral hearing. (Notices of Commencement of Arbitration, Lambert Aff., March 28, 2008, Exhs. 22 and 23). If such a procedure is followed, then an award is typically issued within one or two months of the exchange of submissions and pleadings.

11. Accordingly, it is worth noting that if Plaintiff had served its Claim Submissions on or shortly after the date Defendant appointed its arbitrator (April 16, 2008), then Plaintiff could have requested the tribunal to render an award approximately in July 2008.

12. Instead, Mr. Kaiser states that the parties likely will prepare and exchange questionnaires, enter into a discovery phase, prepare and submit factual as well as expert evidence and then attend a hearing, to be followed by the Tribunal's deliberations. (Kaiser Decl. ¶¶ 11-15.) Mr. Kaiser also declares that "an award is unlikely until seven to nine months from now" – which is three to five months less than the one year mark given by Plaintiff. (Kaiser Decl. ¶ 16.) Leaving aside the contradiction between Plaintiff's Reply and the declaration of Mr. Kaiser, my view on the timeframe for the arbitration is that the proceedings in a claim of this

nature should last between three to five months before the arbitrators are asked to render an award.

13.    I also disagree with Mr. Kaiser's statement that "[i]f the amount of costs is disputed, one should add another one month before there is a final award on all issues." (Kaiser Decl. ¶ 16.) Based on my experience, arguments regarding the amount of costs payable do not usually delay the issuance of an award. If necessary, the tribunal can deal with this matter with a second or supplemental award *after* the main award has been issued.

10.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: London, England
       June 6, 2008

Anthony Robert Swinnerton

# Exhibit 1

# Swinnerton Moore LLP

### SOLICITORS

Cannongate House, 64 Cannon Street
London EC4N 6AE
Tel: +44 (0) 20 7236 7111
Fax: +44 (0) 20 7236 1222
Email: info@swinmoore.com
Web: www.swinmoore.com

Associated Offices: Moscow, St. Petersburg and Piraeus

### Fax Message

| To: | Stephenson Harwood<br>979/46-02883 & 979/45-03151 | Fax: | 7329 7100 |
|-----|----|------|-----|
| Cc: | John Schofield Esq | Fax: | 01689 834903 |
| Cc: | Michael Baker-Harber Esq | Fax: | 020 7351 1623 |
| From: | 5522/TS/LM/KL | Date: | 16 April 2008 |
| Re: | TORM SOFIA C/P 23.08.07<br>OVERSEAS LIMAR C/P 11.07.07 | Pages: | 1 |

Dear Sirs,

We refer to your fax of 9 April and confirm that we have appointed Mr. John Schofield as arbitrator on behalf of the Charterers under both Charterparties. Mr. Schofield's details are:-

10 Sutherland Avenue
Petts Wood
Orpington
Kent BR5 1QZ

Tel:    01689 873587
Fax:    01689 834903
Email:  johnschofield@ntlworld.com

Yours faithfully

SWINNERTON MOORE LLP



INVESTOR IN PEOPLE    **LEXCEL**    Regulated by the
Solicitors Regulation
Authority

A list of members is available for inspection
at the Registered Office at:
Cannongate House, 64 Cannon Street, London EC4N 6AE
Registered in England and Wales, No: OC330607

# Exhibit 2

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

B E T W E E N :-

MANSEL OIL LIMITED

<u>Claimants</u>

-and-

SWIFT AVIATION GROUP INC

<u>Respondents</u>

---

CLAIM SUBMISSIONS

---

1.    By a Charterparty dated 23rd August 2007 on the Beebeevoy3 Form with amendments and additions, the Claimants as Owners chartered the vessel "TORM SOFIA" ("the Vessel") to Swift Transportation Inc as Charterers for the carriage of a cargo of clean petroleum products from one/two safe port(s) Arabian Gulf (excluding Iran and Iraq) to (in the event) Amsterdam.

2.    By Addendum No 2 dated 12th September 2007 it was agreed that the Respondents, Swift Aviation Group Inc would be substituted as Charterers under the said Charterparty.

3.    The Charterparty, which is contained in or evidenced by a fixture recap dated 23rd August 2007 and to which the Claimants will refer as necessary for its full terms, meaning and effect expressly further provided as follows:-

*"Clause 18*

*Charterers shall be allowed seventy two (72) hours, Sundays and holidays included, together with any period of additional laytime arising under the*

provisions of Clause 17 if Charterers sanction loading of the Vessel before the commencement of laydays, as laytime for loading and discharging and in respect of any period(s) when the Vessel, in accordance with Charterers' instructions, is proceeding or operating as referred to in Clauses 4, 5, 12, 21, 24, 25, 26, 29, 30 and 31. Sundays and holidays shall be included in respect of laytime for loading or discharging and Charterers shall have the right of loading and discharging during the night.

### Clause 19

Subject only to Clauses 17, 20 and 21:-

(a) laytime or, if the Vessel is on demurrage, demurrage shall at each loading and each discharge port or place commence at the expiry of 6 hours after Notice of Readiness to load or discharge has been tendered by the Master or his agents by Charterers or their agents, berth or no berth, or when the Vessel [is] all fast, whichever first occurs.

Such Notice of Readiness may be given either by letter, facsimile transmission, telegram, telex, radio or telephone (and if given by radio or telephone shall subsequently be confirmed in writing and if given by facsimile transmission confirmed by telex).....

(b) laytime or, if the Vessel is on demurrage, demurrage shall run until the cargo hoses have been finally disconnected upon termination of loading or discharging, such disconnection to be effected promptly; provided always that if the Vessel is detained for more than 2 hours beyond the final disconnection of hoses by the shore terminal solely for the completion of cargo documentation and the presentation of such documents on board the vessel, laytime or, if the Vessel is on demurrage, demurrage shall re-commence after such period of 2 hours and terminate upon the completion of cargo documentation.

### Clause 20

Time shall not count against laytime or, if the vessel is on demurrage, for demurrage when spent or lost:-

(a) on an inward passage, including awaiting daylight, tide, opening of locks, pilot or tugs and moving from anchorage, even if lightening has taken place at the anchorage, until the Vessel is securely moored at the berth or other loading or discharging place specified by Charterers;

(b) ....

### Clause 22

Charterers shall pay demurrage at the rate of US$28,500 per running day and pro rata for part of a running day for all time that loading and discharging and any other time counting as laytime exceeds the laytime specified in Clause 18

**Clause 24**

*If at any time after the Vessel has completed loading the cargo or part cargo, as the case may be, Charterers instruct the vessel to await their orders at any one or more locations, then all time spent by the Vessel awaiting orders as aforesaid shall count as laytime or, if the Vessel is on demurrage, as demurrage.*

**Additional Clauses**

*Address Commission Clause: Amended*

*1.25 per cent is payable by Owners to Charterers on all monies paid, on deviation. Such address commission is deductible at source. Address Commission to be paid only on time itemised as demurrage"*

4.    Further it was an implied term of the Charterparty to be implied therein by reason of the express terms and/or in order to give business efficacy thereto and/or as a matter of law that in the event that the Vessel had to spend time awaiting orders from the Charterers, then the cost of bunkers thereby wasted would be paid by the Respondents.

5.    Pursuant to the Charter, the Respondents ordered the vessel to proceed to Mina Abdullah to load cargo. The vessel tendered NOR at 00:12 on 7th September 2007 and time therefore started to count 6 hours later at 06:12 hours on 7th September 2007. Following instructions, the vessel proceeded to berth between 06:54 hours on 16th September 2007 until 09:45 hours on 16th September 2007 which period falls to be deducted from the calculation of time. Thereafter loading operations were completed and hoses disconnected at 04:10 hours on 17th September 2007.

6.    In the premises, the total time used at Mina Abdulla was 243 hours and 58 minutes from which there falls to be deducted 6 hours in respect of the period after NOR and 2 hours 51 minutes in respect of time spent proceeding inwards. In the premises and as set out in the attached calculations, the total time used at Mina Abdulla was 235 hours and 7 minutes.

7.    Thereafter and when the vessel was laden with cargo, the Respondents ordered the vessel to wait for orders off Gibraltar. The period spent so

waiting for orders off Gibraltar was from 20:08 hours on 6th October to 21:24 hours 11th October 2007 a total of 5 days and 1 hour and 16 minutes. During this period of waiting the vessel consumed a total of 24.20 mt of HFO.

8.  Then the Respondents ordered the vessel to proceed to Rotterdam and await further orders. The vessel arrived at anchorage at Rotterdam at 20:20 hours on 15th October 2007 and there awaited orders until 13:00 hours on 17th October 2007, a period of 1 day 16 hours and 40 minutes. During this period of waiting the vessel consumed a total of 8.10mt of HFO.

9.  Thereafter, the Respondents ordered the vessel to proceed to Amsterdam to discharge the cargo where she arrived and tendered NOR at 17:06 hours on 17th October 2007. Just prior to the expiry of the 6 hour period, the vessel commenced her inward passage and was berthed and all fast at 06:00 hours on 18th October 2007. Thereafter, discharge operations were not completed and hoses disconnected until 04:45 hours on 21st October 2007. In the premises, time ran from the time the vessel was all fast until hoses were disconnected, being a period of 70 hours and 45 minutes as set out in the attached calculation.

10.  Accordingly the total time used at Mina Abdulla and Amsterdam was 305 hours and 52 minutes whereas the total available laytime was 72 hours. Accordingly, the Respondents are liable for demurrage for the period of 233 hours and 52 minutes and owe to the Claimants the sum of US$274,245.22 (US$277,716.67 less commission of US$3,471.45).

11.  In addition pursuant to Clause 24, the Respondents are liable for demurrage for the time awaiting orders at Gibraltar and Rotterdam, being a total period of 6 days 17 hours and 56 minutes. In the premises, the Respondents owe the sum of US$189,892.13 (being US$192,295.83 less commission of US$2,403.70) in respect of demurrage. Further, the Respondents owe the sum of US$9,256.50 in respect of bunkers at Gibraltar (24.20 x US$382.5 pmt) and US$3,013.20 in respect of bunkers at Rotterdam (8.1 x US$372 pmt).

12.  In the premises, the Respondents owe to the Claimants the total sum of US$476,407.05.  However, wrongfully and in breach of the Charterparty the Respondents have failed and/or refused to pay the said sums or any part thereof.

13.  Further, the Claimants claim interest pursuant to Section 49 of the Arbitration Act 1996 on such sums as are awarded to them at such rate and for such period as the Tribunal thinks fit.


AND THE CLAIMANTS CLAIM

(1) US$476,407.05 or such other sum as the Tribunal determines;

(2) Interest pursuant to section 49 of the Arbitration Act 1996 as aforesaid.

(3) Costs


                                        POONAM MELWANI


Served this 4th day of June 2008, by Stephenson Harwood, One St Paul's Churchyard, London EC4M 8SH, Solicitors for the Claimants



BP SHIPPING LTD.
Britannic Tower
Moor Lane
LONDON EC2Y 9BU

Code word for this Charterparty
BEEPEEVOY3"

# *Voyage Charterparty*

| | |
|---|---|
| **LONDON** *23rd August* ............................................ ~~19~~..2007 | 1 |
| *It is this day agreed between Mansel Oil Limited*................................................... | 2 |
| *of Bermuda*......................................................... | 3 |
| ........................................................................ | 4 |
| *timechartered* Owners (hereinafter referred to as 'Owners') of the good motor/~~steam~~ tank vessel called | 5 |
| *"TORM SOFIA"*........................................ | 6 |
| (hereinafter referred to as 'the Vessel') now *in ballast ETA Kuwait 5th September 2007*.................... | 7 |
| ................................. ~~and expected ready to load about~~ ........................... | 8 |
| and ~~*BP Shipping Limited*~~ ~~of London as agents for~~ *Swift Transportation Inc.,* ...................... | 9 |
| ......................................................................... | 10 |
| (hereinafter referred to as 'Charterers') | 11 |

| | | |
|---|---|---|
| **Classification of Vessel** | 1. Owners undertake that: | 12 |
| | (a) the Vessel is classed    *Lloyds Register* ........................... | 13 |
| **Description of Vessel** | (b) the Vessel has a summer deadweight of *72,718 metric* ........................................ tonnes | 14 |
| | on a saltwater draught of *14.022* ............................................ metres, with a total cargo capacity (98% | 15 |
| | full) of *78,812.6*......................................... cubic metres; - *slop tank(s) @ 98% 4,255.8 cubic metres* | 16 |
| | (c) the Vessel is fully fitted with heating coils fabricated from ......................................... | 17 |
| | in all cargo tanks, capable of heating the cargo to, and maintaining it at all times at a temperature of, | 18 |
| | 57deg C (135deg F); | 19 |
| | (d) the Vessel is equipped with ~~derricks~~ *one (1) crane* capable of lifting to, and supporting at, the Vessel's port and | 20 |
| | starboard manifolds submarine hoses of up to *fifteen (15)* ............................................ tonnes in weight. | 21 |
| **Condition of Vessel** | 2. Owners shall before, at the commencement of, and throughout the voyage exercise due diligence to make and maintain the Vessel, her tanks, pumps, valves and pipelines tight, staunch, strong, in good order and condition, in every way fit for the voyage and fit to carry the cargo provided for in Clause 3, with the Vessel's machinery, boilers and hull in a fully efficient state, and with a full and efficient complement of Master, officers and crew. | 22 23 24 25 26 |
| **Loading** | 3. Subject to the provisions of Clause 24, the Vessel shall proceed to *one/two safe port(s) Arabian Gulf excluding Iran and Iraq* | 27 |

| | | | |
|---|---|---|---|
| and Discharge<br>Ports Range | ................................................................................................................ | 28 |
| | ................................................................................................................ | 29 |
| | ................................................................................................................ | 30 |
| Cargo | or so near thereunto as she may safely reach, and there load a cargo of *in Charterers option upto full cargo* | 31 |
| | *- no heat - non persistant clean petroleum products, unleaded, undunker 2.5, unleaded - maximum* | 32 |
| | *two grades within vessels natural segregation excluding lubes, casing head, solvents, chemicals,* | 33 |
| | *penthane, penthane plus, paraffinic naphtha - Owner advises vessel loads approximately 67,710.54* | 34 |
| | *basis 13.72 sailing draft* ................................................................................. | 35 |
| | ................................................................................................................ | 36 |
| | ............................................................................................. in bulk, | 37 |
| | not exceeding what can reasonably stow and carry over and above the tackle, provisions and furniture, | 38 |
| | and in any case not in excess of the quantity permitted by the International Load Line Convention, 1966, or | 39 |
| | any modification or amendment thereof as may be applicable to the voyage to be performed under this | 40 |
| | Charter. Thereupon the Vessel shall proceed with such cargo at a speed which Owners undertake shall be | 41 |
| | *about fourteen (14)* knots ('Base Speed'), *weather and safe navigation permitting,* as ordered on signing | 42 |
| | Bills of Lading or as provided in Clauses | |
| | *24 and/or 26 to one/two safe port(s) United Kingdom, Continent Gibraltar / Hamburg range* ............... | 43 |
| | *excluding Scandinavia/Denmark, Manchester Ship Canal, Peterhead, Tranmere, Dundee,* ............ | 44 |
| | *Londonderry, Lyme Bay, Eire, Liverpool via Suez or in Charterers option one/two safe port(s)* | 45 |
| | *West Africa Abdijan / Douala range excluding United Nations sanctioned Countries and River* | 46 |
| | *ports - via Cape or in Charterers option one/two safe port(s) Mediterranean excluding Yugoslavia,* | 47 |
| | *former Yugoslavia, Albania, Turkish occupied Cyprus, Syria, Lebanon, Israel via Suez and/or* | 48 |
| | *Charterers option one/two safe port(s) United States Atlantic Coast if New York not North of* | 49 |
| | *George Washington Bridge via Suez and/or in Charterers option one/two safe port(s) United States* | |
| | *Gulf excluding Mississippi River via Suez and/or Charterers option one/two safe port(s) Caribbean* | |
| | *Seas excluding Cuba, Orinoco, Haiti, Carapito and Lake Maracaibo via Suez or so near thereunto as* | |
| | she may safely reach, | |
| | and deliver the same in consideration of the payment of freight as provided in Clauses 6 and 7. | 50 |
| | *Maximum three (3) discharge ports in total and maximum two (2) ranges if combination. If* | |
| | *combination with Mediterranean with Transatlantic option rotation always to be East to West. If* | |
| | *combination between Transatlantic options rotation always to be North to South and East to West* | |
| | ~~Charterers shall have the right at any time during the voyage to order the Vessel to increase speed in order~~ | 51 |
| | ~~to arrive at a port or place on a certain date. Charterers shall not instruct the Vessel to increase speed such~~ | 52 |
| | ~~as to require the Vessel to proceed at a maximum speed in excess of that set out in the BP Shipping~~ | 53 |
| | ~~Questionnaire. If Charterers require any increase of speed to be made, any increase in the freight rate~~ | 54 |
| | ~~consequent thereon shall be calculated in accordance with the provisions of Clause 6.~~ | 55 |
| | ~~If the Vessel fails to maintain Base Speed, or fails to comply with instructions as to the increase of speed~~ | 56 |
| | ~~given by Charterers pursuant to this Clause, Owners shall, subject to Clause 46, be liable for all costs,~~ | 57 |
| | ~~losses, damages and expenses arising as a direct consequence thereof save to the extent that Owners can~~ | 58 |
| | ~~prove to the satisfaction of Charterers that such failure was attributable to a reduction in speed necessi-~~ | 59 |
| | ~~tated by either adverse weather and sea state conditions or the safe navigation of the Vessel and Charterers~~ | 60 |
| | ~~shall be entitled to deduct any such costs, losses, damages and expenses from any demurrage due to Owners~~ | 61 |
| | ~~hereunder without prejudice to any other rights available to Charterers under this Charter or otherwise~~ | 62 |
| | ~~under English Law.~~ | 63 |
| Loading/<br>Discharge | 4. The Vessel shall be loaded and discharged at any port, berth, dock, anchorage, submarine line, | 64 |
| | single point or single berth mooring facility, offshore location, alongside vessels or lighters, or any other | 65 |

| | | |
|---|---|---|
| Place | place whatsoever as ordered by Charterers, *however, the safety of same always to be at Masters discretion, which not to be unreasonably withheld.* Charterers shall exercise due diligence before directing the | 66 |
| | Vessel to any such places to ascertain that the Vessel can always lie safely afloat, but Charterers do not warrant the safety of any of the aforementioned places and shall be under no liability in respect thereof except for loss or damage caused by the failure to exercise due diligence as aforesaid. | 67 68 69 |
| Lightening at Sea | If a port is nominated which cannot accommodate the Vessel with the quantity of cargo carried, Charterers undertake to discharge sufficient cargo at a previous port or place, or into vessels or lighters, to enable the Vessel to enter and lie at such nominated port or place. Freight shall be paid in accordance with Clause 6 and lighterage shall be at the expense of Charterers. | 70 71 72 73 |
| | *Unless so stipulated by Worldscale,* A place of lightening at sea, *which subject to Masters approval, which not to be unreasonably withheld* shall not constitute a discharge port or place under Clause 19, but all time used | 74 |
| | for a lightening operation (excluding any time lost or spent by reason of any of the causes stipulated in Clauses 20 and 21) shall count against the number of running hours stipulated in Clause 18 for the purpose of calculating Charterers' liability, if any, for demurrage as provided in Clause 22. For the purpose of this Clause the lightening operation shall be deemed to commence ~~when the Vessel is properly tied up and moored alongside the lightening vessel~~ and to end when unmooring has been completed. *Laytime to commence tendering NOR upon arrival at lightering position* | 75 76 77 78 79 |
| | Subject to the preceding paragraph of this Clause, any additional steaming and/or waiting time used solely by reason of Charterers' orders to lighten at sea shall count as laytime or, if the Vessel is on demurrage, as demurrage. | 80 81 82 |
| Ship to Ship Transfer Operations | If Charterers require the Vessel to trans-ship cargo from or into another ocean going vessel the trans-shipment operation shall be carried out in accordance with the recommendations set out in the latest edition of the ICS/OCIMF Ship to Ship Transfer Guide (Petroleum) and Owners undertake that the Vessel and her crew will comply with such recommendations. Charterers shall provide and pay for all necessary equipment including suitable fenders and hoses. Owners shall permit supervisory personnel nominated by Charterers to attend on board, including a Mooring Master, to assist in the trans-shipment operation. In the case of a ship to ship transfer freight shall be paid in accordance with the provisions of Clause 6. | 83 84 85 86 87 88 89 |
| | No provision herein contained as to laytime and demurrage shall be affected by the provisions of Clause 46. | 90 |
| | *Term Lightering/Ship to Ship Transfer Clause :* | |
| | *If lightering/ship to ship transfer operation is required same always to be in accordance with OCIMF latest edition of ship to ship transfer. Charterers to supply all fenders/lines/hoses and any other equipment required for such an operation at Charterers time and expenses and always subject to Masters approval. Time to count in full 6 hours after tendering NOR or when first lighter vessel is alongside, whichever earlier, until last line/fender is off and lighter vessel has sailed. Time lost due to tide and/or weather and/or sea conditions to count in full as laytime or demurrage if on demurrage. If the vessel is required to complete cargo operation at a berth in port Charterers will not have the benefit of 6 hours nor prior berthing in port. Charterers warrant that there is no prohibition or restriction on ship to ship operation at the port/place to which the vessel is ordered to perform ship to ship transfer and further that they have obtained any/all necessary local approvals or licences to carry out operations at the designated port/place* | |
| Shifting | 5.  Charterers may require the Vessel to load at more than one berth at each loading port or place and to discharge at more than one berth at each discharge port or place in which event Owners shall, in the first instance, pay expenses arising from any of the following movements of the Vessel:- | 91 92 93 |
| | (a)  unmooring at, and pilotage and towage off, the first loading or discharge berth; | 94 |
| | (b)  mooring and unmooring at, and pilotage and towage on to and off, the intermediate loading or discharge berths; and | 95 96 |
| | (c)  mooring at, and pilotage and towage on to, the last loading or discharge berth. | 97 |
| | Charterers shall reimburse Owners in respect of expenses properly incurred arising from any of the afore-mentioned movements upon presentation by Owners of all supporting invoices evidencing prior payment by Owners. | 98 99 100 |
| | Charterers shall reimburse Owners in respect of any dues and/or other charges incurred in excess of those which would have been incurred if all the cargo involved at the particular port or place had been loaded or | 101 102 |

|  | discharged at the first berth only. Time consumed on account of shifting shall coent as laytime or, if the Vessel is on demurrage, as demurrage, except as otherwise provided in Clause 20. | 103<br>104 |
|---|---|---|
| **Port and Terminal Combinations** | For the purpose of freight payment, the places grouped in Port and Terminal Combinations in the New Worldwide Tanker Nominal Freight Scale (hereinafter referred to as 'Worldscale'), as amended at the date of this Charter, shall be considered as berths within a single port, Charterers reimbursing shifting expenses in accordance with the foregoing provisions. | 105<br>106<br>107<br>108 |
| **Rate of Freight** | 6. The rate of Freight shall be at the level of *lumpsum rates basis 1/1 and inclusive of Suez transit* | 109 |
|  | *where applicable.  Additional ports payable as per Torm Interim Port Clause - US$ 1,850,000/=* | 110 |
|  | *East   Mediterranean not West of but including Malta via Suez, US$ 1,950,000/=  West* | 111 |
|  | *Mediterranean via  Suez, US$ 2,100,000/= United Kingdom, Continent via Suez, US$ 2,600,000/=* | 112 |
|  | *West Africa via  Cape, US$ 2,700,000/= United States Atlantic Coast via Suez, US$ 2,800,000/=* | 113 |
|  | *Caribbean Seas via Suez, US$ 2,900,000/= United States Gulf via Suez - freight payable before* | 114 |
|  | *breaking bulk (BBB)* ........................................................................ % of the rate for the voyage | 115 |
|  | as provided in Worldscale, as amended at the date of this Charter. ~~If Charterers order the Vessel to~~ | 116 |
|  | ~~increase speed under the provisions of Clause 3 such rate shall be increased by~~ | 117 |
|  | ~~Worldscale points for each knot of increased speed above the Base Speed or on a pro rata basis for fractions~~ | 118 |
|  | ~~of a knot up to a maximum of ...................................... knots. Such increase shall be calculated in accordance~~ | 119 |
|  | ~~with the following example:~~ | 120 |
|  | ~~Example: The Vessel proceeds at Base Speed of 10 knots, the rate for which is Worldscale 40.~~ | 121 |
|  | ~~After 10 days the Vessel is ordered to complete the voyage at 12 knots. The remainder of the~~ | 122 |
|  | ~~voyage takes 20 days. The increased speed option provides for a premium of 0.5 of a Worldscale~~ | 123 |
|  | ~~point per knot of increased speed over Base Speed.~~ | 124 |
|  | ~~The freight rate for the above voyage would be calculated as follows:~~ | 125 |
|  | ~~Voyage Freight Rate =   (W40 x 10 days)   +   (W41* x 20 days)~~ | 126 |
|  | ~~30 (total voyage days)~~ | 127 |
|  | ~~=   W40.67~~ | 128 |
|  | ~~(*1 point premium for 12 knots maximum speed)~~ | 129 |
|  | ~~Should the Vessel not maintain the speed ordered, due to breakdown or any other reason whatsoever~~ | 130 |
|  | ~~beyond Charterers' control, the freight rate shall be calculated based on the average speed actually~~ | 131 |
|  | ~~achieved by the Vessel using BP Worldwide Marine Distance Tables to assess the length of the voyage~~ | 132 |
|  | ~~between pilot stations at the loading and discharge ports or places.~~ | 133 |
|  | If the Vessel is ordered to lighten pursuant to Clause 4, the freight rate shall, notwithstanding the lightening, be the same Worldscale rate for the voyage as would be payable if no such lightening had taken place, *unless so stipulated by Worldscale.* | 134<br>135<br>136 |
|  | In the case of a ship to ship transfer, as referred to in Clause 4, the freight rate for the voyage shall be the rate as provided in Worldscale for the relevant Trans-shipment Area, as amended at the date of this Charter, or as provided by Worldscale upon application by the parties or either of them. | 137<br>138<br>139 |
|  | Notwithstanding the provisions of Clause 3 and the provisions of this Clause should the Vessel load in excess of the quantity specified therein then the freight payable for any overage in excess of such quantity shall be at one half of the freight rate(s) referred to above. | 140<br>141<br>142 |
| **Payment of Freight** | 7. Freight shall be payable immediately after completion of discharge, on the gross quantity of cargo loaded by the Vessel as evidenced by the Bills of Lading furnished by the shippers. Payment shall be made in U.S. dollars | 143<br>144<br>145 |
|  | *to at sight immediately upon completion of discharge by electronic fund transfer to : JP Morgan* | 146 |
|  | *Chase Bank New York, in favour JPMorgan Chase Bank, London, for credit to : Mansel Oil* .......... | 147 |
|  | *Limited, Account No. GB90CHAS60924223961701 - Any delays and/or extra expenses incurring* | 148 |
|  | *due awaiting clearance by port authorities in the United States to be for Charterers account*   less | 149 |

any sum derived from the operation of Clauses 8, *see also No. 5 of Trafigura Clauses 1991* and 54 and less 150
any disbursements or advances made to 151
the Master or agents at ports of loading and/or discharge, and additional cargo insurance premium for 151
Owners' account under Clause 42, provided that no freight shall be payable on any quantity which 152
submerges, at any stage of the voyage, the marks appropriate under the International Load Line 153
Convention, 1966, or any modification or amendment thereof as may be applicable to the voyage to be 154
performed under this Charter. 155

**Cargo Retention**    8. If any material remains in the Vessel's cargo tanks on completion of discharge of cargo Charterers 156
shall be entitled to appoint an *two* independent surveyors, *one appointed by Charterers and one* 157
*appointed and paid for by Owners*, to determine what, if any, quantity of such material is 158
cargo which is liquid, pumpable and reachable by the Vessel's pumps, *provided Master has ensured correct* 158
*trim procedures to maximise cargo outturn.* The independent surveyor's findings 158
shall be final and binding on Owners and Charterers. Charterers shall be entitled to deduct from freight an *shall* 159
*have the right to claim from Owners an* 159
amount equal to the FOB port of loading value of any quantity so determined together with freight due with 160
respect thereto. Charterers hereby agree to indemnify Owners against any liability to a Bill of Lading 161
holder resulting from non-delivery of any such cargo in respect of which a deduction from freight *claim* is made 162
provided, however, that Charterers shall in no event be liable to indemnify Owners in an amount greater 163
than the amount of the deduction from freight.*than their quantified claim* 164

**Cleaning of**    9. Without prejudice to the provisions of Clause 2 Owners shall use due diligence to ensure that the 165
**Vessel's**    Vessel presents for loading with her tanks, pumps and pipelines properly cleaned to the satisfaction of any 166
**Tanks, Pumps**    inspector appointed by Charterers and ready for loading the cargo specified in Clause 3. Any time used in 167
**and Pipelines**    cleaning tanks, pumps and pipelines to Charterers' inspector's satisfaction shall not count as laytime or 168
demurrage and shall, together with any costs incurred in the foregoing operations, be for Owners' account. 169

**Arriving to**    10.    If for any reason the Vessel is unable to trim to even keel for arrival at a discharge port Owners shall 170
**Even Keel**    notify Charterers by radio or telex stating the Vessel's expected arrival draught forward and aft in salt 171
water. Such notification shall be given as soon as practicable after the receipt of loading orders and no later 172
than sailing from the loading port or place. 173

**Slack Tanks**    11.    Notwithstanding the provisions of Clause 7, if Charterers are unable to supply the quantity of cargo 174
specified in Clause 3 the Vessel shall not be required to proceed to sea until such of her tanks are filled as 175
will place her in a seaworthy condition, and freight shall be paid as if the Vessel had been loaded with the 176
quantity of cargo specified in Clause 3. 177

**Inert Gas**    12.    Owners undertake that the Vessel is equipped with a fully functional Inert Gas System which is in 178
**System**    use on the date hereof and shall so remain during the period of this Charter and that the officers and crew 179
are properly qualified by way of certification for, and experienced in, the operation of such System. 180
Owners further undertake that the Vessel shall arrive at the loading port with her cargo tanks inerted and 181
that such tanks shall remain inerted throughout the voyage and the subsequent discharge of the cargo. Any 182
time lost, whether or not the Vessel is on demurrage, owing to deficient or improper operation of the Inert 183
Gas System shall be for Owners' account. 184

The Vessel's Inert Gas System shall fully comply with Regulation 62, Chapter II-2 of the SOLAS 185
Convention 1974 as modified by its Protocol of 1978 and Owners undertake that such System shall be 186
operated by the officers and crew in accordance with the operational procedures set out in the IMO 187
publication entitled 'Inert Gas Systems 1983' as may, from time to time, be amended. 188

If Charterers so require, Owners shall arrange for the Vessel's tanks to be de-inerted to facilitate 189
inspection, gauging and sampling. Any time taken in de-inerting, inspecting, gauging, sampling and re- 190
inerting thereafter shall count as laytime or, if the Vessel is on demurrage, as demurrage. 191

~~**Crude Oil**~~    ~~13.    Owners undertake that the Vessel is equipped with a fully functional Crude Oil Washing System~~ 192
~~**Washing**~~    ~~and that the officers and crew are properly qualified by way of certification for, and experienced in, the~~ 193
~~**Crude Oil**~~    ~~operation of such System.~~ 194
~~**Vessels**~~

~~Whilst Charterers may instruct the Master to carry out crude oil washing of all tanks which contained~~ 195
~~cargo the Master shall, in any event, arrange for the crude oil washing of cargo tanks to the MARPOL~~ 196
~~minimum standards, as set out in the Vessel's Crude Oil Washing Operation and Equipment Manual, at~~ 197
~~the discharge port or place.~~ 198

~~For all such crude oil washing the period for discharge specified in Clause 16 shall be increased from 24 to~~ 199
~~30 hours or pro rata thereof in the case of a part cargo. Any additional time taken for discharge and crude~~ 200
~~oil washing shall not count as laytime or, if the Vessel is on demurrage, as demurrage.~~ 201

| | | |
|---|---|---|
| **Dues and Other Charges** | 14.    Dues and other charges levied upon the Vessel, howsoever assessed, shall be paid by Owners. Dues and other charges upon the cargo shall be paid by Charterers. *Taxes and/or dues in cargo and/or freight to be for Charterers account and settled directly by them* | 202 203 |

Notwithstanding the foregoing where, under the provisions of Worldscale, as amended at the date of this Charter, a due or charge is expressly for the account of Owners or Charterers then such due or charge shall be paid in accordance with such provisions. 204 205 206

Should a charge be imposed upon Charterers by the owner of a berth by reason of prolonged occupation of such berth by the Vessel for reasons beyond the control of Charterers or their agents such charge shall be paid by Owners. 207 208 209

**Loading and Discharge of Cargo**    15.    The cargo shall be pumped into the Vessel at the expense of and at the risk and peril of Charterers as far as the Vessel's manifold only, and pumped out of the Vessel at the expense of and at the risk and peril of Owners as far as the Vessel's manifold only. 210 211 212

Owners shall, if requested, make available the hands, equipment, and facilities required on board for the connecting and disconnecting of hoses for loading and discharging. The Master may demand shore supervision of, and approval for, the connecting and disconnecting of hoses. Any delay resulting from the failure by Owners to provide the hands, equipment and facilities as aforesaid shall not count as laytime or, if the Vessel is on demurrage, as demurrage. 213 214 215 216 217

**Pumping**    16.    Owners undertake that the Vessel shall discharge a full cargo, as defined hereunder, within 24 hours, or pro rata thereof in respect of a part cargo, from the commencement of pumping or that the Vessel shall maintain a minimum discharge *average* pressure of 100 psig at the Vessel's manifold *except when stripping*, throughout the period of 218 219 220

discharge provided that the shore receiving facilities are capable of accepting discharge of the cargo within such time or at such pressure. The shore receiving facilities shall have the right to gauge discharge pressure at the Vessel's manifold. 221 222 223

Any additional time used owing to the inability of the Vessel to discharge the cargo within 24 hours or 30 hours, as the case may be, or such shorter period as may be applicable in the case of a part cargo, or to maintain a minimum discharge pressure of 100 psig at the Vessel's manifold throughout the discharge shall be for Owners' account and shall not count as laytime or, if the Vessel is on demurrage, as demurrage. If the shore receiving terminal facilities are unable to accept discharge of the cargo within the aforementioned time or at the aforementioned discharge pressure the Master shall present the shore receiving terminal with a Note of Protest forthwith, and in any event prior to the Vessel's departure from the berth, and shall use all reasonable endeavours to have such Note of Protest countersigned on behalf of the shore receiving terminal in the absence of which countersignature the Master shall present a further Note of Protest to the shore receiving terminal. 224 225 226 227 228 229 230 231 232 233

For the purpose of this Clause a full cargo shall mean the quantity referred to in Clause 3 or the Bill of Lading quantity, whichever is the greater. 234 235

Charterers will not consider any claim by Owners for additional time used in the foregoing circumstances in the absence of the provision by Owners of the following documentation:- 236 237

(a)    an hourly pumping log, signed by a responsible officer of the Vessel and a terminal or Charterers' representative, showing the pressure maintained at the manifold throughout discharge and, in the absence of a signature from a terminal or Charterers' representative, a Note of Protest; 238 239 240

(b)    copies of all Notes of Protest issued or received by the Vessel in relation to the discharge in question; and 241

(c)    copies of any other documentation generated by the Vessel or by the shore receiving terminal relevant to the discharge in question. 242 243

**Laydays/ Cancelling**    17.    Laydays for the purpose of this Charter shall be from *6th September 2007*.................................... 244

("the Commencement Date") to *8th September 2007*......................................................................... ("the Cancelling Date"). Laytime for the purposes of loading shall not commence before ~~0600~~ *00.01* hours local time on the Com- 245 246

mencement Date unless with Charterers' sanction in which event laytime shall commence when the Vessel commenced loading and should the Vessel not be ready to load by ~~1600~~ *23.59* hours local time on the Cancelling 247 248

Date Charterers shall have the option of cancelling this Charter. Should the Vessel, with Charterers' sanction, have commenced loading prior to the commencement of laytime, as provided above, then the time from such commencement of loading to the commencement of laytime shall constitute additional laytime 249 250 251

for the purpose of loading and discharging and in respect of the period(s) referred to in Clause 18.    252

If it appears to Charterers that the Vessel will be delayed beyond the Cancelling Date Charterers may   253
require Owners to notify Charterers of the date on which they expect the Vessel to be ready to load   254
whereupon Charterers shall have the option to cancel this Charter and such option shall then be declared   255
by Charterers within 96 hours, *48 hours* Sundays and holidays ~~excepted~~ *excluded*, of the receipt of the said   256
notification from
Owners. In the event of Owners giving such notification and Charterers not exercising their option to   257
cancel within the stated period, the third day after the readiness date stated in Owners' notification, or   258
such other date as may be mutually agreed, shall be the new Cancelling Date for the purpose of this Clause.   259
If Owners fail to give such notification when requested by Charterers, Charterers shall have the option to   260
cancel this Charter at any time prior to the arrival of the Vessel.   261

Cancellation or failure to cancel shall be entirely without prejudice to any claim for damages Charterers   262
may have for the Vessel not being ready to load by the original Cancelling Date stated in this Clause.   263

**Amount of, and Definition of, Laytime**

18.    Charterers shall be allowed *seventy two (72)*.................. hours, together with any period of additional   264
laytime arising under the provisions of Clause 17 if Charterers sanction loading of the Vessel before the   265
commencement of laydays, as laytime for loading and discharging and in respect of any period(s) when the   266
Vessel, in accordance with Charterers' instructions, is proceeding or operating as referred to in Clauses 4,   267
5, 12, 21, 24, 25, 26, 29, 30 and 31. Sundays and holidays shall be included in respect of laytime for loading   268
or discharging ~~unless loading or discharging on the Sunday or holiday in question is prohibited by law or~~   269
~~regulation at the port or place of loading or discharge and~~ Charterers shall have the right of loading and   270
discharging during the night.   271

**Commencement and Termination of Laytime/ Demurrage**

**for Loading and Discharge**

19.    Subject only to Clauses 17, 20 and 21:-   272

(a)  laytime or, if the Vessel is on demurrage, demurrage shall at each loading and each discharge port or   273
place commence at the expiry of 6 hours after Notice of Readiness to load or discharge has been ~~received~~   274
*tendered*
~~from~~ by the Master or his agents by Charterers or their agents, berth or no berth, or when the Vessel   275
~~commences to load or discharge at the berth or other loading or discharging place,~~ *all fast* whichever first   276
occurs.
Such Notice of Readiness may be given either by letter, facsimile transmission, telegram, telex, radio or   277
telephone (and if given by radio or telephone shall subsequently be confirmed in writing and if given by   278
facsimile transmission confirmed by telex) but Notice of Readiness shall not be given, without Charterers'   279
sanction, before the commencement of laydays; and   280

(b)  laytime or, if the Vessel is on demurrage, demurrage shall run until the cargo hoses have been finally   281
disconnected upon termination of loading or discharging, such disconnection to be effected promptly;   282
provided always that if the Vessel is detained for more than 2 hours beyond the final disconnection of hoses   283
by the shore terminal solely for the completion of cargo documentation and the presentation of such   284
documents on board the vessel, laytime or, if the Vessel is on demurrage, demurrage shall re-commence   285
after such period of 2 hours and terminate upon the completion of cargo documentation.   286

**Suspension of Laytime/ Demurrage for Loading and Discharge**

20.    Time shall not count against laytime or, if the Vessel is on demurrage, for demurrage when spent or   287
lost: -   288

(a)  on an inward passage, including awaiting daylight, tide, opening of locks, pilot, or tugs and moving from   289
anchorage, even if lightening has taken place at the anchorage, until the Vessel is securely moored at the   290
berth or other loading or discharging place specified by Charterers;   291

(b)  due, whether directly or indirectly, to breakdown, inefficiency or other cause attributable to the Vessel   292
and/or Owners, including inability of the Vessel to pump out the cargo at the rate indicated in Clause 16   293
after taking account of any variations in back pressure;   294

(c)  as a result of a labour dispute, or strike, involving Master, officers or crew of the Vessel or tugs or pilot;   295

(d)  in, or in connection with, the handling of ballast unless this is carried out concurrently with loading or   296
discharging such that no loss of time is involved; and   297

(e)  in cleaning tanks, pumps and pipelines.   298

Nothing herein contained shall be affected by the provisions of Clause 46.   299

**Laytime/ Demurrage/**

21.    Any delay(s) arising from adverse weather or sea state conditions, fire, explosion, breakdown or   300
failure of equipment, plant or machinery in or about ports or places of loading and/or discharge, Act of   301

| | | |
|---|---|---|
| Force Majeure | God, act of war, labour dispute, strike, riot, civil commotion, or arrest or restraint of princes, rulers or peoples *and any other cause* shall, provided always that the cause of the delay(s) was not within the reasonable control of | 302<br>303 |
| | Charterers or Owners or their respective servants or agents, count as one half laytime or, if the Vessel is on demurrage, at one half of the demurrage rate. | 304<br>305 |
| Demurrage | 22.    Charterers shall pay demurrage at the rate of US$ *28,500/=* ............................... per running day and pro rata for part of a running day for all time that loading and discharging and any other time counting as laytime exceeds the laytime specified in Clause 18. | 306<br>307<br>308 |
| Demurrage<br>Time Bar | 23.    Charterers shall be discharged and released from all liability in respect of any claim for demurrage which Owners may have under this Charter unless a claim in writing has been presented to Charterers together with supporting documentation substantiating each and every constituent part of the claim within 90 days of the completion of discharge of the cargo carried hereunder. | 309<br>310<br>311<br>312 |
| Orders for<br>Discharge Ports<br>or Places | 24.    If, at any time after the Vessel has completed loading the cargo or part cargo, as the case may be, Charterers instruct the Vessel to await their orders at one or more locations, then all time spent by the Vessel awaiting orders as aforesaid shall count as laytime or, if the Vessel is on demurrage, as demurrage. | 313<br>314<br>315 |
| Revised Orders | If after any loading or discharge port or place has been nominated Charterers desire to vary such port or place, Owners shall issue such revised instructions as are necessary at any time to give effect to Charterers' revised orders and any period by which the steaming time, *maximum four (4) days* taken to reach the alternative port or place | 316<br>317<br>318 |
| | exceeds the time which should have been taken had the Vessel proceeded thither directly shall count as laytime or, if the Vessel is on demurrage, as demurrage. Charterers shall pay Owners for additional bunkers consumed during such excess time at the replacement price as paid by Owners substantiated by copies of such documents as Charterers may require. | 319<br>320<br>321<br>322 |
| Vessel/Cargo<br>Inspections/<br>Bunker Surveys | 25.    Charterers shall be entitled to cause their representative(s) to carry out inspections of the Vessel and/or observe cargo operations and/or ascertain the quantity and quality of the cargo, water and residues on board at any loading and/or discharge port or place. | 323<br>324<br>325 |
| | Charterers' representative(s), or any independent surveyor appointed by Charterers, shall be entitled to survey and take samples from any or all of the Vessel's bunker fuel tanks and non-cargo spaces at any loading and/or discharge port or place. | 326<br>327<br>328 |
| | Any exercise of, or failure to exercise, any of their rights under the foregoing provisions by Charterers shall neither increase nor reduce the respective rights and obligations of the parties under this Charter and shall not be deemed to be, nor construed as, a waiver or acceptance of any default on the part of Owners. | 329<br>330<br>331 |
| | Any delay arising solely as a result of any such inspection, survey or sampling as aforesaid shall count as laytime or, if the Vessel is on demurrage, as demurrage. If the Master refuses to permit any such inspection, survey or sampling as aforesaid Charterers shall have the right to procure the removal of the Vessel from the place at which she is lying. All time lost by reason of any such refusal by the Master, including without limitation any time used in shifting the Vessel off, and back to, such, or any other, place shall not count as laytime or, if the Vessel is on demurrage, as demurrage and any expenses incurred as a result of any such refusal, including without limitation Vessel shifting expenses, shall be paid by Owners. | 332<br>333<br>334<br>335<br>336<br>337<br>338 |
| Cargo Sampling | 26.    Charterers shall be entitled to require the Vessel to deviate at any time after leaving any loading port or place and to call at or off a port or place for cargo sampling purposes. Charterers undertake to obtain the consent of the owner(s) of any cargo on board at the time before requiring the Vessel to deviate as aforesaid. | 339<br>340<br>341<br>342 |
| | Any delay arising from Charterers' requiring the Vessel to deviate as aforesaid, based upon the period by which the steaming time taken by the Vessel to reach the next port of loading or discharge exceeds the time which should have been taken had the Vessel proceeded thither directly, shall count as laytime, or if the Vessel is on demurrage, as demurrage. Charterers shall pay Owners for additional bunkers consumed during the period of deviation at the replacement price as paid by Owners and substantiated by copies of such documents as Charterers may require and shall pay port expenses incurred by Owners at the port to which Owners were required to divert the Vessel. | 343<br>344<br>345<br>346<br>347<br>348<br>349 |
| ~~Maintenance of Cargo Temperature~~ | ~~27.    If Charterers so require Owners shall maintain the loaded temperature of the cargo and the Master shall advise Charterers, on a daily basis, of the temperature of each cargo in each of the Vessel's tanks. Notwithstanding the foregoing the Vessel shall not be obliged to maintain the cargo at a temperature in excess of 57deg C (135deg F). Owners warrant that the Vessel is capable of maintaining the cargo up to such maximum temperature throughout the laden voyage and throughout discharge of the cargo. If the Vessel fails to maintain the required temperature Owners shall be responsible for any resulting delay and any time lost thereby shall not count as laytime or, if the Vessel is on demurrage, as demurrage. Should it~~ | 350<br>351<br>352<br>353<br>354<br>355<br>356 |

~~become necessary for the Vessel to vacate the berth because of Owners' failure to maintain the required~~ 357
~~temperature all time lost and expenses incurred shall be for Owners' account.~~ 358

**~~Cargo Heating~~**    ~~28.    Charterers shall be entitled to require the Vessel to raise the temperature of the cargo above the~~ 359
~~loaded temperature up to a maximum temperature of 57deg C (135deg F) in all the Vessel's tanks. The~~ 360
~~Master shall advise Charterers, on a daily basis, of the temperature of the cargo in each of the Vessel's~~ 361
~~tanks throughout the voyage. Charterers shall reimburse Owners for the cost of additional bunkers used~~ 362
~~solely to raise the temperature of the cargo as aforesaid, as evidenced by copies of the Vessel's daily Engine~~ 363
~~Log Book for the complete laden voyage, subject to a limit of 5 tonnes per degree Celsius. Charterers shall~~ 364
~~pay for such bunkers at the replacement price paid by Owners and substantiated by copies of such~~ 365
~~documents as Charterers may require.~~ 366

**Ice on Voyage**    29.    If on passage to the nominated port or place of loading or discharge the Master finds that the port 367
or place is inaccessible owing to ice he shall immediately request Charterers by radio for revised orders and 368
remain outside the area of ice-bound water. The terms governing such time awaiting orders shall be in 369
accordance with the provisions of Clause 24. Upon receipt of such request Charterers shall give orders for 370
the Vessel to proceed to an alternative ice-free and accessible port or place where there are facilities for 371
receiving or delivering the cargo. In this event freight shall be paid at the rate applicable under this 372
Charter to such alternative loading or discharge port or place, and any period by which the steaming time 373
taken to reach such alternative port or place exceeds the time which should have been taken had the Vessel 374
proceeded thither direct shall count as laytime, or, if the Vessel is on demurrage, as demurrage. 375

**Ice at Loading/**    30.    If, on or after the Vessel's arrival at a nominated port or place of loading or discharge, there is a 376
**Discharge Ports**    danger of the Vessel being frozen in, the Master shall proceed to the nearest safe and ice-free position and 377
**or Places**    at the same time request Charterers by radio for revised orders. Upon receipt of such request Charterers 378
shall give orders for the Vessel either to proceed to an alternative ice-free and accessible port or place, 379
where there is no danger of the Vessel being frozen in and where there are facilities for receiving or 380
delivering cargo, or to return to and load or discharge at the nominated port or place. If the Vessel is 381
ordered to an alternative port or place the sum in respect of freight and delay to be paid by Charterers shall 382
be as provided in Clause 29, but if the Vessel loads or discharges at the nominated port or place, then, 383
subject to the provisions of Clauses 19, 20 and 21, the whole of the time occupied from the receipt of Notice 384
of Readiness to load or discharge on the Vessel's first arrival until hoses are disconnected after the 385
completion of loading or discharge shall count as laytime, or if the Vessel is on demurrage, as demurrage. 386
Any delay after the final disconnection of shore hoses caused by ice by reason of the Vessel returning to the 387
nominated port or place on Charterers' instructions shall count as laytime or, if the Vessel is on 388
demurrage, as demurrage. 389

**Quarantine**    31.    Should Charterers require the Vessel to proceed to any port or place at which, at the time the Vessel 390
is ordered to that port or place, there is quarantine time shall count as laytime or, if the Vessel is on 391
demurrage, as demurrage whilst the Vessel is detained, but should quarantine be declared only whilst the 392
Vessel is on passage to the port or place Charterers shall not be liable for any delay caused by such 393
quarantine. 394

**Lien**    32.    Owners shall have a lien upon the cargo for all freight, deadfreight, demurrage and the cost of 395
recovery thereof. 396

**Documentation**    33.    Owners undertake that throughout the currency of this Charter the Vessel shall have on board all 397
such valid documentation as may, from time to time, be required to enable the Vessel to enter and carry out 398
all required operations at loading or discharge ports or places and leave, without let or hindrance, all ports 399
or places to which the Vessel may be directed under the terms of this Charter and Owners hereby expressly 400
confirm: - 401

(a)    that they shall be responsible for any loss, damage, delay or expenses; and 402

(b)    that time shall not count as laytime or, if the Vessel is on demurrage, as demurrage for any period 403
during which the Vessel is not fully and freely available to Charterers; 404

as a result of action taken against her by any Government, Government Organisation, competent 405
authority, person or organisation, owing to her flag, failure to have on board valid documentation as 406
aforesaid or any dispute relating to Owners' wages or crew employment policy or to the condition of the 407
Vessel or her equipment. 408

**~~Calls at~~**    ~~34.    (a)    Notwithstanding Clause 45 as from the date of agreement to, and for the duration of, this~~ 409
**~~Sollum Voe~~**    ~~Charter Owners and their agents shall observe Charterers' instructions regarding the disposal of ballast~~ 410
~~from the Vessel. For such period as aforesaid Owners shall ensure that no engine room, pumproom or~~ 411
~~other oily effluent is discharged from the Vessel and shall, if required by Charterers, produce evidence of~~ 412
~~instructions cabled by them to the Master forbidding the discharge of such effluent from the Vessel.~~ 413
~~Charterers shall pay any deadfreight arising by reason of compliance with Charterers' instructions. If,~~ 414

~~before the commencement of loading at Sullom Voe Terminal, Charterers produce to Owners evidence of~~ 415
~~non-compliance with such instructions regarding the disposal of ballast or evidence of the discharge, or~~ 416
~~apparent discharge, of such effluent Charterers may, by notice in writing, cancel this Charter without~~ 417
~~incurring any liability for damages.~~ 418

~~b)  Owners warrant that the Vessel is capable of accepting cargo at the following minimum acceptance~~ 419
~~rate and of deballasting within the following maximum periods:~~ 420

| | Minimum | Maximum | |
|---|---|---|---|
| ~~Ship's size~~ | ~~Cargo Acceptance Rate~~ | ~~Deballasting Period~~ | 421 / 422 |
| ~~Up to 81,283 tonnes SDWT~~ | ~~7.5 per cent of SDWT/Hour~~ | ~~5 hours 30 minutes~~ | 423 |
| ~~81,284 tonnes to 162,567 tons SDWT~~ | ~~6.6 per cent of SDWT/Hour~~ | ~~8 hours 40 minutes~~ | 424 |
| ~~162,568 to 325,134 tonnes SDWT~~ | ~~5.8 per cent of SDWT/Hour~~ | ~~11 hours 10 minutes~~ | 425 |
| ~~Over 325,135 tonnes SDWT~~ | ~~5.8 per cent of SDWT/Hour~~ | ~~13 hours 00 minutes~~ | 426 |

~~Should the Vessel's cargo acceptance rate be less than the relevant minimum rate specified above or should~~ 427
~~the deballasting time specified above exceed the relevant maximum period the excess time required to~~ 428
~~complete loading shall be deducted from any laytime or demurrage accruing under the provisions of this~~ 429
~~Charter.~~ 430

~~(c)  Owners warrant that the Vessel shall present manifolds of 16 inch diameter, class ANSI 150 with a~~ 431
~~minimum 500 mm between flanges or reducer/spool pieces such that the quick-closing coupler may operate~~ 432
~~without restriction.~~ 433

**Calls at Nigerian Ports**

35.  Owners warrant that the Vessel is neither directly nor indirectly owned and/or chartered by South 434
African, Namibian, Zimbabwean or Israeli companies or persons, that the Vessel is not registered in any of 435
the aforementioned States and that the Vessel is not linked, by means of financial arrangements or 436
mortgages, with such States. 437

Owners warrant that the Master, officers and crew and any supernumeraries or passengers do not, and 438
shall not, include nationals of any of the aforementioned States or persons who were born in, or reside in, 439
any of such States. 440

Owners warrant that the Vessel has not called at or off any port in South Africa, Namibia, or Israel within 441
the last 2 years prior to her arrival in Nigerian waters. A port of call in this context includes calling at or off 442
a port to receive services such as mail and/or provisions whether by helicopter or launch and not merely 443
discharging, loading, repairing or bunkering. 444

Owners warrant that no stores, spare parts, provisions and packing of material on board emanate from any 445
of the States referred to in the first paragraph of this Clause. 446

**Bills of Lading and Indemnities**

36.  Bills of Lading shall be signed as Charterers direct, without prejudice to this Charter. Charterers 447
hereby indemnify Owners - *in accordance with Owners P and I Club wording and detailed in* 448
*accordance with appendix AA and BB hereof* 449

(a)  against all liabilities that may arise from the signing of Bills of Lading in accordance with the directions 449
of Charterers to the extent that the terms of such Bills of Lading impose more onerous liabilities than those 450
assumed by Owners under the terms of this Charter; and 451

(b)  against claims brought by holders of Bills of Lading against Owners by reason of any deviation required 452
by Charterers under the provisions of Clauses 24 and 26. 453

All Bills of Lading issued under this Charter shall contain War Risks, Both-to-Blame Collision and New 454
Jason clauses. 455

**Unavailability of Bills of Lading Change of Receiver Change of Discharge Port or Places**

If a Bill of Lading is not available at any discharge port or place to which the Vessel may be ordered by 456
Charterers under this Charter or if Charterers require Owners to deliver cargo to a party and/or at a port 457
or place other than as set out in the Bills of Lading, then Owners shall nevertheless discharge the cargo 458
~~carried by Vessel in compliance with Charterers' instructions, upon a consignee nominated by~~ 459
~~Charterers (hereinafter called "the Receiver") presenting reasonable identification to the Master, in~~ 460
~~consideration of the following undertakings by Charterers:~~ 461

~~(i)  to indemnify Owners (which term shall, for the purpose of this Clause, include Owners' servants and~~ 462
~~agents) and to hold Owners harmless in respect of any liability, loss or damage of whatsoever nature which~~ 463
~~Owners may sustain by reason of delivering the cargo to the Receiver in accordance with Charterers'~~ 464
~~instructions;~~ 465

~~(ii)  to provide Owners, in the event of any proceedings being commenced against Owners in connection~~ 466

~~with the delivery of the cargo as aforesaid, from time to time on demand, with sufficient funds to defend the~~ 467
~~same;~~ 468

~~(iii) to provide Owners on demand such bail or other security as may be required if, in connection with the~~ 469
~~delivery of the cargo as aforesaid, the Vessel or any other vessel or property belonging to Owners should be~~ 470
~~arrested or detained or, if the arrest or detention thereof should be threatened, to prevent such arrest or~~ 471
~~detention, or to secure the release of such Vessel or property and to indemnify Owners in respect of any~~ 472
~~loss, damage or expenses caused by such arrest or detention whether or not the same be justified; and~~ 473

~~(iv) to produce and deliver to Owners all original Bills of Lading in respect of the cargo loaded by the Vessel~~ 474
~~as soon as same shall have arrived and/or come into the possession of Charterers whereupon Charterers'~~ 475
~~liability hereunder shall cease.~~ 476

The provisions of the foregoing undertakings shall be governed by English Law.  *Owners to return to* 477
*Charterers 2/3 original bills of lading together with Owners receipt for 1/3 original bills of lading*
*within twenty one (21) days of receipt - (Bank guarantee by countersigned letter of indemnity)*

*Bill of Lading Clause :*
*Following wording to be inserted in all original bill of lading issued and presented to Master; "All*
*terms, conditions, liberties and exceptions of the Charter Party including the Arbitration Clause are*
*herewith incorporated, as per Charter Party dated 23rd August 2007*

**Coding of**  37.    If Charterers require the Vessel to load or discharge at a port or ports within the jurisdiction of the 478
**Cargo**  US Customs Service, Owners shall procure that the Master complies with Charterers' instructions as to the 479
**Documentation -**  insertion of Owners' Unique Identifier in each Bill of Lading accompanying a shipment of imported cargo 480
**US Customs**  in accordance with US Customs Regulations (19 CFR Parts 4 and 178). Owners shall provide Charterers or 481
**Regulations**  their agents on request with details of their Unique Bill of Lading Identifier in respect of any cargo carried 482
hereunder. 483

In the event that the Master fails to comply with Charterers' instruction as aforesaid Owners shall be liable 484
for any delays resulting therefrom and any time lost thereby shall not count as laytime or, if the Vessel is 485
on demurrage, as demurrage. 486

**Liberty**  38.    The Vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in 487
distress, to call at any port or ports for bunkers, and to deviate for the purpose of saving life or property, 488
or for any other reasonable purpose. 489

**Agency**  39.    Charterers shall nominate the Vessel's agents at loading and discharge ports or places but such 490
agents shall be employed, instructed and paid by Owners. 491

**Estimated**  40.    If the Master fails to comply with any of the following provisions any delay, either at a loading or 492
**Times of**  discharge port or place, resulting therefrom shall not count as laytime or, if the Vessel is on demurrage, as 493
**Arrival**  demurrage and Owners shall be responsible for any additional costs incurred by Charterers arising from 494
such non-compliance. 495

The Master shall send messages by radio or telex to Charterers addressed 'BP Shipping-London' and to the 496
agents at the loading port or place advising the date and approximate hour of the Vessel's arrival. Such 497
messages shall be sent upon the Vessel's sailing from the prior discharge port and 7 days and 72, 48 and 24 498
hours prior to the Vessel's estimated arrival at the loading port or place. Should the Vessel be at sea or 499
elsewhere when ordered by Owners to proceed to the loading port or place the Master shall, if the Vessel is 500
less than 7 days or 72/48/24 hours, as applicable, from the loading port or place, immediately notify 501
Charterers and the agents of the Vessel's ETA in the manner aforesaid and thereafter notify Charterers 502
and the agents of the Vessel's ETA at such of the times as aforesaid as are applicable or immediately 503
provide Charterers with such other ETAs as Charterers may request. 504

The Master shall notify Charterers and the agents of the Vessel's ETA at the discharge port or place in the 505
manner aforesaid also providing information as to the Vessel's expected arrival draught on even keel salt 506
water either upon the Vessel leaving the previous port or place or 72 hours prior to her estimated arrival 507
at the discharge port or place, whichever is the later. Thereafter the Master shall notify Charterers and the 508
agents of the Vessel's ETA together with the information as aforesaid 48 and 24 hours, as applicable, from 509
the discharge port or place or immediately provide Charterers with such other ETAs as Charterers may 510
request. 511

The Master shall advise Charterers and the agents promptly by radio or telex of any variation of more than 512
6 hours in estimated dates or times of arrival at the loading and/or discharge port or place. 513

Should the voyage involve passing the Cape of Good Hope the Master shall, on passing the Cape of Good 514

Hope, send an additional radio or telex message to Charterers, advising the Vessel's ETA off Land's End 515
or at the discharge port or place if already nominated, stating also the estimated arrival draught on even 516
keel salt water. 517

Charterers shall have the right to see copies of all telexes (showing answerbacks) referred to in this Clause. 518

**Sub-Charter** 41.    Charterers may sub-charter the Vessel without prejudice to the respective rights and obligations of 519
either party under this Charter. *However Swift Transportation Inc., always to remain responsible for* 520
*the performance of this Charter Party* 

~~Cargo Insurance~~ ~~42.    Any additional premium which might be placed on the cargo insurance by reason of the Vessel's age~~ 521
~~and/or condition shall be for Owners' account, and Charterers shall be entitled to deduct the cost of any~~ 522
~~such additional premium from the freight.~~ 523

**Bunker Fuel** 43.    If the supply of bunker fuel required for the voyage performed under this Charter should not at the 524
material date be covered under a contract between Owners and any of the BP Group of Companies, the 525
first option of supplying such bunker fuel shall be given by Owners to a Company within the BP Group. 526

**Traffic** 44.    Owners shall instruct the Master to observe recommendations as to traffic separation and routeing 527
**Separation** as issued from time to time by the International Maritime Organisation or as promulgated by the State of 528
**and Routeing** the flag of the Vessel or the State in which the effective management of the Vessel is exercised. 529

**Oil Pollution** 45.    Owners shall instruct the Master to retain on board all oily residues of oil of a persistent nature 530
**Prevention** remaining in the Vessel from the previous cargo. The Master shall, during tank washing, collect the 531
washings into one cargo compartment and after maximum separation of the free water, discharge the 532
water so separated overboard. In the discharge of all water separated as aforesaid Owners shall comply 533
with the requirements of the International Convention for the Prevention of Pollution from Ships 1973, as 534
amended by its Protocol of 1978 (MARPOL 73/78), insofar as these do not conflict with any applicable law. 535

When this operation is completed the Master shall notify Charterers by radio of the estimated tonnage of 536
all segregated tank washings from previous cargoes. 537

**Treatment of** On the Vessel's arrival at the loading port or place the Master shall arrange that the quantity of all 538
**Tank Washings** segregated tank washings shall be measured in conjunction with cargo suppliers and shall make a note in 539
the Vessel's ullage record of the quantity so measured. 540

If Charterers require the Master to load the cargo on top of the segregated tank washings, freight 541
calculated in accordance with Clause 6 shall be paid on that quantity of the tank washings up to a tonnage 542
equivalent of 1% of the Vessel's summer deadweight. Owners shall instruct the Master to keep the water 543
to a minimum and in any event not exceeding 0.15% of the Vessel's summer deadweight tonnage. 544

If Charterers require the Master to segregate the tank washings from the cargo to be loaded, Charterers 545
shall pay for any deadfreight so incurred. 546

If, for whatever reason, the cargo loaded hereunder is not loaded on top of the segregated tank washings 547
from previous cargoes (or any part thereof), Owners undertake that all such washings shall be discharged 548
or disposed of or retained in accordance with the orders and directions of Charterers on completion of the 549
voyage hereunder. 550

**Exceptions** 46.    The provisions of Articles III (other than Rule 8), IV, IV bis and VIII of the Schedule to the Carriage 551
of Goods by Sea Act, 1971 of the United Kingdom shall apply to this Charter and shall be deemed to be 552
inserted in extenso herein. This Charter shall be deemed to be a contract for the carriage of goods by sea to 553
which the said Articles apply, and Owners shall be entitled to the protection of the said Articles in respect 554
of any claim made hereunder. 555

Charterers shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or 556
damage or delay or failure in performance hereunder arising or resulting from Act of God, act of war, 557
seizure under legal process, quarantine restrictions, labour disputes, strikes, riots, civil commotions, arrest 558
or restraint of princes, rulers or peoples, *or any other cause beyond Charterers control*. 559

**War Risks** 47.    (a)  The Master shall not be required or bound to sign Bills of Lading for any blockaded port or for 560
any port which the Master or Owners in his or their discretion consider dangerous or impossible to enter 561
or reach. 562

(b)  If - 563
(i)   any port of loading or of discharge named in this Charter or to which the Vessel may properly be 564
ordered pursuant to the terms of this Charter or the Bills of Lading be blockaded; or 565

(ii)  owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions, or the    566
operation of international law:-    567

(aa) entry to any such port of loading or of discharge or the loading or discharge of cargo at any port    568
be considered by the Master or Owners in his or their discretion dangerous or prohibited, or    569

(bb) it be considered by the Master or Owners in his or their discretion dangerous or impossible for    570
the Vessel to reach any such port of loading or of discharge,    571

then Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or    572
discharged at any other port of loading or of discharge whether within or outside the range of loading or    573
discharge ports respectively established under the provisions of this Charter (provided such other port is    574
not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Own-    575
ers' discretion dangerous or prohibited). If no orders are received from Charterers within 48 hours after    576
they or their agents have received from Owners a request for the nomination of a substitute port, then:    577

if the affected port is the first and only loading port and no cargo has been loaded, this Charter    578
shall terminate forthwith;    579

if the affected port is a loading port and part of the cargo has already been loaded, the Vessel    580
may proceed on passage and Charterers shall pay for any deadfreight so incurred;    581

if the affected port is a discharge port, Owners shall be at liberty to discharge the cargo at any safe    582
port which they or the Master may in their or his discretion decide on (whether within or outside the    583
range of discharge ports established under the provisions of this Charter) and such discharge    584
shall be deemed to be due fulfilment of the contract or contracts of affreightment so far as cargo so    585
discharged is concerned.    586

In the event of the cargo being loaded or discharged at any such other port within the respective range of    587
loading or discharge ports established under the provisions of this Charter, this Charter shall be read in re-    588
spect of freight and all other conditions whatsoever as if the voyage performed were that originally    589
designated. However if the Vessel discharges the cargo at a port outside the range of discharge ports estab-    590
lished under the provisions of this Charter, freight shall be paid as for the voyage originally designated and    591
all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat    592
shall be paid by Charterers. In the latter event Owners shall have a lien on the cargo for all such extra    593
expenses.    594

(c)  The Vessel shall have liberty to comply with any directions or recommendations as to departure,    595
arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatso-    596
ever given by the government of the nation under whose flag the Vessel sails or any other government or    597
local authority including any de facto government or local authority or by any person or body acting or    598
purporting to act as or with the authority of any such government or authority or by any committee or    599
person having under the terms of the war risks insurance on the Vessel the right to give any such directions    600
or recommendations. If by reason of or in compliance with any such directions or recommendations    601
anything is done or is not done such shall not be deemed a deviation.    602

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to    603
the port or ports of discharge originally designated or to which she may have been ordered pursuant to the    604
terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or    605
Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be    606
deemed to be due fulfilment of the contract or contracts of affreightment and Owners shall be entitled to    607
freight as if discharge had been effected at the port or ports originally designated or to which the Vessel    608
may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching    609
and discharging the cargo at any such other port of discharge shall be paid by Charterers and Owners shall    610
have a lien on the cargo for freight and all such expenses.    611

**Both to Blame**
**Collision**       48.       If the liability for any collision in which the Vessel is involved while performing this Charter falls to    612
be determined in accordance with the laws of the United States of America, or the laws of any State which    613
applies laws similar to those applied in the USA in the circumstances envisaged by this Clause, the    614
following Clause shall apply:-    615

"If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and    616
any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or    617
in the management of the Vessel, the owners of the goods carried hereunder will indemnify the carrier    618
against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability    619
represents loss of, or damage to, or any claim whatsoever of the owners of, said goods, paid or payable by    620
the other or non-carrying vessel or her owners to the owners of said goods and set off, recouped or    621
recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying    622

vessel or carrier. 623

The foregoing provisions shall also apply where the owner, operators or those in charge of any vessel or 624
vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of 625
collision or contact." 626

Whilst Charterers shall procure that all Bills of Lading issued under this Charter shall contain a provision 627
in the foregoing terms, to be applicable where the liability for any collision in which the Vessel is involved 628
falls to be determined in accordance with the preamble of this Clause, Charterers neither warrant nor 629
undertake that such provision shall be effective. In the event that such provision proves ineffective 630
Charterers shall, notwithstanding anything to the contrary herein provided, not be obliged to indemnify 631
Owners. 632

**General Average**    49.    General Average shall be adjusted and settled in London in accordance with the York/Antwerp 633
Rules 1974, *with as amended 1990* or any modification or re-enactment thereof for the time being in force. 634
*General Average / Arbitration London, English law to apply* 

**New Jason**    50.    If, notwithstanding Clause 49, it is agreed in writing that General Average adjustment be made in 635
accordance with the law and practice of the United States of America, the following Clause shall apply:- 636

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, 637
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence 638
of which, the carrier is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or 639
owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, 640
losses or expenses of a general average nature that may be made or incurred and shall pay salvage and 641
special charges incurred in respect of the cargo. 642

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving 643
ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover 644
the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be 645
made by the cargo shippers, consignees or owners of the cargo to the carrier before delivery". 646

**FMC Certificate/**    51.    Owners undertake that the Vessel carries on board a valid US Coast Guard Certificate of Financial 647
**US Coastguard**    Responsibility as required under the US Federal Water Pollution Control Act as amended by the Clean 648
**Regulations**    Water Act of 1977. Any delay arising from failure by Owners to have such a Certificate on board the Vessel 649
shall not count as laytime or, if the Vessel is on demurrage, as demurrage. 650

Owners warrant that during the period of this Charter the Vessel shall comply with all applicable US Coast 651
Guard Regulations and that if in any respect whatsoever the Vessel does not so comply there shall be on 652
board the Vessel appropriate waivers from the US Coast Guard. Any delay arising from non-compliance 653
with the foregoing provision shall not count as laytime or, if the Vessel is on demurrage, as demurrage. 654

**Clause**    52.    All Bills of Lading issued under this Charter shall contain the following Clause Paramount:- 655
**Paramount**

"CLAUSE PARAMOUNT 656

This Bill of Lading shall: 657

(1)  in relation to the carriage of any goods from any port in Great Britain or Northern Ireland to any other 658
port whether in or outside Great Britain or Northern Ireland have effect subject to the provisions of the 659
Carriage of Goods by Sea Act 1971 and to the Rules contained in the Schedule thereto (the Hague/Visby 660
Rules) and nothing herein contained shall be deemed a surrender by the Carrier of any of his rights or 661
immunities or an increase of any of his responsibilities or liabilities under the said Act; 662

(2)  in relation to the carriage of any goods from any port in a state in which legislation similar in effect to 663
the Carriage of Goods by Sea Act 1971 of the United Kingdom is in force to any port in any other state, have 664
effect subject to such legislation and to the Rules contained in the Schedule thereto and nothing herein 665
contained shall be deemed a surrender by the Carrier of any of his rights or immunities or an increase of 666
any of his responsibilities or liabilities under the said legislation; 667

(3)  in relation to the carriage of any goods between ports in two different states, where this Bill of Lading 668
is issued in Great Britain, Northern Ireland or any state in which legislation similar in effect to the 669
Carriage of Goods by Sea Act 1971 of the United Kingdom is in force have effect subject to such Act or such 670
legislation and to the Rules contained in the Schedule thereto and nothing herein contained shall be deemed 671
a surrender by the Carrier of any of his rights or immunities or an increase of any of his responsibilities or 672
liabilities under the said Act or said legislation; 673

(4)  in any other case have effect as if the contract of carriage herein contained were a contract of carriage 674

to which the provisions of the Carriage of Goods by Sea Act 1971 of the United Kingdom applied and the  675
Carrier shall be entitled to the benefit of the privileges, rights and immunities conferred by the said Act and  676
the Rules contained in the Schedule thereto as if the same were herein specifically set out.  677

Notwithstanding the foregoing provisions of this Clause the Hague/Visby Rules shall not apply to this  678
contract where the goods carried hereunder consist of cargo which by this contract is stated as being  679
carried on deck and is so carried.  680

If any term of this Bill of Lading be repugnant to the provisions of the Hague/Visby Rules such term shall  681
be void to that extent but no further."  682

TOVALOP  ~~53. Owners warrant that the Vessel is a Participating Tanker in TOVALOP and will so remain during~~  683
~~this Charter, provided however that nothing herein shall prevent Owners, upon prior notice to Charterers,~~  684
~~from withdrawing from TOVALOP under Clauses III(B) or X thereof, and provided further that upon any~~  685
~~withdrawal under Clause III(B) or under Clause X, following an amendment to TOVALOP which does not~~  686
~~materially increase the obligations of the Parties thereunder, Charterers shall have the option to terminate~~  687
~~this Charter.~~  688

~~When an escape or discharge of Oil occurs from the Vessel and causes or threatens to cause Pollution~~  689
~~Damage, or when there is the Threat of an escape or discharge of Oil (i.e. a grave and imminent danger of~~  690
~~the escape or discharge of Oil which, if it occurred would create a serious danger of Pollution Damage),~~  691
~~then Charterers may, at their option, upon notice to Owners or the Master, undertake such measures as are~~  692
~~reasonably necessary to prevent or minimise such Damage or to remove the Threat, unless Owners~~  693
~~promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such~~  694
~~measures taken by them, and, if time permits, the nature of the measures intended to be taken by them. Any~~  695
~~of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority and as~~  696
~~Owners' agent, and shall be at Owners' expense except that:~~  697

~~(a) any such escape or discharge or Threat was caused or contributed to by Charterers; or~~  698

~~(b) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on~~  699
~~Civil Liability for Oil Pollution Damage, Owners are, or, had the said Convention applied to such escape or~~  700
~~discharge or to the Threat, would have been, exempt from liability for the same; or~~  701

~~(c) the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of~~  702
~~or in connection with such escape or discharge or Threat removal exceeds One Hundred and Sixty U.S.~~  703
~~Dollars per ton or Sixteen Million Eight Hundred Thousand U.S. Dollars, whichever is the lesser, save~~  704
~~insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention~~  705
~~on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under~~  706
~~CRISTAL, provided that in any incident to which the TOVALOP Supplement applies the Owners' limit of~~  707
~~liability hereunder shall be that provided for in the said Supplement.~~  708

~~PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be~~  709
~~discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue~~  710
~~said measures under the provisions of this Clause and all further liability to Charterers under this Clause~~  711
~~shall thereupon cease.~~  712

~~The above provisions are not in derogation of such other rights as Charterers or Owners may have under~~  713
~~this Charter or may otherwise have or acquire by Law or any International Convention or TOVALOP.~~  714

~~For the purposes of this Clause, the meaning of the terms "Oil" and "Pollution Damage" shall be as~~  715
~~defined in TOVALOP and "ton" shall be understood in relation to "tonnage" as defined therein.~~  716

*1/ is a tanker owned by a member of The International Tanker Owners Pollution Federation*
*Limited and will so remain throughout the charter and*
*2/ is entered in the following P & I Club Britannia and will so remain unless Owners have given*
*Charterers prior written notice of their intention to change*
*Owners warrant that the vessel will only be entered in a P & I Club within the International Group*
*P & I Clubs*

The BP Shipping  ~~54. During pre-fixture negotiations leading to agreement between Owners and Charterers to the terms~~  717
Questionnaire  ~~and conditions of this Charter Owners have, either in consultation with their brokers or otherwise,~~  718
~~provided Charterers with a completed BP Shipping Questionnaire a copy of which shall be attached hereto~~  719
~~as Appendix I.~~  720

~~Owners warrant that the responses to the BP Shipping Questionnaire provided by or on behalf of them are~~  721
~~correct. If any response as provided by or on behalf of Owners proves to be incorrect Charterers shall be~~  722

~~entitled either:~~  723

~~(a)   to cancel this Charter forthwith without prejudice to any other rights available to them under this~~ 724
~~Charter or otherwise under English Law; or~~ 725

~~(b)   to recover, by deduction from freight, any losses, costs, damages or expenses incurred as a direct result~~ 726
~~of Owners' breach of warranty.~~ 727

~~In the event of any conflict arising between any provision(s) in the body of this Charter and any provision(s)~~ 728
~~in Appendix 1 the provision(s) contained in the body of this Charter shall prevail.~~ 729

**Law**  55.    The construction, validity and performance of this Charter shall be governed by English Law. The  730
High Court in London shall have exclusive jurisdiction over any dispute which may arise out of this  731
Charter.  732

*Additional Clauses Nos. 1 to 10 attached are deemed to be incorporated in this Charter Party*

***In Witness Whereof*** the parties have caused this Charter to be executed as of the date first above
written

..........................................................................

for and on behalf of

..................................................................................................................... OWNERS

..........................................................................

for and on behalf of ~~BP SHIPPING LIMITED as agents for~~

..................................................................................................................... CHARTERERS

**This Charterparty is a computer generated copy of the BEEPEEVOY3 form, printed under licence from
BP Shipping Limited using software which is the copyright of Strategic Software Limited.**

**It is a precise copy of the original document which can be modified, amended or added to only by the
striking out of original characters, or the insertion of new characters, such characters being clearly
highlighted by underlining or use of colour or use of a larger font and marked as having been made by the
licensee or end user as appropriate and not by the author.**

# APPENDIX 1

The  BP  Shipping  Questionaire

*Type Here (Delete this)*

**Ewan Warren**

| | |
|---|---|
| **From:** | brokers@petrian.co.uk |
| **Sent:** | 20 September 2007 16:50 |
| **To:** | Nick Mahoney |
| **Subject:** | torm sofia/swift 23 august 07 addendum 1 brasil option |

```
TO..: "Vitol, London"
ATTN: Nick Mahoney
FROM: PETRIAN SHIPBROKERS LLP
DATE: 20-SEP-2007 16:50
MSG.: 993603

ref mt torm sofia / swift transportation inc c/p 23rd august 2007
------------------------------------------------------------------
please find hereunder addendum number 1 dated 31st august 2007

it is mutually agreed between owners and chrts that the following discharge
range option is incorporated under above captioned c/p

disch: or in chopt 1/2 sp(s) east coast south america buenos aries/sao luiz
       range inclusive but excluding river ports

rate : lumpsum usd 2,900,000 basis 1:1 via cape of good hope

all other terms, conditions, exceptions and exemptions remain unaltared

end



nb
--
please be aware that this option is via cape of good hope and all other
discharge ranges in c/p except wafr are via suez so need to order vsl
accordingly and timely in order to avoid deviation etc




Regards
Frazer Williams
Petrian Shipbrokers LLP
dir: 44 20 7227 0486
mob: 44 7711 140894
aoh: 44 1932 845632
yahoo id: frazer_petrian
```

1

**Ewan Warren**

From:           brokers@petrian.co.uk
Sent:           20 September 2007 16:49
To:             Nick Mahoney
Subject:        TORM SOFIA/SWIFT CP 23/08/07 - ADDENDUM NO.2 - DATED 12/09/0

```
TO..: "Vitol, London"
ATTN: Nick Mahoney
FROM: PETRIAN SHIPBROKERS LLP
DATE: 20-SEP-2007 16:48
MSG.: 993602


TORM SOFIA/SWIFT CP 23/08/07 - ADDENDUM NO.2 - DATED 12/09/07
===========================

WITH REGARDS TO THE ABOVE CP IT HAS BEEN MUTUALLY AGREED TO AMEND THE
CHARTERERS STYLE TO THE FOLLOWING

CHARTERERS STYLE             : SWIFT AVIATION GROUP INC
COMPANY REGISTRATION NUMBER  : 1121306-9
CORPORATE HEADQUARTERS ADDRESS : SWIFT AVIATION GROUP INC
                               2710 EAST OLD TOWER ROAD
                               PHOENIX, AZ 85034
                               U.S.A

Regards
Frazer Williams
Petrian Shipbrokers LLP
dir: 44 20 7227 0486
mob: 44 7711 140894
aoh: 44 1932 845632
yahoo id: frazer_petrian
```

1

**Ewan Warren**

| | |
|---|---|
| **From:** | Nick Mahoney |
| **Sent:** | 23 August 2007 18:00 |
| **To:** | Shipping London; Freight |
| **Subject:** | TORM SOFIA/SWIFT CP DATED 23/9/07 |

final recap

-----Original Message-----
From: brokers@petrian.co.uk [mailto:brokers@petrian.co.uk]
Sent: 23 August 2007 17:58
To: Nick Mahoney
Subject: TORM SOFIA/SWIFT CP DATED 23/9/07


TO..: "Vitol, London"
ATTN: Nick Mahoney
FROM: PETRIAN SHIPBROKERS LLP
DATE: 23-AUG-2007 17:57
MSG.: 986815

TO:     NICK      -    VITOL
FROM:   SIMON     -    PETRIAN SHIPBROKERS LLP

WE ARE PLEASED TO CONFIRM THE FOLLOWING FIXTURE CONCLUDED TODAY WITH ALL
SUBJECTS LIFTED AND IN ORDER:


---------------------------------------------------------------
                         (TITLE)
                         -------
CHARTERERS            : SWIFT TRANSPORTATION INC

DISPONENT OWNERS      : LR1 MANAGEMENT K/S AS AGENT TO OWNER A/S
                        DAMPSKIBSSELSKABET TORM

TIMECHARTER OWNERS    : MANSEL

CHARTER PARTY         : BP VOY 4

CP DATE               : 23RD AUGUST 2007

---------------------------------------------------------------
                        (VESSEL)
                        --------
VESSEL        : TORM SOFIA
EX-NAME       : N/A
SDWT          : 72,718 MT
SDRAFT        : 14.022 M
LOA           : 227.832 M
BEAM          : 32.275 M
FLAG          : SINGAPORE
BUILT         : AUG 22, 2005
CLASS         : LLOYDS REGISTER
CHAIN STOPPER : 2 X 200 MT - TONGUE TYPE
CHAIN SIZE    : 78 MILLIMETRES
CUBIC 98 PCT  : 78812.6 CU. METRES
SLOP 98 PCT   : 4255.8 CU. METRES
SEGREGATIONS  : 3
PUMPS         : 3 x 2000 Cu. Metres/Hour (Centrifugal)
TPC           : 66.8 METRIC TONNES
BCM           : 113.114 Metres
KTM           : 45.65 Metres
IGS           : YES
COW           : YES
SBT/CBT       : SBT
VRS           : YES

```
GRT          : 41503 MT
NRT          : 20972 MT
PCNT         : 34292 MT
SCNT         : 38517.12 MT
DERRICK/CRANE: CRANES 1 X 15 METRIC TONNES
COATED       : PURE EPOXY
HULL         : DH
CALL SIGN    : 9VDG9
P AND I      : BRITANNIA

LAST 3 CARGOES          : 1) UMS
                          2) UMS
                          3) UMS

POSITON                 : IN BALLAST ETA KUWAIT 5/9

APPROVALS               : TTBOOK WOG VESSEL IS NOT UNACCEPTABLE TO THE
                          FOLLOWING OIL COMPANIES
                          STATOIL/CONOCO/CSSA/BP/CHEVRON/EXXON

-----------------------------------------------------------------
                          (CARGO)
                          -------

QUANTITY/GRADE          : CHOPT TO FULL CARGO - NO HEAT - NON
                          PERSISTANT CPP UNL UND 2.5, UNL
                          - MAX 2 GRDS WVNS
                          EXCL LUBES/ CASINGHEAD/ SOLVENTS/ CHEMICALS/
                          PENTHANE/ PENTHANE PLUS/ PARAFFINIC NAPHTHA

                          OWNER ADVISES VESSEL LOADS APPROX 67710.54 BASIS 13.72
                          SAILING DRAFT
-----------------------------------------------------------
                          (GEOGRAPHICAL)
                          --------------

LOADING RANGE   : 1/2 SPS AG EXCL I/I

DISCHARGE RANGE : 1/2 SP(S) UKCONTINENT GIB/HAMBURG RGE
                  EXCL SCAN/DEN, MSC, PETERHEAD, TRANMERE, DUNDEE
                  LONDONDERRY, LYME BAY, EIRE, LIVERPOOL VIA SUEZ

                  OR CHOPT

                  1/2 SP(S) WAF ABDIJAN/DOUALA RGE
                  EXCL UN SANCTIONED COUNTRIES AND RIVER PORTS - VIA CAPE

                  OR CHOPT

                  1/2 SP(S) MED EXCL Y/FY/ALBANIA/TOC/SYRIA/LEBANON/ISRAEL
                  VIA SUEZ

                  AND/OR CHOPT

                  1/2 SP(S) USAC IF NYNNGWB VIA SUEZ

                  AND/OR CHOPT

                  1/2 SP(S) USG EXCL MISSISSIPPI RIVER VIA SUEZ

                  AND/OR CHOPT

                  1/2 SP(S) CARIBS EXCL C/O/H, CARAPITO AND LAKE MARACAIBO
                  VIA SUEZ

-----------------------------------------------------------------
                          (DATES)
                          -------
```

2

```
LAYCAN                 : 6TH SEPTEMBER 2007 (00:01 HRS) / 8TH SEPTEMBER  2007
                         (23:59)
-------------------------------------------------------------------
                         (FINANCIAL)

FREIGHT RATE           : LUMPSUM RATES 1:1 AND INCLUSIVE OF SUEZ
                         TRANSIT WHERE APPLICABLE.ADDITIONAL PORTS PAYABLE AS
                         PER TORM INTERIM PORT CLAUSE

                         USD 1,850,000 - EAST MED NWOBI MALTA VIA SUEZ
                         USD 1,950,000 - WEST MED  VIA SUEZ
                         USD 2,100,000 - UKC VIA SUEZ
                         USD 2,600,000 - WAF VIA CAPE
                         USD 2,700.000 - USAC VIA SUEZ
                         USD 2,800.000 - CARIBS VIA SUEZ
                         USD 2,900.000 - USG VIA SUEZ

DEMURRAGE              : USD 28,500 PDPR

MAX 3 DISPORTS IN TOTAL AND MAX 2 RANGES IF COMBO
IF COMBINATION OF MED WITH TRANSATLANTIC OPTION ROTATION ALWAYS TO BE EAST TO
WEST
IF COMBINATION BETWEEN TRANSATLANTIC OPTIONS ROTATION ALWAYS TO BE NORTH TO
SOUTH AND EAST TO WEST.


-------------------------------------------------------------------
                         (TERMS)


- FREIGHT PAYABLE BBB

- BANK GUARANTEE BY COUNTERSIGNED LOI

GA/ARB LONDON ENGLISH LAW TO APPLY

LAYTIME    : 72 HRS

FREIGHT PAYMENT DETAILS:
AT SIGHT IMMEDIATELY UPON COMPLETION OF DICHARGE
BY:         ELECTRONIC FUND TRANFER
TO:         JP MORGAN CHASE BANK NEW YORK
IN FAVOUR: JPMORGAN CHASE BANK, LONDON
FOR CREDIT TO:  MANSEL OIL LIMITED
ACCOUNT NO:   GB90CHAS60924223961701

ANY DELAYS AND/OR EXTRA EXPENSES INCURRING DUE AWAITING CLEARANCE BY PORT
AUTHORITIES IN THE UNITED STATES TO BE FOR CHARTS ACCT.

CHEVRON WAR RISK TO APPLY.

WAFR CLAUSES:
-------------

MAX PORT COSTS EACH PORT IN WAF USD 20,000 FOR OWNERS ACC.

ANY TAXES AND/OR DUES ON CARGO AND/OR FREIGHT INCLUDING BUT NOT LIMITED
TO NIGERIAN CONSERVANCY DUES, SHIP DUES, HANDLING CHARGES AND NMA LEVY
TO BE FOR CHARTERERS ACCOUNT AND SETTLED DIRECTLY BY THEM.

IF ANY VETTING ARRANGEMENT IS OR SHOULD BECOME NECESSARY TO CALL WAF
CHRTS TO ARRANGE FOR SAME AT THEIR TIME AND EXPENSE. SHOULD ANY DELAYS
BE INCURRED SAME TO BE FOR CHRTS ACCOUNT.

ANY TIME AWAITING NAVAL CLEARANCE TO BE FOR CHRTS ACCOUNT AND COUNT AS
LAYTIME OR DEMURRAGE IF ON DEMURRAGE.WATCHMEN, IF REQUIRED, TO BE FOR
CHRTS ACCOUNT.

IF THE VSL IS DELAYED BY STRIKE ACTION, CHRTRS TO PAY DEMURRAGE RATE PDPR
FOR THE DURATION OF THE STRIKE, EXCEPT FOR STRIKE BY
VSL CREW.
```

ANY DELAYS IN OBTAINING NIGERIAN TASK FORCE PREMISSON TO ENTER NIGERIAN
WATERS TO COUNT IN FULL AS USED LAYTIME OR DEMURRAGE IF ON DEMURRAGE.
NMA FEE IF IMPOSED NOT TO BE FOR OWNRS ACCT.  THE CHRTRS ARE TO BE
RESPONSIBLE FOR THE NMA APPROVALS.

IF DISCHARGE APAPA, CHRTRS TO ARRANGE AND PAY FOR 2 TUGS TO ASSIST
VESSEL TO MANOUVER TO AND FROM APAPA.

DEMURRAGE PAYABLE EVERY 7 DAYS ON ACCOUNT AGAINST OWNERS INVOICE WITH
FULL SUPPORTING DOCUMENTS TO FOLLOW.  AFTER 7 DAYS DEMURRAGE TO INCREASE
TO USD 32,500 PDPR FOR BALANCE OF THE PERIOD

TAXES AND DUES CLAUSE:
----------------------
ANY TAXES AND/OR DUES ON CARGO AND/OR FREIGHT TO BE FOR CHARTERERS ACCOUNT  AND
SETTLED DIRECTLY BY THEM.

BILL OF LADING CLAUSE:
----------------------
FOLLOWING WORDING TO BE INSERTED IN ALL ORIGINAL BILL OF LADING ISSUED AND
PRESENTED TO MASTER: 'ALL TERMS, CONDITIONS,
LIBERTIES AND EXCEPTIONS OF  THE CHARTER PARTY INCLUDING THE ARBITRATION CLAUSE
ARE HEREWITH  INCORPORATED, AS PER CHARTER
PARTY DATED 11TH JULY 2007

SMALL CLAIMS PROCEDURE:
-----------------------
ENGLISH LAW:
FOR DISPUTES WHERE THE TOTAL AMOUNT CLAIMED BY EITHER PARTY DOES NOT  EXCEED
THE AMOUNT OF USD 50,000 THE ARBITRATION SHALL BE
CONDUCTED IN  ACCORDANCE WITH THE SMALL CLAIMS PROCEDURE OF THE LONDON MARITIME
ARBITRATORS ASSOCIATION CURRENTLY IN FORCE.

VOYAGE ORDERS:
--------------
ALL VOYAGE ORDERS AND CHANGES TO SAME TO BE SENT ON TLX OR E-MAIL NOT FAX.
CHARTERERS ARE NOT ALLOWED TO COMMUNICATE DIRECTLY WITH MASTER UNLESS
AGREEMENT GIVEN BY OWNERS.

TORM LIGHTERING/STS TRANSFER CLAUSE:
------------------------------------
IF LIGHTERING/STS TRANSFER OPERATION IS REQUIRED SAME ALWAYS TO BE IN
ACCORDANCE WITH OCIMF LATEST EDITION OF STS TRANSFER.
CHARTERERS TO SUPPLY  ALL FENDERS/LINES/HOSES AND ANY OTHER EQUIPMENT REQUIRED
FOR SUCH AN  OPERATION AT CHARTERERS TIME AND
EXPENSES AND ALWAYS SUBJECT TO MASTERS  APPROVAL. TIME TO COUNT IN FULL 6HRS
AFTER TENDERING NOR OR WHEN FIRST  LIGHTER VESSEL
IS ALONGSIDE, WHICHEVER EARLIER, UNTIL LAST LINE/FENDER IS  OFF AND LIGHTER
VESSEL HAS SAILED. TIME LOST DUE TO TIDE AND/OR
WEATHER  AND/OR SEA CONDITIONS TO COUNT IN FULL AS LAYTIME OR DEMURRAGE IF ON
DEMURRAGE. IF THE VESSEL IS REQUIRED TO COMPLETE
CARGO OPERATION AT A  BERTH IN PORT CHARTERERS WILL NOT HAVE THE BENEFIT OF 6
HRS NOR PRIOR  BERTHING IN PORT. CHARTERERS
WARRANT THAT THERE IS NO PROHIBITION OR  RESTRICTION ON STS OPERATION AT THE
PORT/PLACE TO CHICH THE VESSEL IS  ORDERED TO
PERFORM STS TRANSFEER AND FURTHER THAT THEY HAVE OBTAINED  ANY/ALL NECCESSARY
LOCAL APRROVALS OR LICENCES TO CARRY OUT OPERATIONS AT  THE DESIGNATED
PROT/PLACE.

TORM INTERIM PORT CLAUSE
------------------------
CHARTERERS TO PAY FOR ADDITIONAL INTERIM LOAD/DISCH PORT
AT COST WITH ADDITIONAL STEAMING TIME TO BE INCURRED FOR
SUCH DEVIATION WHICH EXCEEDS DIRECT PASSAGE FROM FIRST
LOADPORT TO FINAL DISPORT. TIME TO COUNT FROM ARRIVAL
PILOT STATION INTERIM LOAD/DISCHARGE PORT UNTIL DROPPING
LAST OUTWARD PILOT INTERIM LOAD/DISCHARGE PORT I.E. NO
ALLOWANCE FOR NOTICE TIME, NOR DEDUCTION FOR SHIFTING
EVEN FROM ANCHORAGE TO 1ST BERTH AND NO DEDUCTION FOR
TIME LOST DUE TO WEATHER CONDITIONS.
DEVIATION AND TIME USED TO BE CALCULATED AT DEMURRAGE

```
RATE PER DAY PRO RATA PLUS COSTS FOR ADDITIONAL BUNKERS
CONSUMED AS PER MASTERS INVOICE PRESENTED BY OWNERS.
DEVIATION, TIME USED, BUNKERS CONS BUNKERS CONSUMED AND PORT COSTS
AS PER AGENTS PROFORMA D/A TO BE PAID TOGETHER WITH
FREIGHT AS PER OWNERS TELEXED INVOICE, WHICH LATER
TO BE SUPPORTED BY HARD COPY DOCUMENTATION.

TRAFIGURA TERMS AND BPVOY 3 AS AMENDED
======================================

B P VOY 3 AS AMENDED
--------------------

- SPEED ABT 14 KTS WSNP
- DELETE LINE 51-63
- LINE 66 INSERT 'HOWEVER THE SAFETY OF SAME ALWAYS TO BE AT MASTERS
  DISCRESTION, WHICH NOT TO BE UNREASONABLY WITHELD' AFTER 'CHTS'
- LINE 74 ADD 'UNLESS SO STIPULATED BY WORLDSCALE'
- LINE 74 INSERT AFTER 'SEA' WHICH SUBJECT TO MASTERS APPROVAL WHICH
  NOT TO BE UNREASONABLY WITHELD'
- LINE 79 ADD 'LAYTIME TO COMMENCE TENDERING NOR UPON ARRIVAL AT
  LIGHTERING POSITION' DELELTE 'WHEN THE VSL IS PROPERLY TIED UP AND
  MOORED ALONGSIDE THE LIGHTERING VSL'
- LINE 116 - 133 DELETE
- LINE 136 - ADD 'UNLESS SO STIPULATED BY WS'
- LINE 146 (FREIGHT PAYMENT DETAILS SEE ABOVE)
- LINE 150 AFTER CLAUSED 8 INSERT 'SEE ALSO NO.5 OF TRAFIGURA
  CLS 1991 ATTACHED
- LINE 157 INSERT AFTER 'APPOINT TWO INDEPENDANT SURBEYORS, ONE
  APPOINTED BY CHTS AND ONE APPOINTED AND PAID FOR BY OWNERS'
- LINE 158 AFTER 'PUMPS' ADD 'PROVIDED MASTER HAS ENSURED CORRECT
  TRIM PROCEDURES TO MAXIMISE CARGO OUTTURN'
- LINE 159 DELETE AFTER 'CHTS' AND REST OF LINE AND INSERT 'SHALL
  HAVE THE RIGHT TO CLAIM FROM OWNERS AN AMOUNT EQUAL TO'
- LINE 162 DELETE 'DEDUCTION FRM FRT' INSERT 'A CLAIM'
- LINE 164 DELETE INSERT 'THAN THEIR QUANTIFIED CLAIM'
- LINE 192 - 201 DELETE
- LINE 203 INSERT 'TAXES AND/OR DUES IN CGO AND/OR FRT TO BE FOR
  CHTS ACCOUNT AND SETTLED DIRECTLY BY THEM'
- LINE 220 AFTER 'MANIOFOLD' INSERT 'EXCEPT WHEN STRIPPING'
  LINE 220 INSERT 'AVERAGE' BEFORE 'PRESSURE OF'
- LINE 244 INSERT 'SEPTEMBER 6TH 2007'
- LINE 245 INSERT 'SEPTEMBER 8TH 2007'
- LINE 256 DELETE '96 HRS' INSERT '48 HRS - SUNDAY AND HOLIDAYS
  EXCLUDED'
- LINE 264 INSERT '72'
- LINE 269 DELETE AFTER 'DISCHARGING' UNTIL 'CHTS' IN LINE 270
- LINE 274 DELETE 'RECEIVED' AND INSERT 'TENDERED'
- LINE 275 DELETE 'FROM' INSERT 'BY'
- LINE 276 DELETE FROM 'COMMENCES...' UNTIL 'PLACE' INSERT 'ALL
  FAST'
- LINE 303 AFTER 'PEOPLES' INSERT 'AND ANY OTHER CLAUSE'
- CLAUSE 24 - INSERT MAXIMUM FOUR DAYS
- LINE 350-358 DELETE
- LINE 359-366 DELETE
- LINE 409-433 DELETE
- LINE 448 ADD 'IN ACCORDANCE WITH OWNERS P AND I CLUB WORDING AND
  DETAILED IN ACCORDANCE WITH APPENDIX AA AND BB HEREOF'
- LINE 459-461 DELETE
- LINE 462-476 DELETE
- LINE 477 ADD 'OWNERS TO RETURN TO CHTS 2/3 ORIGINAL B/L TOGETHER
  WITH OWNERS RECEIPT FOR 1/3 ORIGINAL B/L WITHIN 21 DAYS OF
  RECEIPT'
- LINE 520 ADD 'HOWEVER SWIFT TRANSPORTATION INC ALWAYS TO REMAIN
  RESPONSIBLE FOR THE PERORMANCE OF THIS C/P'
- LINE 521-523 DELETE
- LINE 559 ADD 'OR ANY OTHER CAUSE BEYOND CHTS CONTROL'
- LINE 634 INSERT AFTER '1974' WITH AS AMENDED 1990'
- LINE 683-716 DEL AND INSERT '1/ IS A TANKER OWNED BY A MEMBER OF
  THE INTERNATIONAL TANKER OWNERS POLLUTION FEDERATION LIMITED AND
  WILL SO REMAIN THROUGHOUT THE CHARTER AND 2/ IS ENTERED IN THE
```

```
FOLLOWING P AND I CLUB BRITANNIA AND WILL SO REMAIN UNLESS OWNERS HAVE
GIVEN CHARTERERS PRIOR WRITTEN NOTICE FO THEIR INTENTION TO
CHANGE.
OWNERS WARRANT THAT THE VESSEL WILL ONLY BE ENTERED IN A P AND I
CLUB WITHIN THE INTERNATIONAL GROUP OF P AND I CLUBS'
- LINE 717-729 DELETE

- CONOCO WEATHER CLAUSE
- HESS SHIFTING CLAUSE

TRAFIGURA CLAUSES 1-19(02.02.2001) AMENDED AS FOLLOWS:
-------------------------------------------------------

CLS 4 LINE 2 - DELETE 0.3 AND INSERT 0.5
      LINE 3 - DELETE 'DEDUCT FROM FREIGHT' AND INSERT 'CLAIM FROM
      OWNERS'
      LINE 4 - DELETE 'AND INSURANCE'
      ADD AT THE END OF CLAUSE 'IRRESPECTIVE OF ABOVE OWNRS TO
      MANTAIN ALL HAGUE VISBY RULES AND DEFENCE'
CLS 5 AFTER 'PAID' INSERT ' ON DEVIATION, ADD COMM TO BE PAID ONLY
      ON TIME ITEMIZED AS DEMURRAGE'
CLS 6 DELETE
CLS 7 DELETE
CLS 8 TO BE ADVISED PRIOR FIXING ADD AT BEGINNING 'IF REQUESTED'

CLS 9 PARA 1 DELETE LAST SENTENCE CLS 12 FIRST LINE AFTER 'THAT' INSERT
      'TO BEST OF THEIR KNOWLEDGE'
CLS 13 ADD AT END 'ANY CONTAMINATION BY VIRTUE OF
       CLEANING TO BE FOR CHARTERERS RISK'
CLS 15 7TH LINE AFTER 'CERTIFICATE' INSERT ' WHICH OWNERS SUBMIT
       CHARTERERS AS SOON AS POSSIBLE'
       8TH/9TH LINE DELETE
       12TH LINE AFTER 'ANY' INSERT 'DIRECT'
CLS 16 DELETE
CLS 18 DELETE SEE MAIN TERMS

1.25 % ADDRESS AND 1.25% PETRIAN SHIPBROKERS LLP ON FT/DFT AND DEMURRAGE

BEST REGARDS

SIMON LANE
PETRIAN SHIPBROKERS LLP
```

REC.

**LAYTIME STATEMENT**

VESSEL            : TORM SOFIA              OUR REF. : 273556

COMPANY           : SWIFT

LOCATIONS SUMMARY

| LOCATION | TIME USED |
|---|---|
| MINA ABDULLA | 235H 07M |
| AMSTERDAM | 70H 45M |
| TIME TO COUNT | : 305H 52M |
| | |
| LAYTIME ALLOWED | : 72H 00M |
| TIME ON DEMURRAGE | : 233H 52M |

DEMURRAGE :

| HOURS MINS | DEM. (%) | RATE | AMOUNT |
|---|---|---|---|
| 233H 52M | 100 | 28,500.00 | 277,716.67 |

TOTAL DEMURRAGE AMOUNT :                              USD 277,716.67

REC.

### LAYTIME STATEMENT

| | | |
|---|---|---|
| VESSEL | : TORM SOFIA | OUR REF. : 273556 |
| LOADING PORT | : MINA ABDULLA | DATE : 07/09/07 - 17/09/07 |
| COMPANY | : SWIFT | |

| ACTIVITIES | DATE | TIME |
|---|---|---|
| NOR | 07-09-07 | 00:12 |
| TIME STARTS COUNTING | 07-09-07 | 00:12 |
| ANCHOR UP | 16-09-07 | 06:54 |
| ALL FAST | 16-09-07 | 09:45 |
| STARTED LOADING | 16-09-07 | 10:55 |
| FINISHED LOADING | 17-09-07 | 03:45 |
| HOSES DISCONNECTED | 17-09-07 | 04:10 |
| TIME STOPS COUNTING | 17-09-07 | 04:10 |

**TOTAL TIME TO COUNT**                                         **243H 58M**

| DEDUCTIONS | FROM | TO | DEDUCTION | TIME(%) | NET |
|---|---|---|---|---|---|
| NOR | 07-09 00:12 | | 06H 00M | 100 | 06H 00M |
| MOVING IN | 16-09 06:54 | 16-09 09:45 | 02H 51M | 100 | 02H 51M |

**TOTAL NET DEDUCTIONS**                                         **08H 51M**

| | | |
|---|---|---|
| TOTAL TIME TO COUNT | : | 243H 58M |
| TOTAL NET DEDUCTIONS | : | 08H 51M |
| NET TIME TO COUNT | : | 235H 07M |

REC.

### LAYTIME STATEMENT

| | | |
|---|---|---|
| VESSEL | : TORM SOFIA | OUR REF. : 273556 |
| DISCHARGING PORT | : AMSTERDAM | DATE : 17/10/07 - 21/10/07 |
| COMPANY | : SWIFT | |

| ACTIVITIES | DATE | TIME |
|---|---|---|
| NOR | 17-10-07 | 17:06 |
| ANCHOR UP | 17-10-07 | 23:00 |
| TIME STARTS COUNTING | 18-10-07 | 06:00 |
| ALL FAST | 18-10-07 | 06:00 |
| STARTED DISCHARGING | 18-10-07 | 12:30 |
| STOPPED DISCHARGING | 19-10-07 | 06:40 |
| RESUMED DISCHARGING | 19-10-07 | 20:45 |
| HOSES DISCONNECTED | 21-10-07 | 04:45 |
| TIME STOPS COUNTING | 21-10-07 | 04:45 |
| **TOTAL TIME TO COUNT** | | **70H 45M** |

| DEDUCTIONS | FROM | TO | DEDUCTION | TIME(%) | NET |
|---|---|---|---|---|---|
| NONE | 00-00 00:00 | 00-00 00:00 | 00H 00M | 100 | 00H 00M |
| **TOTAL NET DEDUCTIONS** | | | | | **00H 00M** |

| | | |
|---|---|---|
| **TOTAL TIME TO COUNT** | : | 70H 45M |
| **TOTAL NET DEDUCTIONS** | : | 00H 00M |
| **NET TIME TO COUNT** | : | 70H 45M |

# *MANSEL OIL LIMITED*

## *Hamilton, Bermuda*

**SWIFT AVIATION GROUP INC**
210 EAST OLD TOWER ROAD
PHOENIX, AZ 85034

USA

REGISTRATION NUMBER : 1121306-9

HAMILTON        : 17 OCTOBER 2007

# I N V O I C E
------------

NUMBER      : **S0702078**

VESSEL      : M/T TORM SOFIA

B/L DATE    : 17.09.2007
CARGO QTY   : 65,923.000 METRIC TONS
YOUR REF    : C/P DATED 23.09.2007
OUR  REF    : DEAL 273556 - VOY. 6
-------------------------------------

WE HEREWITH CHARGE YOU FOR FREIGHT AS FOLLOWS:
VOYAGE FROM MINA ABDULLAH & MINA AL AHMADI TO AMSTERDAM:

```
GIBRALTAR WAITING TIME: 5.05278 DAYS @ $ 28,500.- PDPR    = USD 144,004.17
ROTTERDAM WAITING TIME: 1.69444 DAYS @ $ 28,500.- PDPR    = USD  48,291.65
LESS 1.25% ADDRESS COMMISSION                             = USD   2,403.70

BUNKERS AT GIBRALTAR: HSFO 24.20 MTS @ $ 382.50 PMT       = USD   9,256.50
BUNKERS AT ROTTERDAM: LSFO  8.10 MTS @ $ 372.00 PMT       = USD   3,013.20
                                                           ----------------
                              TOTAL AMOUNT DUE   = USD 202,161.82
                                                 ================
```

                                            **MANSEL OIL LIMITED**

**PAYMENT**
-------

**AT SIGHT IMMEDIATELY UPON COMPLETION OF DISCHARGE**
BY              : ELECTRONIC FUND TRANSFER
TO              : JPMORGAN CHASE BANK NEW YORK
IN FAVOUR OF    : JPMORGAN CHASE BANK , LONDON
FOR CREDIT TO   : **MANSEL OIL LIMITED**
ACCOUNT NO      : **GB90CHAS60924223961701**

|  | TIME |  | HFO | DO |
|---|---|---|---|---|
| **<u>INTERIM PORT TIME</u>** |  |  |  |  |
| ARRIVED MINA AL AHMADI: | 9/17/07 9:48 |  | 1,095.90 | 112.10 |
| DROPPED LAST OUTWARD PILOT: | 9/20/07 11:00 |  | 1,078.03 | 112.10 |
|  |  |  |  |  |
| INTERIM PORT CONSUMPTION: | 3.05 | DAYS | 17.87 | 0.00 |
|  |  |  |  |  |
| **<u>GIBRALTAR WAITING TIME</u>** |  |  |  |  |
| ARRIVED MINA AL AHMADI: | 10/6/07 20:08 |  |  |  |
| DROPPED LAST OUTWARD PILOT: | 10/11/07 21:24 |  |  |  |
|  |  |  |  |  |
| INTERIM PORT CONSUMPTION: | 5.052778 | DAYS | 24.20 | 0.00 |
|  |  |  |  |  |
| **<u>ROTTERDAM WAITING TIME</u>** |  |  |  |  |
| ARRIVED MINA AL AHMADI: | 10/15/07 20:20 |  |  |  |
| DROPPED LAST OUTWARD PILOT: | 10/17/07 13:00 |  | LSFO | DO |
| INTERIM PORT CONSUMPTION: | 1.69444 | DAYS | 8.10 | 0.00 |

# Exhibit 3

<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>

<u>AND</u>

<u>IN THE MATTER OF AN ARBITRATION</u>

B E T W E E N :-

MANSEL OIL LIMITED

<u>Claimants</u>

-and-

SWIFT AVIATION GROUP INC

<u>Respondents</u>

CLAIM SUBMISSIONS

1.    By a Charterparty dated 11th July 2007 on the Beebeevoy3 Form with amendments and additions, the Claimants as Owners chartered the vessel "Freja Hafnia", or alternatively the "Overseas Limar" in Owner's option, to Swift Transportation Inc as Charterers for the carriage of a cargo of 1/2 grades clean petroleum products from one/two safe port(s) Arabian Gulf (excluding Iran and Iraq)  to  one/two safe port(s) United States West Coast Los Angeles- San Francisco range including Hawaii or one/two safe port(s) West Coast Central America.

2.    By Addendum No 1 dated 13th July 2007 the Claimants and Respondents mutually agreed that the performing vessel under the Charterparty would be the "Overseas Limar" ("the vessel").

3.    By Addendum No 2 dated 28th August 2007, the Claimants and Respondents mutually agreed that the Charterers would have the option of discharging the cargo at one/two safe ports(s) United States Gulf excluding

Mississippi River via Panama. Further, that "Any waiting time for transit Panama Canal in laden condition in excess of 24 hours to count as laytime or demurrage if on demurrage."

4.    By Addendum No 1 dated 12 September 2007 it was agreed that the Respondent, Swift Aviation Group Inc, would be substituted as Charterers under the said Charterparty.

5.    The Charterparty, which is contained in or evidenced by a fixture recap and to which the Claimants will refer as necessary for its full terms, meaning and effect expressly further provided as follows :-

*"Clause 18*

*Charterers shall be allowed seventy two (72) hours, Sundays and holidays included, together with any period of additional laytime arising under the provisions of Clause 17 if Charterers sanction loading of the Vessel before the commencement of laydays, as laytime for loading and discharging and in respect of any period(s) when the Vessel, in accordance with Charterers' instructions, is proceeding or operating as referred to in Clauses 4, 5, 12, 21, 24, 25, 26, 29, 30 and 31. Sundays and holidays shall be included in respect of laytime for loading or discharging and Charterers shall have the right of loading and discharging during the night.*

*Clause 19*

*Subject only to Clauses 17, 20 and 21:-*

*(a) laytime or, if the Vessel is on demurrage, demurrage shall at each loading and each discharge port or place commence at the expiry of 6 hours after Notice of Readiness to load or discharge has been tendered by the Master or his agents by Charterers or their agents, berth or no berth, or when the Vessel [is] all fast, whichever first occurs.*

*Such Notice of Readiness may be given either by letter, facsimile transmission, telegram, telex, radio or telephone (and if given by radio or telephone shall subsequently be confirmed in writing and if given by facsimile transmission confirmed by telex).....*

*(b) laytime or, if the Vessel is on demurrage, demurrage shall run until the cargo hoses have been finally disconnected upon termination of loading or discharging, such disconnection to be effected promptly; provided always that if the Vessel is detained for more than 2 hours beyond the final disconnection of hoses by the shore terminal solely for the completion of cargo documentation and the presentation of such documents on board the vessel, laytime or, if the Vessel is on demurrage, demurrage shall re-commence after such period of 2 hours and terminate upon the completion of cargo documentation.*

**Clause 20**

Time shall not count against laytime or, if the vessel is on demurrage, for demurrage when spent or lost:-

(a) on an inward passage, including awaiting daylight, tide, opening of locks, pilot or tugs and moving from anchorage, even if lightening has taken place at the anchorage, until the Vessel is securely moored at the berth or other loading or discharging place specified by Charterers;

(b) ....

**Clause 22**

Charterers shall pay demurrage at the rate of US$30,000 per running day and pro rata for part of a running day for all time that loading and discharging and any other time counting as laytime exceeds the laytime specified in Clause 18

**Clause 25**

Charterers shall be entitled to cause their representative(s) to carry out inspections of the Vessel and/or observe cargo operations and/or ascertain the quantity and quality of the cargo, water and residues on board at any loading and/or discharge port or place.

.... ....

Any delay arising solely as a result of such inspection, survey or sampling as aforesaid shall count as laytime or, if the vessel is on demurrage, as demurrage

**Clause 37**

.... ....

Any delays and/or extra expenses incurring, due awaiting clearance by port authorities in the United States to be for Charterers' account.

**Additional Clauses**

Address Commission Clause: Amended

1.25 per cent is payable by Owners to Charterers on all monies paid, on deviation. Such address commission is deductible at source. Commission to be paid only on time itemised as demurrage"

6.    Pursuant to the Charter, the Respondents ordered the vessel to proceed to Shuaiba, Kuwait to load cargo. The vessel tendered NOR at 01:30 on 29th July 2007 and was all fast by 04:36 hours on 29th July 2007. Time

therefore started to count at 04:36 hours on 29th July 2007. Thereafter, loading was completed and hoses were disconnected at 09:35 hours on 30th July 2007. However, two hours later the vessel was still waiting for completion of cargo documentation, which was not finally resolved until 15:30 hours on 30th July.

7.    In the premises, the total time used at Shuaiba was 34 hours and 54 minutes from which 2 hours allowance for cargo documentation is to be deducted. In the premises, and in accordance with the laytime calculations attached hereto, the total time to count was 32 hours 54 minutes.

8.    Thereafter, the vessel proceeded to the delivery range and in the event was ordered to proceed to Houston, Texas to discharge the cargo. The Vessel was in a position ready to transit the Panama Canal at 10:48 hours on 16th September 2007 but it was not until 20:47 hours on 19th September 2007 that the Vessel was allowed to transit the Canal. In the premises, the Vessel waited to transit the Panama Canal for 81 hours and 59 minutes, of which (pursuant to Addendum 2) 57 hours and 59 minutes counts towards laytime/demurrage.

9.    The Vessel arrived at Houston and tendered NOR at 08:00 on 26th September 2007. Following orders to berth, the vessel was engaged in inward passage from 23:10 hours on 26th September 2007 until 06:36 hours on 27th September 2007 when the vessel was all fast. Thereafter, at 09:10 hours on 27th September 2007 a USCG inspection commenced which was completed at 12:35 hours. Discharge operations were completed at 01:40 hours on 29th September 2007.

10.    In the premises, the total time used at Houston was 65 hours 40 minutes from which there falls to be deducted 6 hours in respect of the period following NOR, 7 hours 26 minutes in respect of the inward passage and 3 hours 25 minutes in respect of the inspection. In the premises and as set out in the attached calculations, the total time used at Houston was 48 hours 49 minutes.

11.    Accordingly, the total time used was 139 hours and 42 minutes against an allowed laytime of 72 hours. In the premises, the vessel was on demurrage for 67 hours and 42 minutes.

12.    In the premises, demurrage is payable in the sum of US$83,567.19 (being US$84,625 less commission in the sum of US$1057.81.) However, wrongfully and in breach of the Charterparty the Respondents have failed and/or refused to pay the said sum or any part thereof.

13.    Further, the Claimants claim interest pursuant to Section 49 of the Arbitration Act 1996 on such sums as are awarded to them at such rate and for such period as the Tribunal thinks fit.


AND THE CLAIMANTS CLAIM

(1) US$83,567.19 or such other sum as the Tribunal determines;

(2) Interest pursuant to section 49 of the Arbitration Act 1996 as aforesaid.

(3) Costs


POONAM MELWANI


Served this 4th day of June 2008, by Stephenson Harwood, One St Paul's Churchyard, London EC4M 8SH, Solicitors for the Claimants

**BP SHIPPING LTD.**
Britannic Tower
Moor Lane
LONDON EC2Y 9BU



Code word for this Charterparty
BEEPEEVOY3*

## *Voyage Charterparty*

<table>
<tr><td></td><td>LONDON <i>11th July</i>..................................... <s>19</s> <i>2007</i></td><td>1</td></tr>
<tr><td></td><td><i>It is this day agreed between Mansel Oil Limited</i>.....................................</td><td>2</td></tr>
<tr><td></td><td><i>of Bermuda</i>.....................................</td><td>3</td></tr>
<tr><td></td><td>.....................................</td><td>4</td></tr>
<tr><td></td><td>Owners (hereinafter referred to as 'Owners') of the good motor/steam tank vessel called</td><td>5</td></tr>
<tr><td></td><td>"OVERSEAS LIMAR"</td><td>6</td></tr>
<tr><td></td><td>(hereinafter referred to as 'the Vessel') new <i>still waiting Bander Abbas 16th July 2007, ETB</i> .........</td><td>7</td></tr>
<tr><td></td><td><i>Fujairah 17th/18th July 2007, ETA Kuwait 21st July 2007</i> <s>and expected ready to load about</s> .........</td><td>8</td></tr>
<tr><td></td><td>and <s>BP Shipping Limited of London as agents for</s> <i>Swift Transportation Inc.,</i> .............................</td><td>9</td></tr>
<tr><td></td><td>.....................................</td><td>10</td></tr>
<tr><td></td><td>(hereinafter referred to as 'Charterers')</td><td>11</td></tr>
<tr><td><b>Classification of Vessel</b></td><td>1. Owners undertake that:</td><td>12</td></tr>
<tr><td></td><td>(a) the Vessel is classed    <i>A.B.S.</i> .....................................</td><td>13</td></tr>
<tr><td><b>Description of Vessel</b></td><td>(b) the Vessel has a summer deadweight of <i>46,164.9 metric</i> ..................................... tonnes</td><td>14</td></tr>
<tr><td></td><td>on a saltwater draught of <i>12.205</i> ..................................... metres, with a total cargo capacity (98%</td><td>15</td></tr>
<tr><td></td><td>full) of <i>50,084.4</i> ..................................... cubic metres; - <i>slop tank(s) @ 98% 1,046.54 cubic metres</i></td><td>16</td></tr>
<tr><td></td><td>(c) the Vessel is fully fitted with heating coils fabricated from ..................................... in all cargo tanks, capable of heating the cargo to, and maintaining it at all times at a temperature of, 57deg C (135deg F);</td><td>17<br>18<br>19</td></tr>
<tr><td></td><td>(d) the Vessel is equipped with <s>derricks</s> <i>three (3) cranes</i> capable of lifting to, and supporting at, the Vessel's port and<br>starboard manifolds submarine hoses of up to <i>ten (10)</i> ..................................... tonnes in weight.</td><td>20<br>21</td></tr>
<tr><td><b>Condition of Vessel</b></td><td>2. Owners shall before, at the commencement of, and throughout the voyage exercise due diligence to make and maintain the Vessel, her tanks, pumps, valves and pipelines tight, staunch, strong, in good order and condition, in every way fit for the voyage and fit to carry the cargo provided for in Clause 3, with the Vessel's machinery, boilers and hull in a fully efficient state, and with a full and efficient complement of Master, officers and crew.</td><td>22<br>23<br>24<br>25<br>26</td></tr>
<tr><td><b>Loading</b></td><td>3. Subject to the provisions of Clause 24, the Vessel shall proceed to <i>one / two safe port(s) Arabian Gulf excluding Iran and Iraq</i></td><td>27</td></tr>
</table>

| | | |
|---|---|---|
| and Discharge Ports Range | ................................................................................................................. | 28 |
| | ................................................................................................................. | 29 |
| | ................................................................................................................. | 30 |
| Cargo | or so near thereunto as she may safely reach, and there load a cargo of *in Charterers option upto a full* ......... | 31 |
| | *cargo, no deadfreight for Charterers account provided minimum quantity supplied - 1/2 grades* | 32 |
| | *within vessels natural segregation clean petroleum products, clean unleaded, undarker 2.5 NPA,* | 33 |
| | *excluding lubes / casing heads / solvents and chemicals - Owners advise that vessel can load basis* | 34 |
| | *SG .8 = 40,600 metric tons and less one slop tank = 40,200 metric tons* ................................................... | 35 |
| | ................................................................................................................. | 36 |
| | ............................................................................................................ in bulk, | 37 |
| | not exceeding what she can reasonably stow and carry over and above the tackle, provisions and furniture, | 38 |
| | and in any case not in excess of the quantity permitted by the International Load Line Convention, 1966, or | 39 |
| | any modification or amendment thereof as may be applicable to the voyage to be performed under this | 40 |
| | Charter. Thereupon the Vessel shall proceed with such cargo at a speed which Owners undertake shall be | 41 |
| | *about fourteen (14)* knots ('Base Speed'), *weather and safe navigation permitted,* as ordered on signing | 42 |
| | Bills of Lading or as provided in Clauses | |
| | *24 and/or 26 to one/two safe port(s) United States West Coast Los Angeles - San Francisco range* | 43 |
| | *including Hawaii or one/two safe port(s) West Coast Central America* ............................................... | 44 |
| | ................................................................................................................. | 45 |
| | ................................................................................................................. | 46 |
| | ................................................................................................................. | 47 |
| | ................................................................................................................. | 48 |
| | ...................................................... or so near thereunto as she may safely reach, | 49 |
| | and deliver the same in consideration of the payment of freight as provided in Clauses 6 and 7. | 50 |
| | ~~Charterers shall have the right at any time during the voyage to order the Vessel to increase speed in order~~ | 51 |
| | ~~to arrive at a port or place on a certain date. Charterers shall not instruct the Vessel to increase speed such~~ | 52 |
| | ~~as to require the Vessel to proceed at a maximum speed in excess of that set out in the BP Shipping~~ | 53 |
| | ~~Questionnaire. If Charterers require an increase of speed to be made, any increase in the freight rate~~ | 54 |
| | ~~consequent thereon shall be calculated in accordance with the provisions of Clause 6.~~ | 55 |
| | ~~If the Vessel fails to maintain Base Speed, or fails to comply with instructions as to the increase of speed~~ | 56 |
| | ~~given by Charterers pursuant to this Clause, Owners shall, subject to Clause 46, be liable for all costs,~~ | 57 |
| | ~~losses, damages and expenses arising as a direct consequence thereof save to the extent that Owners can~~ | 58 |
| | ~~prove to the satisfaction of Charterers that such failure was attributable to a reduction in speed necessi-~~ | 59 |
| | ~~tated by either adverse weather and sea state conditions or the safe navigation of the Vessel and Charterers~~ | 60 |
| | ~~shall be entitled to deduct any such costs, losses, damages and expenses from any demurrage due to Owners~~ | 61 |
| | ~~hereunder without prejudice to any other rights available to Charterers under this Charter or otherwise~~ | 62 |
| | ~~under English law.~~ | 63 |
| Loading/ Discharge Place | 4. The Vessel shall be loaded and discharged at any port, berth, dock, anchorage, submarine line, | 64 |
| | single point or single berth mooring facility, offshore location, alongside vessels or lighters, or any other | 65 |
| | place whatsoever as ordered by Charterers, *however the safety of same always to be at Masters* | 66 |
| | *discretion, which not to be unreasonably withheld.* Charterers shall exercise due diligence before directing the | |
| | Vessel to any such places to ascertain that the Vessel can always lie safely afloat, but Charterers do not | 67 |
| | warrant the safety of any of the aforementioned places and shall be under no liability in respect thereof | 68 |
| | except for loss or damage caused by the failure to exercise due diligence as aforesaid. | 69 |

| Lightening at Sea | If a port is nominated which cannot accommodate the Vessel with the quantity of cargo carried, Charterers undertake to discharge sufficient cargo at a previous port or place, or into vessels or lighters, to enable the Vessel to enter and lie at such nominated port or place. Freight shall be paid in accordance with Clause 6 and lighterage shall be at the expense of Charterers. | 70<br>71<br>72<br>73 |
|---|---|---|
| | *Unless stipulated by Worldscale, A place of lightening at sea, which subject to Masters approval which not to be unreasonably withheld, shall not constitute a discharge port or place under Clause 19, but all time used* | 74 |
| | for a lightening operation (excluding any time lost or spent by reason of any of the causes stipulated in Clauses 20 and 21) shall count against the number of running hours stipulated in Clause 18 for the purpose of calculating Charterers' liability, if any, for demurrage as provided in Clause 22. For the purpose of this Clause the lightening operation shall be deemed to commence ~~when the Vessel is properly tied up and moored alongside the lightening vessel~~ and to end when unmooring has been completed. *Laytime to commence tendering NOR upon arrival at lightering position* | 75<br>76<br>77<br>78<br>79 |
| | Subject to the preceding paragraph of this Clause, any additional steaming and/or waiting time used solely by reason of Charterers' orders to lighten at sea shall count as laytime or, if the Vessel is on demurrage, as demurrage. | 80<br>81<br>82 |
| Ship to Ship Transfer Operations | If Charterers require the Vessel to trans-ship cargo from or into another ocean going vessel the transshipment operation shall be carried out in accordance with the recommendations set out in the latest edition of the ICS/OCIMF Ship to Ship Transfer Guide (Petroleum) and Owners undertake that the Vessel and her crew will comply with such recommendations. Charterers shall provide and pay for all necessary equipment including suitable fenders and hoses. Owners shall permit supervisory personnel nominated by Charterers to attend on board, including a Mooring Master, to assist in the trans-shipment operation. In the case of a ship to ship transfer freight shall be paid in accordance with the provisions of Clause 6. | 83<br>84<br>85<br>86<br>87<br>88<br>89 |
| | No provision herein contained as to laytime and demurrage shall be affected by the provisions of Clause 46 | 90 |
| | *Term Lightering/Ship to Ship Transfer Clause:*<br>*If lightering/ship to ship transfer operation is required same always to be in accordance with OCIMF latest edition of ship to ship transfer. Charterers to supply all fenders/lines/hoses and any other equipment required for such an operation at Charterers time and expenses and always subject to masters approval. Time to count in full 6 hours after tendering NOR or when first lighter vessel is alongside, whichever earlier, until last line/fender is off and lighter vessel has sailed. Time lost due to tide and/or weather and/or sea conditions to count in full as laytime or demurrage if on demurrage. If the vessel is required to complete cargo operation at a berth in port Charterers will not have the benefit of 6 hours NOR prior berthing in port. Charterers warrant that there is no prohibition or restriction on ship to ship operation at the port/place to which the vessel is ordered to perform ship to ship transfer and further that they have obtained any/all necessary local approvals or licences to carry out operations at the designated port/place* | |
| Shifting | 5. Charterers may require the Vessel to load at more than one berth at each loading port or place and to discharge at more than one berth at each discharge port or place in which event Owners shall, in the first instance, pay expenses arising from any of the following movements of the Vessel:- | 91<br>92<br>93 |
| | (a)  unmooring at, and pilotage and towage off, the first loading or discharge berth; | 94 |
| | (b)  mooring and unmooring at, and pilotage and towage on to and off, the intermediate loading or discharge berths; and | 95<br>96 |
| | (c)  mooring at, and pilotage and towage on to, the last loading or discharge berth. | 97 |
| | Charterers shall reimburse Owners in respect of expenses properly incurred arising from any of the aforementioned movements upon presentation by Owners of all supporting invoices evidencing prior payment by Owners. | 98<br>99<br>100 |
| | Charterers shall reimburse Owners in respect of any dues and/or other charges incurred in excess of those which would have been incurred if all the cargo involved at the particular port or place had been loaded or discharged at the first berth only. Time consumed on account of shifting shall count as laytime or, if the Vessel is on demurrage, as demurrage, except as otherwise provided in Clause 20. | 101<br>102<br>103<br>104 |
| Port and Terminal Combinations | For the purpose of freight payment, the places grouped in Port and Terminal Combinations in the New Worldwide Tanker Nominal Freight Scale (hereinafter referred to as 'Worldscale'), as amended at the date of this Charter, shall be considered as berths within a single port, Charterers reimbursing shifting expenses in accordance with the foregoing provisions. | 105<br>106<br>107<br>108 |

| | | |
|---|---|---|
| **Rate of Freight** | 6. The rate of Freight shall be at the level of *US$ 2.5 million basis 1-1 United States West Coast* | 109 |
| | *including Hawaii – US$ 2.475 million basis 1-1 West Coast Central America* ............................... | 110 |
| | .................................................................................................................................................. | 111 |
| | .................................................................................................................................................. | 112 |
| | .................................................................................................................................................. | 113 |
| | .................................................................................................................................................. | 114 |
| | ...................................................................................... % of the rate for the voyage | 115 |
| | as provided in Worldscale, as amended at the date of this Charter. If Charterers order the Vessel to | 116 |
| | increase speed under the provisions of Clause 3 such rate shall be increased by ................................ | 117 |
| | Worldscale points for each knot of increased speed above the Base Speed or on a pro rata basis for fractions | 118 |
| | of a knot up to a maximum of ............................... knots. Such increase shall be calculated in accordance | 119 |
| | with the following example: | 120 |
| | Example: The Vessel proceeds at Base Speed of 10 knots, the rate for which is Worldscale 40. | 121 |
| | After 10 days the Vessel is ordered to complete the voyage at 12 knots. The remainder of the | 122 |
| | voyage takes 20 days. The increased speed option provides for a premium of 0.5 of a Worldscale | 123 |
| | point per knot of increased speed over Base Speed. | 124 |
| | The freight rate for the above voyage would be calculated as follows: | 125 |
| | Voyage Freight Rate =   (W40 x 10 days)   +   (W41* x 20 days) | 126 |
| | ----------------------------------------------- | |
| | 30 (total voyage days) | 127 |
| | =   W40.67 | 128 |
| | (*1 point premium for 12 knots maximum speed) | 129 |
| | Should the Vessel not maintain the speed ordered, due to breakdown or any other reason whatsoever | 130 |
| | beyond Charterers' control, the freight rate shall be calculated based on the average speed actually | 131 |
| | achieved by the Vessel using BP Worldwide Marine Distance Tables to assess the length of the voyage | 132 |
| | between pilot stations at the loading and discharge ports or places. | 133 |
| | If the Vessel is ordered to lighten pursuant to Clause 4, the freight rate shall, notwithstanding the | 134 |
| | lightening, be the same Worldscale rate for the voyage as would be payable if no such lightening had taken | 135 |
| | place, *unless so stipulated by Worldscale.* | 136 |
| | In the case of a ship to ship transfer, as referred to in Clause 4, the freight rate for the voyage shall be the | 137 |
| | rate as provided in Worldscale for the relevant Trans-shipment Area, as amended at the date of this | 138 |
| | Charter, or as provided by Worldscale upon application by the parties or either of them. | 139 |
| | Notwithstanding the provisions of Clause 3 and the provisions of this Clause should the Vessel load in | 140 |
| | excess of the quantity specified therein then the freight payable for any overage in excess of such quantity | 141 |
| | shall be at one half of the freight rate(s) referred to above. | 142 |
| **Payment of Freight** | 7. Freight shall be payable immediately after completion of discharge, on the gross quantity of cargo | 143 |
| | loaded by the Vessel as evidenced by the Bills of Lading furnished by the shippers. Payment shall be made | 144 |
| | in U.S. dollars | 145 |
| | *to Payable before breaking bulk (BBB) and with a bank countersigned letter of indemnity. At sight* | |
| | *immediately upon completion of discharge by electronic fund transfer to JP Morgan Chase Bank* | 147 |
| | *New York, in favour of : JP Morgan Chase Bank London, for credit to : Mansel Oil Limited,* | 148 |
| | *Account No. GB90 CHAS 60924223961701* ............................................................................. less | 149 |
| | any sum derived from the operation of Clauses 8, *see also Clause 5 of Trafigura Clauses 1991 attached* | 150 |
| | and 54 and less any disbursements or advances made to | |
| | the Master or agents at ports of loading and/or discharge, and additional cargo insurance premium for | 151 |
| | Owners' account under Clause 42, provided that no freight shall be payable on any quantity which | 152 |
| | submerges, at any stage of the voyage, the marks appropriate under the International Load Line | 153 |
| | Convention, 1966, or any modification or amendment thereof as may be applicable to the voyage to be | 154 |
| | performed under this Charter. | 155 |

| | | |
|---|---|---|
| **Cargo Retention** | 8. If any material remains in the Vessel's cargo tanks on completion of discharge of cargo Charterers shall be entitled to appoint an *two (2) independent surveyors, one appointed by Charterers and one appointed and paid for by Owners*, to determine what, if any, quantity of such material is cargo which is liquid, pumpable and reachable by the Vessel's pumps, *provided Master has ensured correct trim procedures to maximise cargo outturn*. The independent surveyor's findings shall be final and binding on Owners and Charterers. Charterers shall be entitled to deduct from freight *shall have the right to claim from Owners* an | 156 157 158 159 |
| | amount equal to the FOB port of loading value of any quantity so determined together with freight due with respect thereto. Charterers hereby agree to indemnify Owners against any liability to a Bill of Lading holder resulting from non-delivery of any such cargo in respect of which a deduction from freight *claim* is made provided, however, that Charterers shall in no event be liable to indemnify Owners in an amount greater than the amount of the deduction from freight *than their quantified claim*. | 160 161 162 163 164 |
| **Cleaning of Vessel's Tanks, Pumps and Pipelines** | 9. Without prejudice to the provisions of Clause 2 Owners shall use due diligence to ensure that the Vessel presents for loading with her tanks, pumps and pipelines properly cleaned to the satisfaction of any inspector appointed by Charterers and ready for loading the cargo specified in Clause 3. Any time used in cleaning tanks, pumps and pipelines to Charterers' inspector's satisfaction shall not count as laytime or demurrage and shall, together with any costs incurred in the foregoing operations, be for Owners' account. | 165 166 167 168 169 |
| **Arriving to Even Keel** | 10. If for any reason the Vessel is unable to trim to even keel for arrival at a discharge port Owners shall notify Charterers by radio or telex stating the Vessel's expected arrival draught forward and aft in salt water. Such notification shall be given as soon as practicable after the receipt of loading orders and no later than sailing from loading port or place. | 170 171 172 173 |
| **Slack Tanks** | 11. Notwithstanding the provisions of Clause 7, if Charterers are unable to supply the quantity of cargo specified in Clause 3 the Vessel shall not be required to proceed to sea until such of her tanks are filled as will place her in a seaworthy condition, and freight shall be paid as if the Vessel had been loaded with the quantity of cargo specified in Clause 3. | 174 175 176 177 |
| **Inert Gas System** | 12. Owners undertake that the Vessel is equipped with a fully functional Inert Gas System which is in use on the date hereof and shall so remain during the period of this Charter and that the officers and crew are properly qualified by way of certification for, and experienced in, the operation of such System. Owners further undertake that the Vessel shall arrive at the loading port with her cargo tanks inerted and that such tanks shall remain inerted throughout the voyage and the subsequent discharge of the cargo. Any time lost, whether or not the Vessel is on demurrage, owing to deficient or improper operation of the Inert Gas System shall be for Owners' account. | 178 179 180 181 182 183 184 |
| | The Vessel's Inert Gas System shall fully comply with Regulation 62, Chapter II-2 of the SOLAS Convention 1974 as modified by its Protocol of 1978 and Owners undertake that such System shall be operated by the officers and crew in accordance with the operational procedures set out in the IMO publication entitled 'Inert Gas Systems 1983' as may, from time to time, be amended. | 185 186 187 188 |
| | If Charterers so require, Owners shall arrange for the Vessel's tanks to be de-inerted to facilitate inspection, gauging and sampling. Any time taken in de-inerting, inspecting, gauging, sampling and re-inerting thereafter shall count as laytime or, if the Vessel is on demurrage, as demurrage. | 189 190 191 |
| ~~**Crude Oil Washing-Crude Oil Vessels**~~ | ~~13. Owners undertake that the Vessel is equipped with a fully functional Crude Oil Washing System and that the officers and crew are properly qualified by way of certification for, and experienced in, the operation of such System.~~ | 192 193 194 |
| | ~~Whilst Charterers may instruct the Master to carry out crude oil washing of all tanks which contained cargo the Master shall, in any event, arrange for the crude oil washing of cargo tanks to the MARPOL minimum standards, as set out in the Vessel's Crude Oil Washing Operation and Equipment Manual, at the discharge port or place.~~ | 195 196 197 198 |
| | ~~For all such crude oil washing the period for discharge specified in Clause 16 shall be increased from 24 to 30 hours or pro-rata thereof in the case of a part cargo. Any additional time taken for discharge and crude oil washing shall not count as laytime or, if the Vessel is on demurrage, as demurrage.~~ | 199 200 201 |
| **Dues and Other Charges** | 14. Dues and other charges levied upon the Vessel, howsoever assessed, shall be paid by Owners. Dues and other charges upon the cargo shall be paid by Charterers. *Taxes and/or dues on cargo and/or freight to be for Charterers account and settled directly by them* | 202 203 |
| | Notwithstanding the foregoing where, under the provisions of Worldscale, as amended at the date of this Charter, a due or charge is expressly for the account of Owners or Charterers then such due or charge shall be paid in accordance with such provisions. | 204 205 206 |

Should a charge be imposed upon Charterers by the owner of a berth by reason of prolonged occupation of such berth by the Vessel for reasons beyond the control of Charterers or their agents such charge shall be paid by Owners. 207 208 209

**Loading and Discharge of Cargo**

15.    The cargo shall be pumped into the Vessel at the expense of and at the risk and peril of Charterers as far as the Vessel's manifold only, and pumped out of the Vessel at the expense of and at the risk and peril of Owners as far as the Vessel's manifold only. 210 211 212

Owners shall, if requested, make available the hands, equipment, and facilities required on board for the connecting and disconnecting of hoses for loading and discharging. The Master may demand shore supervision of, and approval for, the connecting and disconnecting of hoses. Any delay resulting from the failure by Owners to provide the hands, equipment and facilities as aforesaid shall not count as laytime or, if the Vessel is on demurrage, as demurrage. 213 214 215 216 217

**Pumping**

16.    Owners undertake that the Vessel shall discharge a full cargo, as defined hereunder, within 24 hours, or pro rata thereof in respect of a part cargo, from the commencement of pumping or that the Vessel shall maintain a minimum discharge *average* pressure of 100 psig at the Vessel's manifold, *except when stripping* throughout the period of discharge provided that the shore receiving facilities are capable of accepting discharge of the cargo within such time or at such pressure. The shore receiving facilities shall have the right to gauge discharge pressure at the Vessel's manifold. 218 219 220 221 222 223

Any additional time used owing to the inability of the Vessel to discharge the cargo within 24 hours or 30 hours, as the case may be, or such shorter period as may be applicable in the case of a part cargo, or to maintain a minimum discharge pressure of 100 psig at the Vessel's manifold throughout the discharge shall be for Owners' account and shall not count as laytime or, if the Vessel is on demurrage, as demurrage. If the shore receiving terminal facilities are unable to accept discharge of the cargo within the aforementioned time or at the aforementioned discharge pressure the Master shall present the shore receiving terminal with a Note of Protest forthwith, and in any event prior to the Vessel's departure from the berth, and shall use all reasonable endeavours to have such Note of Protest countersigned on behalf of the shore receiving terminal in the absence of which countersignature the Master shall present a further Note of Protest to the shore receiving terminal. 224 225 226 227 228 229 230 231 232 233

For the purpose of this Clause a full cargo shall mean the quantity referred to in Clause 3 or the Bill of Lading quantity, whichever is the greater. 234 235

Charterers will not consider any claim by Owners for additional time used in the foregoing circumstances in the absence of the provision by Owners of the following documentation:- 236 237

(a)    an hourly pumping log, signed by a responsible officer of the Vessel and a terminal or Charterers' representative, showing the pressure maintained at the manifold throughout discharge and, in the absence of a signature from a terminal or Charterers' representative, a Note of Protest; 238 239 240

(b)    copies of all Notes of Protest issued or received by the Vessel in relation to the discharge in question; and 241

(c)    copies of any other documentation generated by the Vessel or by the shore receiving terminal relevant to the discharge in question. 242 243

**Laydays/ Cancelling**

17.    Laydays for the purpose of this Charter shall be from *18th July 2007*................................................... 244

("the Commencement Date") to *20th July 2007*................................................... ("the Cancelling Date"). Laytime for the purposes of loading shall not commence before ~~0600~~ *00.01* hours local time on the Commencement Date unless with Charterers' sanction in which event laytime shall commence when the Vessel commenced loading and should the Vessel not be ready to load by ~~1600~~ *23.59* hours local time on the Cancelling Date Charterers shall have the option of cancelling this Charter. Should the Vessel, with Charterers' sanction, have commenced loading prior to the commencement of laytime, as provided above, then the time from such commencement of loading to the commencement of laytime shall constitute additional laytime for the purpose of loading and discharging and in respect of the period(s) referred to in Clause 18. 245 246 247 248 249 250 251 252

If it appears to Charterers that the Vessel will be delayed beyond the Cancelling Date Charterers may require Owners to notify Charterers of the date on which they expect the Vessel to be ready to load whereupon Charterers shall have the option to cancel this Charter and such option shall then be declared by Charterers within ~~96 hours~~ *48 hours*, Sundays and holidays ~~excepted~~ *excluded*, of the receipt of the said notification from 253 254 255 256

Owners. In the event of Owners giving such notification and Charterers not exercising their option to   257
cancel within the stated period, the third day after the readiness date stated in Owners' notification, or   258
such other date as may be mutually agreed, shall be the new Cancelling Date for the purpose of this Clause.   259
If Owners fail to give such notification when requested by Charterers, Charterers shall have the option to   260
cancel this Charter at any time prior to the arrival of the Vessel.   261

Cancellation or failure to cancel shall be entirely without prejudice to any claim for damages Charterers   262
may have for the Vessel not being ready to load by the original Cancelling Date stated in this Clause.   263

**Amount of, and**
**Definition of,**
**Laytime**

18.    Charterers shall be allowed *seventy two (72)* ...... hours, *Sundays and holidays included,* together   264
with any period of additional

laytime arising, under the provisions of Clause 17 if Charterers sanction loading of the Vessel before the   265
commencement of laydays, as laytime for loading and discharging and in respect of any period(s) when the   266
Vessel, in accordance with Charterers' instructions, is proceeding or operating as referred to in Clauses 4,   267
5, 12, 21, 24, 25, 26, 29, 30 and 31. Sundays and holidays shall be included in respect of laytime for loading   268
or discharging unless loading or discharging on the Sunday or holiday in question is prohibited by law or   269
regulation at the port or place of loading or discharge and Charterers shall have the right of loading and   270
discharging during the night.   271

**Commencement**
**and Termination**
**of Laytime/**
**Demurrage**

19.    Subject only to Clauses 17, 20 and 21:-   272

**for Loading**
**and Discharge**

(a)  laytime or, if the Vessel is on demurrage, demurrage shall at each loading and each discharge port or   273
place commence at the expiry of 6 hours after Notice of Readiness to load or discharge has been received   274
*tendered*

*from by* the Master or his agents by Charterers or their agents, berth or no berth, or when the Vessel   275
commences to load or discharge at the berth or other loading or discharging place, *all fast,* whichever first   276
occurs.

Such Notice of Readiness may be given either by letter, facsimile transmission, telegram, telex, radio or   277
telephone (and if given by radio or telephone shall subsequently be confirmed in writing and if given by   278
facsimile transmission confirmed by telex) but Notice of Readiness shall not be given, without Charterers'   279
sanction, before the commencement of laydays; and   280

(b)  laytime or, if the Vessel is on demurrage, demurrage shall run until the cargo hoses have been finally   281
disconnected upon termination of loading or discharging, such disconnection to be effected promptly;   282
provided always that if the Vessel is detained for more than 2 hours beyond the final disconnection of hoses   283
by the shore terminal solely for the completion of cargo documentation and the presentation of such   284
documents on board the vessel, laytime or, if the Vessel is on demurrage, demurrage shall re-commence   285
after such period of 2 hours and terminate upon the completion of cargo documentation.   286

**Suspension of**
**Laytime/**
**Demurrage**
**for Loading**
**and Discharge**

20.    Time shall not count against laytime or, if the Vessel is on demurrage, for demurrage when spent or   287
lost: -   288

(a)  on an inward passage, including awaiting daylight, tide, opening of locks, pilot, or tugs and moving from   289
anchorage, even if lightening has taken place at the anchorage, until the Vessel is securely moored at the   290
berth or other loading or discharging place specified by Charterers;   291

(b)  due, whether directly or indirectly, to breakdown, inefficiency or other cause attributable to the Vessel   292
and/or Owners, including inability of the Vessel to pump out the cargo at the rate indicated in Clause 16   293
after taking account of any variations in back pressure;   294

(c)  as a result of a labour dispute, or strike, involving Master, officers or crew of the Vessel or tugs or pilot;   295

(d)  in, or in connection with, the handling of ballast unless this is carried out concurrently with loading or   296
discharging such that no loss of time is involved; and   297

(e)  in cleaning tanks, pumps and pipelines.   298

Nothing herein contained shall be affected by the provisions of Clause 46.   299

**Laytime/**
**Demurrage/**
**Force Majeure**

21.    Any delay(s) arising from adverse weather or sea state conditions, fire, explosion, breakdown or   300
failure of equipment, plant or machinery in or about ports or places of loading and/or discharge, Act of   301
God, act of war, labour dispute, strike, riot, civil commotion, or arrest or restraint of princes, rulers or   302
peoples, *and any other cause* shall, provided always that the cause of the delay(s) was not within the   303
reasonable control of
Charterers or Owners or their respective servants or agents, count as one half laytime or, if the Vessel is on   304
demurrage, at one half of the demurrage rate.   305

| | | |
|---|---|---|
| **Demurrage** | 22.    Charterers shall pay demurrage at the rate of US$ *30,000/=* ............................. per running day and pro rata for part of a running day for all time that loading and discharging and any other time counting as laytime exceeds the laytime specified in Clause 18. | 306 307 308 |
| **Demurrage Time Bar** | 23.    Charterers shall be discharged and released from all liability in respect of any claim for demurrage which Owners may have under this Charter unless a claim in writing has been presented to Charterers together with supporting documentation substantiating each and every constituent part of the claim within 90 days of the completion of discharge of the cargo carried hereunder. | 309 310 311 312 |
| **Orders for Discharge Ports or Places** | 24.    If, at any time after the Vessel has completed loading the cargo or part cargo, as the case may be, Charterers instruct the Vessel to await their orders at one or more locations, then all time spent by the Vessel awaiting orders as aforesaid shall count as laytime or, if the Vessel is on demurrage, as demurrage. | 313 314 315 |
| **Revised Orders** | If after any loading or discharge port or place has been nominated Charterers desire to vary such port or place, Owners shall issue such revised instructions as are necessary at any time to give effect to Charterers' revised orders and any period by which the steaming time, *maximum four (4) days*, taken to reach the alternative port or place | 316 317 318 |
| | exceeds the time which should have been taken had the Vessel proceeded thither directly shall count as laytime or, if the Vessel is on demurrage, as demurrage. Charterers shall pay Owners for additional bunkers consumed during such excess time at the replacement price as paid by Owners substantiated by copies of such documents as Charterers may require. | 319 320 321 322 |
| **Vessel/Cargo Inspections/ Bunker Surveys** | 25.    Charterers shall be entitled to cause their representative(s) to carry out inspections of the Vessel and/or observe cargo operations and/or ascertain the quantity and quality of the cargo, water and residues on board at any loading and/or discharge port or place. | 323 324 325 |
| | Charterers' representative(s), or any independent surveyor appointed by Charterers, shall be entitled to survey and take samples from any or all of the Vessel's bunker fuel tanks and non-cargo spaces at any loading and/or discharge port or place. | 326 327 328 |
| | Any exercise of, or failure to exercise, any of their rights under the foregoing provisions by Charterers shall neither increase nor reduce the respective rights and obligations of the parties under this Charter and shall not be deemed to be, nor construed as, a waiver or acceptance of any default on the part of Owners. | 329 330 331 |
| | Any delay arising solely as a result of any such inspection, survey or sampling as aforesaid shall count as laytime or, if the Vessel is on demurrage, as demurrage. If the Master refuses to permit any such inspection, survey or sampling as aforesaid Charterers shall have the right to procure the removal of the Vessel from the place at which she is lying. All time lost by reason of any such refusal by the Master, including without limitation any time used in shifting the Vessel off, and back to, such, or any other, place shall not count as laytime or, if the Vessel is on demurrage, as demurrage and any expenses incurred as a result of any such refusal, including without limitation Vessel shifting expenses, shall be paid by Owners. | 332 333 334 335 336 337 338 |
| **Cargo Sampling** | 26.    Charterers shall be entitled to require the Vessel to deviate at any time after leaving any loading port or place and to call at or off a port or place for cargo sampling purposes. Charterers undertake to obtain the consent of the owner(s) of any cargo on board at the time before requiring the Vessel to deviate as aforesaid. | 339 340 341 342 |
| | Any delay arising from Charterers' requiring the Vessel to deviate as aforesaid, based upon the period by which the steaming time taken by the Vessel to reach the next port of loading or discharge exceeds the time which should have been taken had the Vessel proceeded thither directly, shall count as laytime, or if the Vessel is on demurrage, as demurrage. Charterers shall pay Owners for additional bunkers consumed during the period of deviation at the replacement price as paid by Owners and substantiated by copies of such documents as Charterers may require and shall pay port expenses incurred by Owners at the port to which Owners were required to divert the Vessel. | 343 344 345 346 347 348 349 |
| ~~**Maintenance of Cargo Temperature**~~ | ~~27.    If Charterers so require Owners shall maintain the loaded temperature of the cargo and the Master shall advise Charterers, on a daily basis, of the temperature of such cargo in each of the Vessel's tanks. Notwithstanding the foregoing the Vessel shall not be obliged to maintain the cargo at a temperature in excess of 57deg. C (135deg. F). Owners warrant that the Vessel is capable of maintaining the cargo up to such maximum temperature throughout the laden voyage and throughout discharge of the cargo. If the Vessel fails to maintain the required temperature Owners shall be responsible for any resulting delay and any time lost thereby, shall not count as laytime or, if the Vessel is on demurrage, as demurrage. Should it become necessary for the Vessel to vacate the berth because of Owners' failure to maintain the required temperature all time lost and expenses incurred shall be for Owners' account.~~ | 350 351 352 353 354 355 356 357 358 |
| ~~**Cargo Heating**~~ | ~~28.    Charterers shall be entitled to require the Vessel to raise the temperature of the cargo above the loaded temperature up to a maximum temperature of 57deg. C (135deg. F) in all the Vessel's tanks. The Master shall advise Charterers, on a daily basis, of the temperature of the cargo in each of the Vessel's~~ | 359 360 361 |

~~tanks throughout the voyage. Charterers shall reimburse Owners for the cost of additional bunkers used~~ 362
~~solely to raise the temperature of the cargo as aforesaid, as evidenced by copies of the Vessel's daily Engine~~ 363
~~Log Book for the complete laden voyage, subject to a limit of 6 tonnes per degree Celsius. Charterers shall~~ 364
~~pay for such bunkers at the replacement price paid by Owners and substantiated by copies of such~~ 365
~~documents as Charterers may require.~~ 366

**Ice on Voyage**    29.    If on passage to the nominated port or place of loading or discharge the Master finds that the port 367
or place is inaccessible owing to ice he shall immediately request Charterers by radio for revised orders and 368
remain outside the area of ice-bound water. The terms governing such time awaiting orders shall be in 369
accordance with the provisions of Clause 24. Upon receipt of such request Charterers shall give orders for 370
the Vessel to proceed to an alternative ice-free and accessible port or place where there are facilities for 371
receiving or delivering the cargo. In this event freight shall be paid at the rate applicable under this 372
Charter to such alternative loading or discharge port or place, and any period by which the steaming time 373
taken to reach such alternative port or place exceeds the time which should have been taken had the Vessel 374
proceeded thither direct shall count as laytime or, if the Vessel is on demurrage, as demurrage. 375

**Ice at Loading/**    30.    If, on or after the Vessel's arrival at a nominated port or place of loading or discharge, there is a 376
**Discharge Ports** danger of the Vessel being frozen in, the Master shall proceed to the nearest safe and ice-free position and 377
**or Places** at the same time request Charterers by radio for revised orders. Upon receipt of such request Charterers 378
shall give orders for the Vessel either to proceed to an alternative ice-free and accessible port or place, 379
where there is no danger of the Vessel being frozen in and where there are facilities for receiving or 380
delivering cargo, or to return to and load or discharge at the nominated port or place. If the Vessel is 381
ordered to an alternative port or place the sum in respect of freight and delay to be paid by Charterers shall 382
be as provided in Clause 29, but if the Vessel loads or discharges at the nominated port or place, then, 383
subject to the provisions of Clauses 19, 20 and 21, the whole of the time occupied from the receipt of Notice 384
of Readiness to load or discharge on the Vessel's first arrival until hoses are disconnected after the 385
completion of loading or discharge shall count as laytime, or if the Vessel is on demurrage, as demurrage. 386
Any delay after the final disconnection of shore hoses caused by ice by reason of the Vessel returning to the 387
nominated port or place on Charterers' instructions shall count as laytime or, if the Vessel is on 388
demurrage, as demurrage. 389

**Quarantine**    31.    Should Charterers require the Vessel to proceed to any port or place at which, at the time the Vessel 390
is ordered to that port or place, there is quarantine time shall count as laytime or, if the Vessel is on 391
demurrage, as demurrage whilst the Vessel is detained, but should quarantine be declared only whilst the 392
Vessel is on passage to the port or place Charterers shall not be liable for any delay caused by such 393
quarantine. 394

**Lien**    32.    Owners shall have a lien upon the cargo for all freight, deadfreight, demurrage and the cost of 395
recovery thereof. 396

**Documentation**    33.    Owners undertake that throughout the currency of this Charter the Vessel shall have on board all 397
such valid documentation as may, from time to time, be required to enable the Vessel to enter and carry out 398
all required operations at loading or discharge ports or places and leave, without let or hindrance, all ports 399
or places to which the Vessel may be directed under the terms of this Charter and Owners hereby expressly 400
confirm: - 401

(a)    that they shall be responsible for any loss, damage, delay or expenses; and 402

(b)    that time shall not count as laytime or, if the Vessel is on demurrage, as demurrage for any period 403
during which the Vessel is not fully and freely available to Charterers; 404

as a result of action taken against her by any Government, Government Organisation, competent 405
authority, person or organisation, owing to her flag, failure to have on board valid documentation as 406
aforesaid or any dispute relating to Owners' wages or crew employment policy or to the condition of the 407
Vessel or her equipment. 408

~~**Cells at**~~    ~~34.    (a)    Notwithstanding Clause 45 so from the date of agreement to, and for the duration of, this~~ 409
~~**Sullom Voe**~~ ~~Charter Owners and their agents shall observe Charterers' instructions regarding the disposal of ballast~~ 410
~~from the Vessel. For such period as aforesaid Owners shall ensure that no engine-room, pumproom or~~ 411
~~other oily effluent is discharged from the Vessel and shall, if required by Charterers, produce evidence of~~ 412
~~instructions cabled by them to the Master forbidding the discharge of such effluent from the Vessel.~~ 413
~~Charterers shall pay any deadfreight arising by reason of compliance with Charterers' instructions. If,~~ 414
~~before the commencement of loading at Sullom Voe Terminal, Charterers produce to Owners evidence of~~ 415
~~non-compliance with such instructions regarding the disposal of ballast or evidence of the discharge, or~~ 416
~~apparent discharge, of such effluent Charterers may, by notice in writing, cancel this Charter without~~ 417
~~incurring any liability for damages.~~ 418

~~b)    Owners warrant that the Vessel is capable of accepting cargo at the following minimum acceptance~~ 419

~~rates and of debsllasting within the following maximum periods:~~ 420

| ~~Ship's size~~ | ~~Minimum~~<br>~~Cargo Acceptance Rate~~ | ~~Minimum~~<br>~~Debellasting Period~~ | 421<br>422 |
|---|---|---|---|
| ~~Up to 81,283 tonnes SDWT~~ | ~~7.5 per cent of SDWT/Hour~~ | ~~5 hours 30 minutes~~ | 423 |
| ~~81,284 tonnes to 162,567 tons SDWT~~ | ~~6.6 per cent of SDWT/Hour~~ | ~~8 hours 40 minutes~~ | 424 |
| ~~162,568 to 325,134 tonnes SDWT~~ | ~~5.8 per cent of SDWT/Hour~~ | ~~11 hours 10 minutes~~ | 425 |
| ~~Over 325,135 tonnes SDWT~~ | ~~5.8 per cent of SDWT/Hour~~ | ~~13 hours 00 minutes.~~ | 426 |

~~Should the Vessel's cargo acceptance rate be less than the relevant minimum rate specified above or should~~ 427
~~the debellasting time specified above exceed the relevant maximum period the excess time required to~~ 428
~~complete loading shall be deducted from any laytime or demurrage accruing under the provisions of this~~ 429
~~Charter.~~ 430

~~(c) Owners warrant that the Vessel shall present manifolds of 16 inch diameter, class ANSI 150 with a~~ 431
~~minimum 500 mm between flanges or reducer/spool pieces such that the quick closing coupler may operate~~ 432
~~without restrictions.~~ 433

**Calls at**
**Nigerian Ports**

35.    Owners warrant that Vessel is neither directly nor indirectly owned and/or chartered by South 434
African, Namibian, Zimbabwean or Israeli companies or persons, that the Vessel is not registered in any of 435
the aforementioned States and that the Vessel is not linked, by means of financial arrangements or 436
mortgages, with such States. 437

Owners warrant that the Master, officers and crew and any supernumeraries or passengers do not, and 438
shall not, include nationals of any of the aforementioned States or persons who were born in, or reside in, 439
any of such States. 440

Owners warrant that the Vessel has not called at or off any port in South Africa, Namibia, or Israel within 441
the last 2 years prior to her arrival in Nigerian waters. A port of call in this context includes calling at or off 442
a port to receive services such as mail and/or provisions whether by helicopter or launch and not merely 443
discharging, loading, repairing or bunkering. 444

Owners warrant that no stores, spare parts, provisions and packing of material on board emanate from any 445
of the States referred to in the first paragraph of this Clause. 446

**Bills of Lading**
**and Indemnities**

36.    Bills of Lading shall be signed as Charterers direct, without prejudice to this Charter. Charterers 447
hereby indemnify Owners - *In accordance with Owners P & I Club wording and detailed in* 448
*accordance with appendix AA and BB hereof;* 

(a)    against all liabilities that may arise from the signing of Bills of Lading in accordance with the directions 449
of Charterers to the extent that the terms of such Bills of Lading impose more onerous liabilities than those 450
assumed by Owners under the terms of this Charter; and 451

(b)    against claims brought by holders of Bills of Lading against Owners by reason of any deviation required 452
by Charterers under the provisions of Clauses 24 and 26. 453

All Bills of Lading issued under this Charter shall contain War Risks, Both-to-Blame Collision and New 454
Jason clauses. 455

**Unavailability of**
**Bills of Lading**
**Change of**
**Receiver**
**Change of**
**Discharge**
**Port or Places**

If a Bill of Lading is not available at any discharge port or place to which the Vessel may be ordered by 456
Charterers under this Charter or if Charterers require Owners to deliver cargo to a party and/or at a port 457
or place other than as set out in the Bills of Lading, then Owners shall nevertheless discharge the cargo 458
~~carried by the Vessel in compliance with Charterers' instructions, upon a consignee nominated by~~ 459
~~Charterers (hereinafter called "the Receiver") presenting reasonable identification to the Master, in~~ 460
~~consideration of the following undertakings by Charterers:~~ 461

~~(i) to indemnify Owners (which term shall, for the purpose of this Clause, include Owners' servants and~~ 462
~~agents) and to hold Owners harmless in respect of any liability, loss or damage of whatsoever nature which~~ 463
~~Owners may sustain by reason of delivering the cargo to the Receiver in accordance with Charterers'~~ 464
~~instructions;~~ 465

~~(ii) to provide Owners, in the event of any proceedings being commenced against Owners in connection~~ 466
~~with the delivery of the cargo as aforesaid, from time to time on demand, with sufficient funds to defend the~~ 467
~~same;~~ 468

~~(iii) to provide Owners on demand such bail or other security as may be required if, in connection with the~~ 469
~~delivery of the cargo as aforesaid, the Vessel or any other vessel or property belonging to Owners should be~~ 470
~~arrested or detained or, if the arrest or detention thereof should be threatened, to prevent such arrest or~~ 471

~~detention, or to secure the release of such Vessel or property and to indemnify Owners in respect of any~~ 472
~~loss, damage or expenses caused by such arrest or detention whether or not the same be justified; and~~ 473

~~(iv) to produce and deliver to Owners all original Bills of Lading in respect of the cargo loaded by the Vessel~~ 474
~~as soon as same shall have arrived and/or come into the possession of Charterers whereupon Charterers'~~ 475
~~liability hereunder shall cease.~~ 476

The provisions of the foregoing undertakings shall be governed by English Law. *Owners to return to* 477
*Charterers 2/3 original bills of lading together with Owners receipt for 1/3 original bills of lading*
*within twenty one (21) days of receipt*

*Bill of Lading Clause : Following wording to be inserted in all original bills of lading issued and*
*presented to Master : "All terms, conditions, liberties and exceptions of the charter party including*
*the Arbitration Clause are herewith incorporated, as per charter party dated 11th July 2007"*

| | | |
|---|---|---|
| Coding of<br>Cargo<br>Documentation –<br>US Customs<br>Regulations | 37.   If Charterers require the Vessel to load or discharge at a port or ports within the jurisdiction of the<br>US Customs Service, Owners shall procure that the Master complies with Charterers' instructions as to the<br>insertion of Owners' Unique Identifier in each Bill of Lading accompanying a shipment of imported cargo<br>in accordance with US Customs Regulations (19 CFR Parts 4 and 178). Owners shall provide Charterers or<br>their agents on request with details of their Unique Bill of Lading Identifier in respect of any cargo carried<br>hereunder. | 478<br>479<br>480<br>481<br>482<br>483 |

In the event that the Master fails to comply with Charterers' instruction as aforesaid Owners shall be liable 484
for any delays resulting therefrom and any time lost thereby shall not count as laytime or, if the Vessel is 485
on demurrage, as demurrage. *Any delays and/or extra expenses incurring, due awaiting clearance by* 486
*port authorities in the United States to be for Charterers account*

| | | |
|---|---|---|
| Liberty | 38.   The Vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in<br>distress, to call at any port or ports for bunkers, and to deviate for the purpose of saving life or property,<br>or for any other reasonable purpose. | 487<br>488<br>489 |
| Agency | 39.   Charterers shall nominate the Vessel's agents at loading and discharge ports or places but such<br>agents shall be employed, instructed and paid by Owners. | 490<br>491 |
| Estimated<br>Times of<br>Arrival | 40.   If the Master fails to comply with any of the following provisions any delay, either at a loading or<br>discharge port or place, resulting therefrom shall not count as laytime or, if the Vessel is on demurrage, as<br>demurrage and Owners shall be responsible for any additional costs incurred by Charterers arising from<br>such non-compliance. | 492<br>493<br>494<br>495 |

The Master shall send messages by radio or telex to Charterers addressed 'BP Shipping London' and to the 496
agents at the loading port or place advising the date and approximate hour of the Vessel's arrival. Such 497
messages shall be sent upon the Vessel's sailing from the prior discharge port and 7 days and 72, 48 and 24 498
hours prior to the Vessel's estimated arrival at the loading port or place. Should the Vessel be at sea or 499
elsewhere when ordered by Owners to proceed to the loading port or place the Master shall, if the Vessel is 500
less than 7 days or 72/48/24 hours, as applicable, from the loading port or place, immediately notify 501
Charterers and the agents of the Vessel's ETA in the manner aforesaid and thereafter notify Charterers 502
and the agents of the Vessel's ETA at such of the times as aforesaid as are applicable or immediately 503
provide Charterers with such other ETAs as Charterers may request. 504

The Master shall notify Charterers and the agents of the Vessel's ETA at the discharge port or place in the 505
manner aforesaid also providing information as to the Vessel's expected arrival draught on even keel salt 506
water either upon the Vessel leaving the previous port or place or 72 hours prior to her estimated arrival 507
at the discharge port or place, whichever is the later. Thereafter the Master shall notify Charterers and the 508
agents of the Vessel's ETA together with the information as aforesaid 48 and 24 hours, as applicable, from 509
the discharge port or place or immediately provide Charterers with such other ETAs as Charterers may 510
request. 511

The Master shall advise Charterers and the agents promptly by radio or telex of any variation of more than 512
6 hours in estimated dates or times of arrival at the loading and/or discharge port or place. 513

Should the voyage involve passing the Cape of Good Hope the Master shall, on passing the Cape of Good 514
Hope, send an additional radio or telex message to Charterers, advising the Vessel's ETA off Land's End 515
or at the discharge port or place if already nominated, stating also the estimated arrival draught on even 516
keel salt water. 517

Charterers shall have the right to see copies of all telexes (showing answerbacks) referred to in this Clause. 518

| | | |
|---|---|---|
| Sub-Charter | 41.    Charterers may sub-charter the Vessel without prejudice to the respective rights and obligations of either party under this Charter. *However, Swift Transporation Inc., always to remain responsible for the performance of this Charter Party* | 519 520 |

~~Cargo Insurance~~    ~~42.    Any additional premium which might be placed on the cargo insurance by reason of the Vessel's age and/or condition shall be for Owners' account, and Charterers shall be entitled to deduct the cost of any such additional premium from the freight.~~    521 522 523

**Bunker Fuel**    43.    If the supply of bunker fuel required for the voyage performed under this Charter should not at the material date be covered under a contract between Owners and any of the BP Group of Companies, the first option of supplying such bunker fuel shall be given by Owners to a Company within the BP Group.    524 525 526

**Traffic Separation and Routeing**    44.    Owners shall instruct the Master to observe recommendations as to traffic separation and routeing as issued from time to time by the International Maritime Organisation or as promulgated by the State of the flag of the Vessel or the State in which the effective management of the Vessel is exercised.    527 528 529

**Oil Pollution Prevention**    45.    Owners shall instruct the Master to retain on board all oily residues of oil of a persistent nature remaining in the Vessel from the previous cargo. The Master shall, during tank washing, collect the washings into one cargo compartment and after maximum separation of the free water, discharge the water so separated overboard. In the discharge of all water separated as aforesaid Owners shall comply with the requirements of the International Convention for the Prevention of Pollution from Ships 1973, as amended by its Protocol of 1978 (MARPOL 73/78), insofar as these do not conflict with any applicable law.    530 531 532 533 534 535

When this operation is completed the Master shall notify Charterers by radio of the estimated tonnage of all segregated tank washings from previous cargoes.    536 537

**Treatment of Tank Washings**    On the Vessel's arrival at the loading port or place the Master shall arrange that the quantity of all segregated tank washings shall be measured in conjunction with cargo suppliers and shall make a note in the Vessel's ullage record of the quantity so measured.    538 539 540

If Charterers require the Master to load the cargo on top of the segregated tank washings, freight calculated in accordance with Clause 6 shall be paid on that quantity of the tank washings up to a tonnage equivalent of 1% of the Vessel's summer deadweight. Owners shall instruct the Master to keep the water to a minimum and in any event not exceeding 0.15% of the Vessel's summer deadweight tonnage.    541 542 543 544

If Charterers require the Master to segregate the tank washings from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.    545 546

If, for whatever reason, the cargo loaded hereunder is not loaded on top of the segregated tank washings from previous cargoes (or any part thereof), Owners undertake that all such washings shall be discharged or disposed of or retained in accordance with the orders and directions of Charterers on completion of the voyage hereunder.    547 548 549 550

**Exceptions**    46.    The provisions of Articles III (other than Rule 8), IV, IV bis and VIII of the Schedule to the Carriage of Goods by Sea Act, 1971 of the United Kingdom shall apply to this Charter and shall be deemed to be inserted in extenso herein. This Charter shall be deemed to be a contract for the carriage of goods by sea to which the said Articles apply, and Owners shall be entitled to the protection of the said Articles in respect of any claim made hereunder.    551 552 553 554 555

Charterers shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performance hereunder arising or resulting from Act of God, act of war, seizure under legal process, quarantine restrictions, labour disputes, strikes, riots, civil commotions, arrest or restraint of princes, rulers or peoples, *or any other cause beyond Charterers control.*    556 557 558 559

**War Risks**    47.    (a)    The Master shall not be required or bound to sign Bills of Lading for any blockaded port or for any port which the Master or Owners in his or their discretion consider dangerous or impossible to enter or reach.    560 561 562

(b)    If-    563
(i)    any port of loading or of discharge named in this Charter or to which the Vessel may properly be ordered pursuant to the terms of this Charter or the Bills of Lading be blockaded: or    564 565

(ii)    owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions, or the operation of international law:-    566 567

(aa)    entry to any such port of loading or of discharge or the loading or discharge of cargo at any port be considered by the Master or Owners in his or their discretion dangerous or prohibited, or    568 569

(bb) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or of discharge; 570
571

then Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other port of loading or of discharge whether within or outside the range of loading or discharge ports respectively established under the provisions of this Charter (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owners' discretion dangerous or prohibited). If no orders be received from Charterers within 48 hours after they or their agents have received from Owners a request for the nomination of a substitute port, then: 572
573
574
575
576
577

if the affected port is the first and only loading port and no cargo has been loaded, this Charter shall terminate forthwith; 578
579

if the affected port is a loading port and part of the cargo has already been loaded, the Vessel may proceed on passage and Charterers shall pay for any deadfreight so incurred; 580
581

if the affected port is a discharge port, Owners shall be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within or outside the range of discharge ports established under the provisions of this Charter) and such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment so far as cargo so discharged is concerned. 582
583
584
585
586

In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharge ports established under the provisions of this Charter, this Charter shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. However if the Vessel discharges the cargo at a port outside the range of discharge ports established under the provisions of this Charter, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by Charterers. In the latter event Owners shall have a lien on the cargo for all such extra expenses. 587
588
589
590
591
592
593
594

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done such shall not be deemed a deviation. 595
596
597
598
599
600
601
602

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment and Owners shall be entitled to freight as if discharge had been effected at the port or ports originally designated or to which the Vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by Charterers and Owners shall have a lien on the cargo for freight and all such expenses. 603
604
605
606
607
608
609
610
611

*Chevron War Risk to apply - Chevron War Risk Insurance Clause (as amended) First seven (7) days additional war risk on hull and machinery (insured value usd..) and crew war bonus in effect as at (time of fixing/time of offering). Any increase of hull and machinery war risk premiums and crew war bonus over and above those if effect as at (time of fixing/time of offering and any periods in excess of seven days, will be for Charterers' account. Any premiums, or increases thereto, attributable to closure (i.e. blocking and trapping) insurance shall be for Owners' account. Surcharges which are in effect as at time of tender closing are for Owners' account.*

**Both to Blame Collision**   48.   If the liability for any collision in which the Vessel is involved while performing this Charter falls to be determined in accordance with the laws of the United States of America, or the laws of any State which applies laws similar to those applied in the USA in the circumstances envisaged by this Clause, the following Clause shall apply:- 612
613
614
615

*If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the Vessel, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability 616
617
618
619

represents loss of, or damage to, or any claim whatsoever of the owners of, said goods, paid or payable by the other or non-carrying vessel or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying vessel or carrier. `620` `621` `622` `623`

The foregoing provisions shall also apply where the owner, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of collision or contact." `624` `625` `626`

Whilst Charterers shall procure that all Bills of Lading issued under this Charter shall contain a provision in the foregoing terms, to be applicable where the liability for any collision in which the Vessel is involved falls to be determined in accordance with the preamble of this Clause, Charterers neither warrant nor undertake that such provision shall be effective. In the event that such provision proves ineffective Charterers shall, notwithstanding anything to the contrary herein provided, not be obliged to indemnify Owners. `627` `628` `629` `630` `631` `632`

| General Average | 49.    General Average shall be adjusted and settled in London in accordance with the York/Antwerp Rules 1974, *as amended 1990* or any modification or re-enactment thereof for the time being in force. | `633` `634` |
| New Jason | 50.    If, notwithstanding Clause 49, it is agreed in writing that General Average adjustment be made in accordance with the law and practice of the United States of America, the following Clause shall apply:- | `635` `636` |

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. `637` `638` `639` `640` `641` `642`

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo shippers, consignees or owners of the cargo to the carrier before delivery". `643` `644` `645` `646`

| FMC Certificate/ US Coastguard Regulations | 51.    Owners undertake that the Vessel carries on board a valid US Coast Guard Certificate of Financial Responsibility as required under the US Federal Water Pollution Control Act as amended by the Clean Water Act of 1977. Any delay arising from failure by Owners to have such a Certificate on board the Vessel shall not count as laytime or, if the Vessel is on demurrage, as demurrage. | `647` `648` `649` `650` |

Owners warrant that during the period of this Charter the Vessel shall comply with all applicable US Coast Guard Regulations and that if in any respect whatsoever the Vessel does not so comply there shall be on board the Vessel appropriate waivers from the US Coast Guard. Any delay arising from non-compliance with the foregoing provision shall not count as laytime or, if the Vessel is on demurrage, as demurrage. `651` `652` `653` `654`

| Clause Paramount | 52.    All Bills of Lading issued under this Charter shall contain the following Clause Paramount:- | `655` |

"CLAUSE PARAMOUNT `656`

This Bill of Lading shall: `657`

(1)  in relation to the carriage of any goods from any port in Great Britain or Northern Ireland to any other port whether in or outside Great Britain or Northern Ireland have effect subject to the provisions of the Carriage of Goods by Sea Act 1971 and to the Rules contained in the Schedule thereto (the Hague/Visby Rules) and nothing herein contained shall be deemed a surrender by the Carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the said Act; `658` `659` `660` `661` `662`

(2)  in relation to the carriage of any goods from any port in a state in which legislation similar in effect to the Carriage of Goods by Sea Act 1971 of the United Kingdom is in force to any port in any other state, have effect subject to such legislation and to the Rules contained in the Schedule thereto and nothing herein contained shall be deemed a surrender by the Carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the said legislation; `663` `664` `665` `666` `667`

(3)  in relation to the carriage of any goods between ports in two different states, where this Bill of Lading is issued in Great Britain, Northern Ireland or any state in which legislation similar in effect to the Carriage of Goods by Sea Act 1971 of the United Kingdom is in force have effect subject to such Act or such legislation and to the Rules contained in the Schedule thereto and nothing herein contained shall be deemed a surrender by the Carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the said Act or said legislation; `668` `669` `670` `671` `672` `673`

(4) in any other case have effect as if the contract of carriage herein contained were a contract of carriage to which the provisions of the Carriage of Goods by Sea Act 1971 of the United Kingdom applied and the Carrier shall be entitled to the benefit of the privileges, rights and immunities conferred by the said Act and the Rules contained in the Schedule thereto as if the same were herein specifically set out. 674 675 676 677

Notwithstanding the foregoing provisions of this Clause the Hague/Visby Rules shall not apply to this contract where the goods carried hereunder consist of cargo which by this contract is stated as being carried on deck and is so carried. 678 679 680

If any term of this Bill of Lading be repugnant to the provisions of the Hague/Visby Rules such term shall be void to that extent but no further." 681 682

**TOVALOP** ~~53. Owners warrant that the Vessel is a Participating Tanker in TOVALOP and will so remain during this Charter, provided however that nothing herein shall prevent Owners, upon prior notice to Charterers, from withdrawing from TOVALOP under Clause III(B) or X hereof, and provided further that upon any withdrawal under Clause III(B) or under Clause X, following an amendment to TOVALOP which does not materially increase the obligations of the Parties thereunder, Charterers shall have the option to terminate this Charter.~~ 683 684 685 686 687 688

~~When an escape or discharge of Oil occurs from the Vessel and causes or threatens to cause Pollution Damage, or when there is the Threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred would create a serious danger of Pollution Damage), then Charterers may, at their option, upon notice to Owners or the Master, undertake such measures as are reasonably necessary to prevent or minimise such Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such measures taken by them, and, if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority and as Owners' agent, and shall be at Owners' expense except to the extent that:~~ 689 690 691 692 693 694 695 696 697

~~(a) any such escape or discharge or Threat was caused or contributed to by Charterers; or~~ 698

~~(b) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are, or, had the said Convention applied to such escape or discharge or to the Threat, would have been, exempt from liability for the same, or~~ 699 700 701

~~(c) the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat removal exceeds One Hundred and Sixty U.S. Dollars per ton or Sixteen Million Eight Hundred Thousand U.S. Dollars, whichever is the lesser, save insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL, provided that in any incident to which the TOVALOP Supplement applies the Owners' limit of liability hereunder shall be that provided for in the said Supplement;~~ 702 703 704 705 706 707 708

~~PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause and all further liability to Charterers under this Clause shall thereupon cease.~~ 709 710 711 712

~~The above provisions are not in derogation of such other rights as Charterers or Owners may have under this Charter or may otherwise have or acquire by Law or any International Convention or TOVALOP.~~ 713 714

~~For the purposes of this Clause, the meaning of the terms "Oil" and "Pollution Damage" shall be as defined in TOVALOP and "ton" shall be understood in relation to "tonnage" as defined therein.~~ 715 716
*1/ is a tanker owned by a member of The International Tanker Owners Pollution Federation Limited and will so remain throughout the Charter and*
*2/ is entered in the following P & I Club (Gard) and will so remain unless Owners have given Charterers prior written notice of their intention to change.*
*Owners warrant that the vessel will only be entered in a P & I Club within the International Group of P & I Clubs*

**The BP Shipping Questionnaire** ~~54. During pre-fixture negotiations leading to agreement between Owners and Charterers to the terms and conditions of this Charter Owners have, either in consultation with their brokers or otherwise, provided Charterers with a completed BP Shipping Questionnaire a copy of which shall be attached hereto as Appendix I.~~ 717 718 719 720

~~Owners warrant that the responses to the BP Shipping Questionnaire provided by or on behalf of them are~~ 721

~~correct. If any response as provided by or on behalf of Owners proves to be incorrect Charterers shall be~~ 722
~~entitled either:~~ 723

~~(a)  to cancel this Charter forthwith without prejudice to any other rights available to them under this~~ 724
~~Charter or otherwise under English Law, or~~ 725

~~(b)  to recover, by deduction from freight, any losses, costs, damages or expenses incurred as a direct result~~ 726
~~of Owners' breach of warranty.~~ 727

~~In the event of any conflict arising between any provision(s) in the body of this Charter and any provision(s)~~ 728
~~in Appendix I the provision(s) contained in the body of this Charter shall prevail.~~ 729

Law      55.    The construction, validity and performance of this Charter shall be governed by English Law. The  730
High Court in London shall have exclusive jurisdiction over any dispute which may arise out of this  731
Charter.  732

*Additional Clauses Nos. 1 to 8 as attached are deemed to be incoporated in this Charter Party*

*In Witness Whereof* the parties have caused this Charter to be executed as of the date first above written

..........................................................................................................................................

for and on behalf of

........................................................................................................ OWNERS

..........................................................................................................................................

for and on behalf of BP ~~SHIPPING LIMITED~~ as agents for

.................................................................................................... CHARTERERS

This Charterparty is a computer generated copy of the BEEPEEVOY3 form, printed under licence from BP Shipping Limited using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

# APPENDIX 1

## The BP Shipping Questionaire

*Type Here (Delete this)*

.

*Overseas Limar / Swift*
*Charter Party dated 11th July 2007*

**Additional Clauses**

1. Vessels description :
MT Overseas Limar
Built : 1996
Flag : Marshall Island
Loa : 182.9 metres
Beam : 32.2 metres
Sbt /Cbt : Sbt
Cow / Igs : Yes
Tpc : 50.419 metric tons
Bcm : 92.4 metres
Ktm : 49.52 metres
Type of coatings : Epoxy interchem 900 series
Type of coils : N/A
Scnt : 29,001.54
Pcrt : 28,537.00
Grt : 28,357.00
Laden speed : 14 knots weather and safe navigation permitted
IMO Number : 9121003
Last three cargoes : all unleaded motor spirit

2. Approvals :
Shell / Exxon basis Sire / Chevron / Petronas

3. Small Claims Procedure :
English law :
For disputes where the total amount claimed by either party does not exceed the amount of
US$ 50,000/= the arbitration shall be conducted in accordance with the small claims
procedure of the London Maritime Arbitrators Association currently in force

4. Voyage Orders :
All voyage orders and changes to same to be sent on telex or e-mail not fax.  Charterers are
not allowed to communicate directly with master unless agreement given by Owners

5. Conoco Weather Clause
Any time lost at load and/or discharge port(s), whenever/howsoever lost, which is
directly/indirectly attributed to weather conditions and/or 'sea state', shall count as half
laytime or if the vessel is on demurrage, at one half demurrage rate

6. Hess Shifting / Deballasting Clause :
If more than one berth al load or discharge ports is used, shifting expenses, including time, to
be for Charterer's account, except that shifting expenses from anchorage to first berth will not
be for Charterer's account.  Shifting from anchor to first berth and deballasting time, unless
concurrent with cargo operations, never to count as used laytime, even if Vessel already on
demurrage.

7. Commission :
1.25 per cent address and 1.25 per cent Petrian Shipbrokers LLP on freight / deadfreight and
demurrage

8. Trafigura Shipping Additional Chartering Clauses 1st January 1991, as amended 2nd
February 2001 Nos. 1 to 19, plus amendments to Beepeevoy 3 Nos. 1 to 6, as attached are
deemed to be incorporated in this Charter Party

**PETRIAN
SHIPBROKERS
LLP**　　　　COPY

13th July 2007

Addendum No.1
to
m.t "FREJA HAFNIA"
Owners option
"OVERSEAS LIMAR"
Charter Party dated 11th July 2007

With reference to the above mentioned Charter Party between Mansel Oil Limited of Bermuda, as Owners, and Swift Transportation Inc, as Charterers, it is hereby mutually agreed that :

　　　Owners nominate the Overseas Limar as the performing vessel

All other terms, conditions, exceptions and exemptions from liability of above referenced Charter Party to remain unaltered.

For Owners :　　　　　　　　　　　For Charterers :

PETRIAN
SHIPBROKERS                   COPY
LLP

28th August 2007

Addendum No. 2
to
MT "OVERSEAS LIMAR"
Charter Party dated 11th July 2007

With reference to the above mentioned Charter Party between Mansel Oil Limited of Bermuda, as Owners, and Swift Transportation Inc., as Charterers, it is hereby mutually agreed to :

Discharge or in Charterers option
1/2 safe port(s) United States Gulf excluding Mississippi River via Panama

Rate   US$ 2.9 million basis 1-1

Panama Canal Clause
Any waiting time for transit Panama Canal in laden condition in excess of 24 hours to count as laytime or demurrage if on demurrage.  pre-booking cost for Panama Canal transit in laden to be for Charterers account and settled with freight.

All other terms, conditions, exceptions and exemptions from liability of above referenced Charter Party to remain unaltered.

For Owners :                          For Charterers :

*Overseas Limar / Swift*
*Charter Party dated 11ʰ July 2007*

| TRAFIGURA CHARTERING CLAUSES |
|---|

*(amended 02.02.01)*

*TRAFIGURA SHIPPING ADDITIONAL CHARTERING CLAUSES*
*(1st January 1991)*

### 1. CONFIDENTIALITY CLAUSE :
All negotiations and details resulting in this fixture to be kept
strictly private and confidential.

### 2. BASE CHARTER CLAUSE :
Charter party to be based on Beepeevoy 3 Form (Britannic Tower),
deleting any reference to BP Shipping Ltd where applicable and replacing
with Trafigura Beheer BV Amsterdam, Lucerne Branch Office.

### 3. WORLDSCALE / LAYTIME CLAUSE :
Worldscale terms and conditions to apply. ~~96 hours~~ **Seventy two (72) hours** allowed
laytime, **Sundays and holidays included**.

### 4. IN-TRANSIT LOSS CLAUSE : **Amended**
In addition to any other rights which Charterers may have, Owners will
be responsible for the full amount of any in-transit loss if in-transit
loss exceeds ~~0.3%~~ **0.5%** and Charterers shall have the right to ~~deduct from freight~~
**claim from Owners** an amount equal to the FOB port of loading value of such lost
cargo plus freight ~~and insurance~~ due with respect thereto. In-transit loss is defined
as the difference between net vessel volumes after loading at the loading
port and before unloading at the discharge port. **Irrespective of above Owners to
maintain all Hague Visby Rules and Defence**

### 5. ADDRESS COMMISSION CLAUSE : **Amended**
~~2.5 per cent~~ **1.25 per cent** is payable by Owners to Charterers on all monies paid, **on
deviation**. Such address commission is deductible at source. **Commission to be
paid only on time itemised as demurrage.**

### 6. SIDI-KERIR LOADING - VOYAGE ORDERS CLAUSE: (Where applicable)
**Deleted**
~~The following should be included in the voyage orders for vessels~~
~~loading at Sidi Kerir or discharging at Ain Sukhna:~~

~~A)      ETA notices to be sent to Sumed immediately upon sailing from~~
~~previous port then at 72, 48 and 24 hours prior to arrival, plus immediate~~
~~notification of any change in ETA of more than 6 hours either:~~

~~By cable to "Sumed, Alexandria". The cable to be prefixed "to be~~
~~conveyed via telex (54108 or 54033 SUMED UN). To operations office - oil~~
~~movement, attention Mr. S. El Rabat", or~~

~~Direct by telex on number 54108 or 54033 SUMED UN addressed to~~
~~operations office - oil movement attention Mr. S. El Rabat.~~

1

*Overseas Limar / Swift*
*Charter Party dated 11th July 2007*

6.    Continued :

~~In addition to the above, Master should contact SUMED on VHF 2182 khz twenty four hours prior to arrival to confirm ETA. Masters are also required to contact the terminal on VHF channel 16 (or preferably channels 78 and 79 if available) six hours prior to arrival.~~

~~B.        At the time that first ETA is provided Master should also advise amount of ballast to be discharged.  This is most important.  In this respect please note following instructions regarding ballast:~~

~~Any ballast, clean or dirty, contained in vessel's cargo tanks upon arrival at Sidi Kerir, must be discharged at shore deballasting facilities, and will be charged to Owners' account at the usual deballasting fee of 20 cents/mt.~~

~~Should vessel's Master advise that cargo tanks contain clean ballast, SUMED can arrange for an analysis at Master's request, with all costs for account of Owners, and if result shows that ballast will not pollute the sea, they will allow vessel to discharge water into the sea.~~

~~Ballast water will be considered clean only in the following cases:~~

~~A.   To be contained in segregated tanks,~~
~~B.   If ballast is in the cargo tanks that has been crude oil washed in the previous discharge and water washed during the ballast leg. as per MARPOL regulations any other form of ballast will be considered dirty ballast.~~

**7. KHARG ISLAND LOADING CLAUSE :** (Where applicable)
**Deleted**
~~Should any discrepancies arise regarding Bill of Lading figures, Charterers' representative will liaise with the Master to ascertain exact quantity on board and issue an ullage report accordingly.~~

~~Further, Charterers' representative is authorised to sign a letter confirming the actual quantity on board and freight will be payable on this figure, or Bill of Lading whichever is greater.~~

~~Should it be deemed necessary, Charterers' representative is authorised to sign any/all documents such as obq/slops/ullage reports in place of suppliers.~~

**8. OIL POLLUTION CLAUSE :**    **Amended**
**If requested,** Owners warrant that they have valid cover for pollution of USD 1 billion with their P and I Club and that this cover will remain in place throughout this Charter.

*Overseas Limar / Swift*
*Charter Party dated 11th July 2007*

8.    Continued :
Owners shall confirm to Charterers within one (1) business day after
the fixture is concluded, written evidence from the vessel's P and I
Club/responsible insurance broker of P and I Pollution cover of
USD 1 billion and that such cover will be in effect during the entire
period of the Charter.  The vessel's P and I Club/responsible insurance
broker must be acceptable to Charterers.  If not acceptable to Charterers
or if written evidence is not received by Charterers within the one (1)
business day, Charterers shall have the right to cancel said fixture within
one (1) business day from the day the Owner is required to present to
Charterers verification of such pollution coverage.

**9. DRUG AND ALCOHOL CLAUSE :  Amended**
Owner warrants that it has a policy of Drug and Alcohol Abuse
("Policy") applicable to the vessel which meets or exceeds that standards
in the Oil Companies International Marine Forum Guidelines for the control
of drugs and alcohol on board ship ("OCIMF Guidelines").  Owner further
warrants that this policy will remain in effect during the term of this
Charter, and that Owner shall exercise due diligence to ensure that the
policy is complied with.  For the purposes of the Clause and the OCIMF
Guidelines, alcohol impairment shall be defined as a blood alcohol content
of  40 mg/100 ml or greater; the appropriate seafarers to be tested shall
be all vessel officers and the drug/alcohol testing and screening shall
include random testing of the officers with a frequency to ensure that each
officer is tested at least once a year.
~~Owners further warrant that full declaration has been onpassed to~~
~~Exxon/Exxon affiliate which as above states that vessel operates under a~~
~~Drug and Alcohol Policy which meets or exceeds the OCIMF Guidelines.~~

**10. LAW/ARBITRATION CLAUSE :**
Good and proper service of proceedings can be made by ordinary mail on
Owners at (please insert address), and on Charterers at C/O Trafigura Ltd,
17 Connaught Place London W2 2EL

Notwithstanding Clause 55, either party may, by giving written notice
of election to the other party, elect to have any disputes arising under
this Charter referred to arbitration in London according to English Law
consisting of one arbitrator to be appointed by the Owner, one by the
Charterer, and one by the two so chosen.  The decision of any two of the
three on any point or points shall be final. Until such time as the
arbitrators finally close the hearings either party shall have the right by
written notice served on the arbitrators and on an officer of the other
party to specify further disputes or differences under this Charter for
hearing and determination.

*Overseas Limar / Swift*
*Charter Party dated 11th July 2007*

## 11. INSPECTION CLAUSE :

Charterers shall always have the right to place on board an Independent
Inspector at both load and discharge port.

Such Inspector in addition to normal inspection practices, shall always
have the right to ullage, inspect by any means whatsoever, and sample
vessel's bunker tanks as well as vessel's void spaces and other tanks whatsoever.

Charterers shall always be allowed to inspect any or all of the vessel's records
and/or other documents on board which said Inspector deems to be relevant,
including provision of bunkers, and/or to the carriage of the cargo.

## 12. ELIGIBILITY CLAUSE : **Amended**

Owners warrant that **to the best of their knowledge** the vessel is completely free to
trade within IWL and is not in any way listed as unacceptable by any Major Oil
Company, Government or other organisation whatsoever, nor is she debarred by any
activity of any port within load or discharge areas within agreed ranges.

## 13. RELOADING CLAUSE : **Amended**

Charterers shall have the option of reloading the vessel with a part
cargo at any port of discharge nominated by the Charterers within the discharge
option contained in Clause 3 of Beepeevoy 3, and Owner agrees to discharge such
reloaded cargo at any other discharge port or ports previously nominated provided
such port or ports, lie within the rotation of discharge ports previously nominated.

If this option is exercised, freight shall be payable at the demurrage rate stipulated
in Clause 22 for additional time consumed awaiting berth and/or cargo and/or tank
preparation and/or loading and discharging such cargo, and any additional
charges incurred as a result of such reloading shall be for Charterers account. **Any
contamination by virtue of cleaning to be for Charterers risk**

## 14. ITOPF CLAUSE :

Owners undertake that the vessel:
Is a tanker owned by a member of the International Tanker Owners Pollution
Federation Ltd. and will remain so throughout the Charter Period

Owners warrant that the vessel will only be entered in a P&I within the
International Group of P&I Club acceptable to Trafigura.

## 15. ISM COMPLIANCE CLAUSE: **Amended**

Owners undertake that from the date of coming into force of the
International Management Code for the Safe Operation of Ships and for
Pollution Prevention (The International Safety Management (ISM) Code) (the
'ISM Code') on the 1 of July 1998, and for the duration of the Charter, the
vessel and 'the Company' (as defined in the ISM Code) shall comply with the
requirements of the ISM Code.

*Overseas Limar / Swift*
*Charter Party dated 11ᵗʰ July 2007*

15.    Continued :
The Charterers require relevant document of Compliance and/or Safety Management Certificate, **which Owners to submit to Charterers as soon as possible.** ~~If the relevant documents are not received by Charterers within one (1) business day of fixture, they shall have the right to cancel fixture.~~

Without prejudice to any rights or remedies available to the Charterers under the terms of this Charter or under English Law. In the event of a breach of the above undertaking any **direct** loss, damage, expense or delay following therefrom shall be for Owners' account.

**16. NOR CLAUSE :**    **Deleted**
~~NOR to be tendered when vessel is anchored at customary anchorage.~~

**17. INTERIM VOYAGE CLAUSE :**
From  position given when fixing, vessel will not perform any interim voyage.
Vessels schedule to be provided accordingly.

**18. INTERIM PORT CLAUSE :**  **Deleted**
~~Charterers have option to load and/or discharge and/or blend and/or reload part or full cargo at one or more safe port(s) or STS.~~
~~Location(s) after first load port Charterers shall settle all port/STS costs including agency fees directly and shall reimburse owners for all additional time used for deviation and in port (weather permitting or not) at demurrage rate plus bunkers consumed plus any additional expenses incurred as part of the freight payment as per owners telexed invoice with supporting docs to follow if requested by Charterers. However Charterers to be allowed full benefit of unused laytime for calculation of time in port under above clause. Charterers shall have the benefit of 6 hours allowance for nor.~~

**Torm Interim Port Clause :**
**Charterers to pay for additional interim load/discharge port at cost with additional steaming time to be incurred for such deviation which exceeds direct passage from first load port to final discharge port.  Time to count from arrival pilot station interim load/discharge port until dropping last outward pilot interim load/discharge port i.e. no allowance for notice time, nor deduction for shifting even from anchorage to 1st berth and no deduction for time lost due to weather conditions.  Deviation and time used to be calculated at demurrage rate per day pro rata plus costs for additional bunkers consumed as per Masters invoice presented by Owners.  Deviation, time used, bunkers cons bunkers consumed and port costs as per agents proforma disbursement account to be paid together with freight as per Owners telexed invoice, which later to be supported by hard copy documentation.**

*Overseas Limar / Swift*
*Charter Party dated 11th July 2007*

### 19. CP ADMINISTRATION CLAUSE :

A)    Unless otherwise specifically requested by either owners or Charterers, No formal Charterparty shall be prepared and signed. The terms and Conditions of this charter shall be evidenced by a recap fixture telex/email.
"Recap fixture telex/e-mail" issued by Charterers broker to owners and Charterers and shall be confirmed as correct by return telexes/e-mails from both parties to the said broker who shall acknowledge receipt of such confirmation to both parties within forty-eight (48) hours after the lifting of subjects and a Charterparty in the format of this charter, as modified by the recap fixture telex/e-mail and bearing the same date as the recap fixture telex/e-mail, shall be deemed to have signed by Owners and Charterers.

B)    If either party requires a formal Charterparty to be prepared and signed then owners shall procure that owners broker shall prepare a Charterparty in the format of this charter, as modified by the recap fixture telex/e-mail, and bearing the same date as the recap fixture telex/e-mail and shall arrange for signature thereof by both Owners and Charterers.

*Overseas Limar / Swift*
*Charter Party dated 11ᵗʰ July 2007*

### AMENDMENTS TO BEEPEEVOY 3

1. ~~Clause 7:~~   ~~Line 150 from "Clause 8" insert "4 and 5 of Trafigura Shipping Clauses 1991". Delete "54".~~

2.    **Clause 8:**   **Line 158** after "vessel's pumps" insert "provided Master has ensured correct trim procedure to maximise cargo outturn".

3. ~~Clause 21:~~   ~~Line 303 after "peoples" insert "or any other cause".~~

4. ~~Clause 36:~~   ~~Line 459 delete from "upon" until "Master" in line 459.~~

   ~~Line 477: After "Law" insert "Owners to return to Charterers 2/3 original Bills of Lading, together with Owners' receipt for 1/3 original Bill of Lading within 14 days from receipt". LOI~~

   ~~to become null and void upon presentation of b/l or 13 months after issuance whichever occurs first.~~

5.    **Clause 46:**   **Line 559** after "peoples" insert "or any cause beyond Charterers' control".

6. ~~Clause 53:~~   ~~to read 'Owners warrant that they are members of ITOPF and will remain so during the duration of the voyage'~~

## Ewan Warren

| | |
|---|---|
| **From:** | Nick Mahoney |
| **Sent:** | 28 August 2007 16:11 |
| **To:** | Shipping London |
| **Subject:** | OVERSEAS LIMAR/SWIFT ADDENDUM NUMBER 1 |

USG OPTION AGREED

-----Original Message-----
From: brokers@petrian.co.uk [mailto:brokers@petrian.co.uk]
Sent: 28 August 2007 16:09
To: Nick Mahoney
Subject: OVERSEAS LIMAR/SWIFT ADDENDUM NUMBER 1


TO..: "Vitol, London"
ATTN: Nick Mahoney
FROM: PETRIAN SHIPBROKERS LLP
DATE: 28-AUG-2007 16:09
MSG.: 987407

TO:    LAYMON/MATT/GEOFF
TO:    NICK
FROM:  SIMON

OVERSEAS LIMAR / SWIFT TRANSPOTATION CP DATED 11TH JULY 2007
-------------------------------------------------------------

ADDENDUM NUMBER 1
-----------------
IT HAS BEEN MUTUALLY AGREED BETWEEN BOTH PARTIES TO THE FOLLOWING ADDENDUM.

DISCHARGE
OR IN CHOPT
1/2 SB USG EXCL MISSISSIPPI RIVER VIA PANAMA

RATE
USD 2.9 MILLION 1-1

PANAMA CANAL CLAUSE
-------------------
ANY WAITING TIME FOR TRANSIT PANAMA CANAL IN LADEN CONDITION IN EXCESS OF 24
HOURS TO COUNT AS LAYTIME OR DEMURRAGE IF ON DEMURRAGE.  PREBOOKING COST FOR
PANAMA-CANAL TRANSIT IN LADEN TO BE FOR CHARTERERS ACCOUNT AND SETTLED WITH
FREIGHT.

ALL OTHER TERMS AND CONDITIONS AS PER C/P DATED 11TH JULY TO REMAIN THE SAME

END

BEST REGARDS

SIMON LANE
PETRIAN SHIPBROKERS LLP

## Ewan Warren

| | |
|---|---|
| **From:** | Mette Praest |
| **Sent:** | 24 September 2007 10:41 |
| **To:** | Amine Hayek |
| **Subject:** | FW: OVERSEAS LIMAR/SWIFT CP 11/06/07 - ADDENDUM NO.1 - DATED 12/ |

```
-----Original Message-----
From: Nick Mahoney
Sent: 12 September 2007 16:14
To: xtcops
Cc: Nick Mahoney
Subject: FW: OVERSEAS LIMAR/SWIFT CP 11/06/07 - ADDENDUM NO.1 - DATED
12/


-----Original Message-----
From: brokers@petrian.co.uk [mailto:brokers@petrian.co.uk]
Sent: 12 September 2007 16:13
To: Nick Mahoney
Subject: OVERSEAS LIMAR/SWIFT CP 11/06/07 - ADDENDUM NO.1 - DATED 12/


TO..: "Vitol, London"
ATTN: Nick Mahoney
FROM: PETRIAN SHIPBROKERS LLP
DATE: 12-SEP-2007 16:13
MSG.: 991365

OVERSEAS LIMAR/SWIFT CP 11/06/07 - ADDENDUM NO.1 - DATED 12/09/07
=================================

WITH REGARDS TO THE ABOVE CP IT HAS BEEN MUTUALLY AGREED TO AMEND THE
CHARTERERS STYLE TO THE FOLLOWING

CHARTERERS STYLE                  : SWIFT AVIATION GROUP INC
COMPANY REGISTRATION NUMBER       : 1121306-9
CORPORATE HEADQUARTERS ADDRESS    : SWIFT AVIATION GROUP INC
                                    2710 EAST OLD TOWER ROAD
                                    PHOENIX, AZ 85034
                                    U.S.A

REGARDS
KEVIN BEATON
PETRIAN SHIPBROKERS LLP
EMAIL:  BROKERS@PETRIAN.CO.UK
MAIN:   +44 207 222 9561
DIRECT: +44 207 227 0488
MOBILE: +44 7887 546622
```

**Ewan Warren**

| | |
|---|---|
| From: | brokers@petrian.co.uk |
| Sent: | 20 September 2007 16:37 |
| To: | Nick Mahoney |
| Subject: | OVERSEAS LIMAR/SWIFT CP 11/06/07 - ADDENDUM NO.3 - DATED 20/ |

```
TO..: "Vitol, London"
ATTN: Nick Mahoney
FROM: PETRIAN SHIPBROKERS LLP
DATE: 20-SEP-2007 16:37
MSG.: 993599

OVERSEAS LIMAR/SWIFT CP 11/06/07 - ADDENDUM NO.3 - DATED 20/09/07
=================================

IT HAS BEEN MUTUALLY AGREED BETWEEN OWNERS AND CHARTERERS THAT THE
FOLLOWING DISCHARGE OPTIONS WILL BECOME PART OF THE SUBJECT C/P TOGETHER
WITH RELATIVE FREIGHTS AS BELOW:

DISCHARGE   1/2 SP USAC IF NYNNGWB
     OR CHOPT 1/2 SP ECCAN NWOBI MONTREAL WIWL VESSEL NOT TO FORCE ICE
               OR FOLLOW ICE BREAKERS

FREIGHT     USAC USD 3.1 MILLION
            ECCAN USD 3.175 MILLION (USUAL WS FOR CHTRS ACC)


REGARDS
KEVIN BEATON
PETRIAN SHIPBROKERS LLP
EMAIL:  BROKERS@PETRIAN.CO.UK
MAIN:   +44 207 222 9561
DIRECT: +44 207 227 0488
MOBILE: +44 7887 546622
```

1

**Ewan Warren**

| | |
|---|---|
| **From:** | Nick Mahoney |
| **Sent:** | 30 August 2007 12:31 |
| **To:** | xtcops |
| **Cc:** | Nick Mahoney |
| **Subject:** | OVERSEAS LIMAR/SWIFT C/P DATED 11/07/2007 |

```
-----Original Message-----
From: brokers@petrian.co.uk [mailto:brokers@petrian.co.uk]
Sent: 30 August 2007 12:31
To: Nick Mahoney
Subject: OVERSEAS LIMAR/SWIFT C/P DATED 11/07/2007


TO..: "Vitol, London"
ATTN: Nick Mahoney
FROM: PETRIAN SHIPBROKERS LLP
DATE: 30-AUG-2007 12:30
MSG.: 988185

Nick/Simon

Please see below recap

Best Regards
Simon Lane
Petrian Shipbrokers LLP


TO:     LAYMON/MATT/GEOFF  - SWIFT TRANSPORTATION INC
TO:     NICK       -        VITOL
FROM:   SIMON      -        PETRIAN SHIPBROKERS LLP

WE ARE PLEASED TO SET OUT BELOW THE FOLLOWING FIXTURE CONCLUDED YESTERDAY WITH
ALL SUBJECTS LIFTED AND IN ORDER

CP DATED:   11TH JULY 2007

ACCT:    SWIFT TRANSPORTATION INC

SHIP                     : FREJA HAFNIA
SDWT                     : 53,712 MT
DRAUGHT                  : 13.025 M
LOA                      : 185.93 M
BEAM                     : 32.227 M
BUILT                    : 2006
FLAG                     : PANAMA
CAPACITY AT 98 PCT       : 54,764.9 M3
SLOP CAPACITY AT 98 PCT  : 2.357.72 M3
SLOP TANK AVAILIABILITY  :
SBT/CBT                  : SBT
COW                      : N/A
IGS                      : YES
TPC                      : 54.36
BCM                      : 91.73
KTM                      : 49.35
TYPE OF COATINGS         : EPOXY COATED
TYPE OF COILS            : N/A
CLASS                    : NKK
DERRICKS/CRANES          : 1 X 10 TON CRANE
SCNT                     :
PCRT                     :
GRT                      : 31433 MT
TYPE OF HULL
LADEN SPEED              : 14 KNOTS WSNP
```

1

IMO NUMBER    : 9311036

LAST THREE CARGOES UMS/UMS/UMS

APPROVALS    PSC/CHEVRON/BP/SHELL/EXXON

VESSEL ITINERY:  ETA OMAN 11/7 ETS 13/7 ETA FUJAIRAH
14/7 ETS FUJAIRAH 15/7, CLEANING 3.5 DAYS

OWNERS ADVISE THAT VESSEL CAN LOAD BASIS SG .8 = 47,000 MT  AND LESS ONE SLOP
TANK = 46,250 MT

IN OWNERS OPTION ACCEPTABLE TO CHARTERERS WHICH IS NOT TO BE UNREASONABLY
WITHELD

```
SHIP                        : OVERSEAS LIMAR
SDWT                        : 46164.9 MT
DRAUGHT                     : 12.205 M
LOA                         : 182.9 M
BEAM                        : 32.2 M
BUILT                       : 1996
FLAG                        : MARSHALL ISLAND
CAPACITY AT 98 PCT          : 50,084.4M3
SLOP CAPACITY AT 98 PCT     : 1,046.54 M3
SLOP TANK AVAILIABILITY     :
SBT/CBT                     : SBT
COW                         : YES
IGS                         : YES
TPC                         : 50.419 MT
BCM                         : 92.4 M
KTM                         : 49.52 M
TYPE OF COATINGS            : EPOXY INTERCHEM 900 SERIES
TYPE OF COILS               : N/A
CLASS                       : ABS
DERRICKS/CRANES             : 3 X 10 TON CRANE
SCNT                        : 29,001.54
PCRT                        : 28,537.00
GRT                         : 28,357.00
TYPE OF HULL
LADEN SPEED                 : 14 KNOTS WSNP
IMO NUMBER                  : 9121003
```

LAST THREE CARGOES UMS/UMS/UMS

APPROVALS:   SHELL/EXXON BASIS SIRE/CHEVRON/SHELL/PETRONAS

ETS BANDER ABBAS 12-13/7 ETA FUJAIRAH 13-14/7 ETS FUJAIRAH 15/7 ETA KUWAIT 18/7

OWNERS ADVISE THAT VESSEL CAN LOAD BASIS SG .8 = 40,600 MT  AND LESS ONE SLOP
TANK = 40,200 MT

DECLARATION OF PERFORMING VESSEL BY 16:00 HRS LONDON ON THE 13TH JULY 2007

FOR CHOPT UPTO A FULL CARGO NDFCAPMQS
1/2 GRADES WVNS CPP CLN ULD UND 2.5 NPA
EXCL LUBES / CASING HEADS / SOLVENTS AND CHEMS

LAYCAN    18-20 JULY 2007 (00:01-23:59)

LOAD      1-2 SP AG EXCLUDING I AND I

DISCHARGE 1-2 SP USWC LA - SAN FRAN RANGE INC HAWAII
          OR
          1-2 SP WC CAMERICA

RATE      USD 2.5 MILLION 1-1    - USWC INC HAWAII
          USD 2.475 MILLION 1-1  - WCCAM

DEMMURRAGE: 30K PDPR

LAYTIME:   72 HOURS SHINC

2

FREIGHT PAYABE BBB AND WITH A BANK COUNTERSIGNED LOI

FREIGHT PAYMENT DETAILS:
AT SIGHT IMMEDIATELY UPON COMPLETION OF DICHARGE
BY:        ELECTRONIC FUND TRANFER
TO:        JP MORGAN CHASE BANK NEW YORK
IN FAVOUR: JPMORGAN CHASE BANK, LONDON
FOR CREDIT TO:  MANSEL OIL LIMITED
ACCOUNT NO:   GB90CHAS60924223961701

ANY DELAYS AND/OR EXTRA EXPENSES INCURRING DUE AWAITING CLEARANCE BY PORT
AUTHORITIES IN THE UNITED STATES TO BE FOR CHARTS ACCT.

CHEVRON WAR RISK TO APPLY.

TAXES AND DUES CLAUSE:
--------------------------
ANY TAXES AND/OR DUES ON CARGO AND/OR FREIGHT TO BE FOR CHARTERERS ACCOUNT  AND
SETTLED DIRECTLY BY THEM.

BILL OF LADING CLAUSE:
--------------------------
FOLLOWING WORDING TO BE INSERTED IN ALL ORIGINAL BILL OF LADING ISSUED AND
PRESENTED TO MASTER: 'ALL TERMS, CONDITIONS,
LIBERTIES AND EXCEPTIONS OF  THE CHARTER PARTY INCLUDING THE ARBITRATION CLAUSE
ARE HEREWITH  INCORPORATED, AS PER CHARTER
PARTY DATED 11TH JULY 2007

SMALL CLAIMS PROCEDURE:
--------------------------
ENGLISH LAW:
FOR DISPUTES WHERE THE TOTAL AMOUNT CLAIMED BY EITHER PARTY DOES NOT  EXCEED
THE AMOUNT OF USD 50,000 THE ARBITRATION SHALL BE
CONDUCTED IN  ACCORDANCE WITH THE SMALL CLAIMS PROCEDURE OF THE LONDON MARITIME
ARBITRATORS ASSOCIATION CURRENTLY IN FORCE.

VOYAGE ORDERS:
------------------
ALL VOYAGE ORDERS AND CHANGES TO SAME TO BE SENT ON TLX OR E-MAIL NOT FAX.
CHARTERERS ARE NOT ALLOWED TO COMMUNICATE DIRECTLY WITH MASTER UNLESS
AGREEMENT GIVEN BY OWNERS.

TORM LIGHTERING/STS TRANSFER CLAUSE:
--------------------------------------
IF LIGHTERING/STS TRANSFER OPERATION IS REQUIRED SAME ALWAYS TO BE IN
ACCORDANCE WITH OCIMF LATEST EDITION OF STS TRANSFER.
CHARTERERS TO SUPPLY  ALL FENDERS/LINES/HOSES AND ANY OTHER EQUIPMENT REQUIRED
FOR SUCH AN  OPERATION AT CHARTERERS TIME AND
EXPENSES AND ALWAYS SUBJECT TO MASTERS  APPROVAL. TIME TO COUNT IN FULL 6HRS
AFTER TENDERING NOR OR WHEN FIRST  LIGHTER VESSEL
IS ALONGSIDE, WHICHEVER EARLIER, UNTIL LAST LINE/FENDER IS  OFF AND LIGHTER
VESSEL HAS SAILED. TIME LOST DUE TO TIDE AND/OR
WEATHER  AND/OR SEA CONDITIONS TO COUNT IN FULL AS LAYTIME OR DEMURRAGE IF ON
DEMURRAGE. IF THE VESSEL IS REQUIRED TO COMPLETE
CARGO OPERATION AT A  BERTH IN PORT CHARTERERS WILL NOT HAVE THE BENEFIT OF 6
HRS NOR PRIOR  BERTHING IN PORT. CHARTERERS
WARRANT THAT THERE IS NO PROHIBITION OR  RESTRICTION ON STS OPERATION AT THE
PORT/PLACE TO CHICH THE VESSEL IS  ORDERED TO
PERFORM STS TRANSFEER AND FURTHER THAT THEY HAVE OBTAINED  ANY/ALL NECCESSARY
LOCAL AHRROVALS OR LICENCES TO CARRY OUT OPERATIONS AT  THE DESIGNATED
PROT/PLACE.

TORM INTERIM PORT CLAUSE
--------------------------
CHARTERERS TO PAY FOR ADDITIONAL INTERIM LOAD/DISCH PORT
AT COST WITH ADDITIONAL STEAMING TIME TO BE INCURRED FOR
SUCH DEVIATION WHICH EXCEEDS DIRECT PASSAGE FROM FIRST
LOADPORT TO FINAL DISPORT. TIME TO COUNT FROM ARRIVAL
PILOT STATION INTERIM LOAD/DISCHARGE PORT UNTIL DROPPING
LAST OUTWARD PILOT INTERIM LOAD/DISCHARGE PORT I.E. NO

3

ALLOWANCE FOR NOTICE TIME, NOR DEDUCTION FOR SHIFTING
EVEN FROM ANCHORAGE TO 1ST BERTH AND NO DEDUCTION FOR
TIME LOST DUE TO WEATHER CONDITIONS.
DEVIATION AND TIME USED TO BE CALCULATED AT DEMURRAGE
RATE PER DAY PRO RATA PLUS COSTS FOR ADDITIONAL BUNKERS
CONSUMED AS PER MASTERS INVOICE PRESENTED BY OWNERS.
DEVIATION, TIME USED, BUNKERS CONS BUNKERS CONSUMED AND PORT COSTS
AS PER AGENTS PROFORMA D/A TO BE PAID TOGETHER WITH
FREIGHT AS PER OWNERS TELEXED INVOICE, WHICH LATER
TO BE SUPPORTED BY HARD COPY DOCUMENTATION.

TRAFIGURA TERMS AND BPVOY AS AMENDED
====================================

  B P VOY 3 AS AMENDED
  --------------------

  - SPEED ABT 14 KTS WSNP
  - DELETE LINE 51-63
  - LINE 56 INSERT 'HOWEVER THE SAFETY OF SAME ALWAYS TO BE AT MASTERS
    DISCRESTION, WHICH NOT TO BE UNREASONABLY WITHELD' AFTER 'CHTS'
  - LINE 74 ADD 'UNLESS SO STIPULATED BY WORLDSCALE'
  - LINE 74 INSERT AFTER 'SEA' WHICH SUBJECT TO MASTERS APPROVAL WHICH
    NOT TO BE UNREASONABLY WITHELD'
  - LINE 79 ADD 'LAYTIME TO COMMENCE TENDERING NOR UPON ARRIVAL AT
    LIGHTERING POSITION' DELELTE 'WHEN THE VSL IS PROPERLY TIED UP AND
    MOORED ALONGSIDE THE LIGHTERING VSL'
  - LINE 116 - 133 DELETE
  - LINE 136 - ADD 'UNLESS SO STIPULATED BY WS'
  - LINE 146 (FREIGHT PAYMENT DETAILS SEE ABOVE)
  - LINE 150 AFTER CLAUSED 8 INSERT 'SEE ALSO NO.5 OF TRAFIGURA
    CLS 1991 ATTACHED
  - LINE 157 INSERT AFTER 'APPOINT TWO INDEPENDANT SURVEYORS, ONE
    APPOINTED BY CHTS AND ONE APPOINTED AND PAID FOR BY OWNERS'
  - LINE 158 AFTER 'PUMPS' ADD 'PROVIDED MASTER HAS ENSURED CORRECT
    TRIM PROCEDURES TO MAXIMISE CARGO OUTTURN'
  - LINE 159 DELETE AFTER 'CHTS' AND REST OF LINE AND INSERT 'SHALL
    HAVE THE RIGHT TO CLAIM FROM OWNERS AN AMOUNT EQUAL TO'
  - LINE 162 DELETE 'DEDUCTION FRM FRT' INSERT 'A CLAIM'
  - LINE 164 DELETE INSERT 'THAN THEIR QUANTIFIED CLAIM'
  - LINE 192 - 201 DELETE
  - LINE 203 INSERT 'TAXES AND/OR DUES IN CGO AND/OR FRT TO BE FOR
    CHTS ACCOUNT AND SETTLED DIRECTLY BY THEM'
  - LINE 220 AFTER 'MANIOFOLD' INSERT 'EXCEPT WHEN STRIPPING'
    LINE 220 INSERT 'AVERAGE' BEFORE 'PRESSURE OF'
  - LINE 244 INSERT ' JULY 18TH 2007'
  - LINE 245 INSERT 'JULY 20TH 2007'
  - LINE 256 DELETE '96 HRS' INSERT '48 HRS - SUNDAY AND HOLIDAYS
    EXCLUDED'
  - LINE 264 INSERT '72'
  - LINE 269 DELETE AFTER 'DISCHARGING' UNTIL 'CHTS' IN LINE 270
  - LINE 274 DELETE 'RECEIVED' AND INSERT 'TENDERED'
  - LINE 275 DELETE 'FROM' INSERT 'BY'
  - LINE 276 DELETE FROM 'COMMENCES...' UNTIL 'PLACE' INSERT 'ALL
    FAST'
  - LINE 303 AFTER 'PEOPLES' INSERT 'AND ANY OTHER CLAUSE'
  - CLAUSE 24 - INSERT MAXIMUM FOUR DAYS
  - LINE 350-358 DELETE
  - LINE 359-366 DELETE
  - LINE 409-433 DELETE
  - LINE 448 ADD 'IN ACCORDANCE WITH OWNERS P AND I CLUB WORDING AND
    DETAILED IN ACCORDANCE WITH APPENDIX AA AND BB HEREOF'
  - LINE 459-461 DELETE
  - LINE 462-476 DELETE
  - LINE 477 ADD 'OWNERS TO RETURN TO CHTS 2/3 ORIGINAL B/L TOGETHER
    WITH OWNERS RECEIPT FOR 1/3 ORIGINAL B/L WITHIN 21 DAYS OF
    RECEIPT'
  - LINE 520 ADD 'HOWEVER SWIFT TRANSPORTATION INC ALWAYS TO REMAIN
    RESPONSIBLE FOR THE PERORMANCE OF THIS C/P'
  - LINE 521-523 DELETE
  - LINE 559 ADD 'OR ANY OTHER CAUSE BEYOND CHTS CONTROL'

4

- LINE 634 INSERT AFTER '1974' WITH AS AMENDED 1990'
- LINE 683-716 DEL AND INSERT '1/ IS A TANKER OWNED BY A MEMBER OF
  THE INTERNATIONAL TANKER OWNERS POLLUTION FEDERATION LIMITED AND
  WILL SO REMAIN THROUGHOUT THE CHARTER AND 2/ IS ENTERED IN THE
  FOLLOWING P AND I CLUB (OVERSEAS LIMAR) GARD OR FREJA HAFNIA (JAPAN SHIP
  OWNERS MUTUAL PROTECTION AND IDEMNITY) AND WILL SO REMAIN UNLESS OWNERS HAVE
  GIVEN CHARTERERS PRIOR WRITTEN NOTICE FO THEIR INTENTION TO
  CHANGE.
  OWNERS WARRANT THAT THE VESSEL WILL ONLY BE ENTERED IN A P AND I
  CLUB WITHIN THE INTERNATIONAL GROUP OF P AND I CLUBS'
- LINE 717-729 DELETE

- CONOCO WEATHER CLAUSE
- HESS SHIFTING CLAUSE

TRAFIGURA CLAUSES 1-19(02.02.2001) AMENDED AS FOLLOWS:
-------------------------------------------------------

CLS 4 LINE 2 - DELETE 0.3 AND INSERT 0.5
      LINE 3 - DELETE 'DEDUCT FROM FREIGHT' AND INSERT 'CLAIM FROM
      OWNERS'
      LINE 4 - DELETE 'AND INSURANCE'
      ADD AT THE END OF CLAUSE 'IRRESPECTIVE OF ABOVE OWNRS TO
      MANTAIN ALL HAGUE VISBY RULES AND DEFENCE'
CLS 5 AFTER 'PAID' INSERT ' ON DEVIATION, ADD COMM TO BE PAID ONLY
      ON TIME ITEMIZED AS DEMURRAGE'
CLS 6 DELETE
CLS 7 DELETE
CLS 8 TO BE ADVISED PRIOR FIXING ADD AT BEGINNING 'IF REQUESTED'

CLS 9 PARA 1 DELETE LAST SENTENCE CLS 12 FIRST LINE AFTER 'THAT' INSERT
      'TO BEST OF THEIR KNOWLEDGE'
CLS 13 ADD AT END 'ANY CONTAMINATION BY VIRTUE OF
       CLEANING TO BE FOR CHARTERERS RISK'
CLS 15 7TH LINE AFTER 'CERTIFICATE' INSERT ' WHICH OWNERS SUBMIT
       CHARTERERS AS SOON AS POSSIBLE'
       8TH/9TH LINE DELETE
       12TH LINE AFTER 'ANY' INSERT 'DIRECT'
CLS 16 DELETE
CLS 18 DELETE SEE MAIN TERMS

1.25 % ADDRESS AND 1.25% PETRIAN SHIPBROKERS LLP ON FT/DFT AND DEMURRAGE

BEST REGARDS

SIMON LANE
PETRIAN SHIPBROKERS LLP

REC.

## LAYTIME STATEMENT

VESSEL            : OVERSEAS LIMAR          OUR REF. : 267517

COMPANY           : SWIFT

### LOCATIONS SUMMARY

| LOCATION | TIME USED |
|----------|-----------|
| SHUAIBA, KUWAIT | 32H 54M |
| PANAMA | 57H 59M |
| HOUSTON, TX | 48H 49M |
| **TIME TO COUNT** | **: 139H 42M** |
| **LAYTIME ALLOWED** | **: 72H 00M** |
| **TIME ON DEMURRAGE** | **: 67H 42M** |

### DEMURRAGE :

| HOURS MINS | DEM. (%) | RATE | AMOUNT |
|------------|----------|------|--------|
| 67H 42M | 100 | 30,000.00 | 84,625.00 |

**TOTAL DEMURRAGE AMOUNT :**                                          **USD 84,625.00**

REC.

## LAYTIME STATEMENT

| | | |
|---|---|---|
| VESSEL | : OVERSEAS LIMAR | OUR REF. : 267517 |
| LOADING PORT | : SHUAIBA,KUWAIT | DATE : 29/07/07 - 30/07/07 |
| COMPANY | : SWIFT | |

| ACTIVITIES | DATE | TIME |
|---|---|---|
| NOR | 29-07-07 | 01:30 |
| TIME STARTS COUNTING | 29-07-07 | 04:36 |
| ALL FAST | 29-07-07 | 04:36 |
| STARTED LOADING | 29-07-07 | 08:20 |
| FINISHED LOADING | 30-07-07 | 07:20 |
| HOSES DISCONNECTED | 30-07-07 | 09:35 |
| DOCUMENTS ON BOARD | 30-07-07 | 15:30 |
| TIME STOPS COUNTING | 30-07-07 | 15:30 |
| **TOTAL TIME TO COUNT** | | **34H 54M** |

| DEDUCTIONS | FROM | TO | DEDUCTION | TIME(%) | NET |
|---|---|---|---|---|---|
| DOCS ALLOWANCE | | | 02H 00M | 100 | 02H 00M |
| **TOTAL NET DEDUCTIONS** | | | | | **02H 00M** |

| | | |
|---|---|---|
| **TOTAL TIME TO COUNT** | : | 34H 54M |
| **TOTAL NET DEDUCTIONS** | : | 02H 00M |
| **NET TIME TO COUNT** | : | 32H 54M |

**REC.**

**LAYTIME STATEMENT**

| | |
|---|---|
| VESSEL          : **OVERSEAS LIMAR** | OUR REF. : **267517** |
| DISCHARGING PORT : **PANAMA** | DATE : **16/09/07 - 19/09/07** |
| COMPANY          : **SWIFT** | |

| ACTIVITIES | DATE | TIME |
|---|---|---|
| TIME STARTS COUNTING | 16-09-07 | 10:48 |
| ARRIVED | 16-09-07 | 10:48 |
| SAILED | 19-09-07 | 20:47 |
| TIME STOPS COUNTING | 19-09-07 | 20:47 |
| **TOTAL TIME TO COUNT** | | **81H 59M** |

| DEDUCTIONS | FROM | TO | DEDUCTION | TIME(%) | NET |
|---|---|---|---|---|---|
| PER AGREEMENT | | | 24H 00M | 100 | 24H 00M |
| **TOTAL NET DEDUCTIONS** | | | | | **24H 00M** |

| | | |
|---|---|---|
| **TOTAL TIME TO COUNT** | : | 81H 59M |
| **TOTAL NET DEDUCTIONS** | : | 24H 00M |
| **NET TIME TO COUNT** | : | 57H 59M |

REC.

## LAYTIME STATEMENT

| | | | |
|---|---|---|---|
| VESSEL | : OVERSEAS LIMAR | OUR REF. : 267517 | |
| DISCHARGING PORT | : HOUSTON, TX | DATE : 26/09/07 - 29/09/07 | |
| COMPANY | : SWIFT | | |

| ACTIVITIES | | DATE | TIME |
|---|---|---|---|
| NOR | | 26-09-07 | 08:00 |
| TIME STARTS COUNTING | | 26-09-07 | 08:00 |
| ANCHOR UP | | 26-09-07 | 23:10 |
| ALL FAST | | 27-09-07 | 06:36 |
| STARTED DISCHARGING | | 27-09-07 | 13:15 |
| FINISHED DISCHARGING | | 29-09-07 | 00:20 |
| HOSES DISCONNECTED | | 29-09-07 | 01:40 |
| TIME STOPS COUNTING | | 29-09-07 | 01:40 |
| **TOTAL TIME TO COUNT** | | | **65H 40M** |

| DEDUCTIONS | FROM | TO | DEDUCTION | TIME(%) | NET |
|---|---|---|---|---|---|
| NOR | 26-09 08:00 | | 06H 00M | 100 | 06H 00M |
| MOVING IN | 26-09 23:10 | 27-09 06:36 | 07H 26M | 100 | 07H 26M |
| TVE INSPECT. | 27-09 09:10 | 27-09 12:35 | 03H 25M | 100 | 03H 25M |
| **TOTAL NET DEDUCTIONS** | | | | | **16H 51M** |

| | | |
|---|---|---|
| **TOTAL TIME TO COUNT** | : | 65H 40M |
| **TOTAL NET DEDUCTIONS** | : | 16H 51M |
| **NET TIME TO COUNT** | : | 48H 49M |